## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| KAREN A. CARVELLI, Individually and On Behalf of All Others Similarly Situated, | ) ) ) **Case No.** |
| Plaintiff, | ) ) ) |
| v. | ) **CLASS ACTION COMPLAINT** ) |
| OCWEN FINANCIAL CORPORATION, RONALD M. FARIS, and MICHAEL R. BOURQUE JR., | ) **JURY TRIAL DEMANDED** ) ) ) |
| Defendants. | ) ) |

## CLASS ACTION COMPLAINT

Plaintiff Karen A. Carvelli ("Plaintiff"), individually and on behalf of all other persons similarly situated, by her undersigned attorneys, for her complaint against Defendants, alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Ocwen Financial Corporation ("Ocwen" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired Ocwen securities between May 11, 2015 and April 19, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.    Ocwen Financial Corporation is diversified financial services holding company. The Company's primary businesses are the acquisition, servicing, and resolution of sub-performing and nonperforming residential and commercial mortgage loans, as well as the related development of loan servicing technology and business-to business e-commerce solutions for the mortgage and real estate industries.

3.    Founded in 1988, the Company is headquartered in West Palm Beach, Florida. Ocwen's stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "OCN."

4.    Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Ocwen engaged in significant and systemic misconduct at nearly every stage of the mortgage servicing process; (ii) the foregoing conduct, when it became known would subject the Company to heightened regulatory scrutiny and potential criminal sanctions; (iii) as a result of the foregoing, Ocwen's public statements were materially false and misleading at all relevant times.

5.    On April 20, 2017, the U.S. Consumer Financial Protection Bureau ("CFPB") issued a press release entitled "Consumer Financial Protection Bureau sues Ocwen for failing

2

borrowers throughout mortgage servicing process," reporting that the Company had generated errors in borrowers' accounts, failed to credit payments, illegally foreclosed on homeowners, and charged borrowers for add-on products without their consent.  The press release, in part:

> **WASHINGTON, D.C.** — The Consumer Financial Protection Bureau (CFPB) today sued one of the country's largest nonbank mortgage loan servicers, Ocwen Financial Corporation, and its subsidiaries for failing borrowers at every stage of the mortgage servicing process. *The Bureau alleges that Ocwen's years of widespread errors, shortcuts, and runarounds cost some borrowers money and others their homes. Ocwen allegedly botched basic functions like sending accurate monthly statements, properly crediting payments, and handling taxes and insurance. Allegedly, Ocwen also illegally foreclosed on struggling borrowers, ignored customer complaints, and sold off the servicing rights to loans without fully disclosing the mistakes it made in borrowers' records*. The Florida Attorney General took a similar action against Ocwen today in a separate lawsuit. Many state financial regulators are also independently issuing cease-and-desist and license revocation orders against Ocwen for escrow management and licensing issues today.
>
> "Ocwen has repeatedly made mistakes and taken shortcuts at every stage of the mortgage servicing process, costing some consumers money and others their homes," said CFPB Director Richard Cordray. "Borrowers have no say over who services their mortgage, so the Bureau will remain vigilant to ensure they get fair treatment."
>
> Ocwen, headquartered in West Palm Beach, Fla., is one of the nation's largest nonbank mortgage servicers. As of Dec. 31, 2016, Ocwen serviced almost 1.4 million loans with an aggregate unpaid principal balance of $209 billion. It services loans for borrowers in all 50 states and the District of Columbia. A mortgage servicer collects payments from the mortgage borrower and forwards those payments to the owner of the loan. It handles customer service, collections, loan modifications, and foreclosures. Ocwen specializes in servicing subprime or delinquent loans.
>
> *The CFPB uncovered substantial evidence that Ocwen has engaged in significant and systemic misconduct at nearly every stage of the mortgage servicing process.* The CFPB is charged with enforcing the Dodd-Frank Wall Street Reform and Consumer Protection Act, which protects consumers from unfair, deceptive, or abusive acts or practices, and other federal consumer financial laws. In addition, the Bureau adopted common-sense rules for the mortgage servicing market that first took effect in January 2014. The CFPB's mortgage servicing rules require that servicers promptly credit payments and correct errors on request. The rules also include strong protections for struggling homeowners, including those facing foreclosure. In its lawsuit, the CFPB alleges that Ocwen:

- **Serviced loans using error-riddled information**: Ocwen uses a proprietary system called REALServicing to process and apply borrower payments, communicate payment information to borrowers, and maintain loan balance information. Ocwen allegedly loaded inaccurate and incomplete information into its REALServicing system. And even when data was accurate, REALServicing generated errors because of system failures and deficient programming. To manage this risk, Ocwen tried manual workarounds, but ***they often failed to correct inaccuracies and produced still more errors. Ocwen then used this faulty information to service borrowers' loans. In 2014, Ocwen's head of servicing described its system as "ridiculous" and a "train wreck."***

- **Illegally foreclosed on homeowners**: Ocwen has long touted its ability to service and modify loans for troubled borrowers. But allegedly, Ocwen has failed to deliver required foreclosure protections. As a result, the Bureau alleges that ***Ocwen has wrongfully initiated foreclosure proceedings on at least 1,000 people, and has wrongfully held foreclosure sales. Among other illegal practices, Ocwen has initiated the foreclosure process before completing a review of borrowers' loss mitigation applications.*** In other instances, Ocwen has asked borrowers to submit additional information within 30 days, but foreclosed on the borrowers before the deadline. Ocwen has also foreclosed on borrowers who were fulfilling their obligations under a loss mitigation agreement.

- **Failed to credit borrowers' payments**: Ocwen has allegedly failed to appropriately credit payments made by numerous borrowers. Ocwen has also failed to send borrowers accurate periodic statements detailing the amount due, how payments were applied, total payments received, and other information. Ocwen has also failed to correct billing and payment errors.

- **Botched escrow accounts**: Ocwen manages escrow accounts for over 75 percent of the loans it services. Ocwen has allegedly botched basic tasks in managing these borrower accounts. Because of system breakdowns and an over-reliance on manually entering information, Ocwen has allegedly failed to conduct escrow analyses and sent some borrowers' escrow statements late or not at all. Ocwen also allegedly failed to properly account for and apply payments by borrowers to address escrow shortages, such as changes in the account when property taxes go up. One result of this failure has been that some borrowers have paid inaccurate amounts.

- **Mishandled hazard insurance:** If a servicer administers an escrow account for a borrower, a servicer must make timely insurance and/or tax payments on behalf of the borrower. Ocwen, however, has allegedly failed to make timely insurance payments to pay for borrowers' home insurance premiums. Ocwen's failures led to the lapse of homeowners' insurance

4

coverage for more than 10,000 borrowers. Some borrowers were pushed into force-placed insurance.

- **Bungled borrowers' private mortgage insurance:** Ocwen allegedly failed to cancel borrowers' private mortgage insurance, or PMI, in a timely way, causing consumers to overpay. Generally, borrowers must purchase PMI when they obtain a mortgage with a down payment of less than 20 percent, or when they refinance their mortgage with less than 20 percent equity in their property. Servicers must end a borrower's requirement to pay PMI when the principal balance of the mortgage reaches 78 percent of the property's original value. Since 2014, Ocwen has failed to end borrowers' PMI on time after learning information in its REALServicing system was unreliable or missing altogether. Ocwen ultimately overcharged borrowers about $1.2 million for PMI premiums, and refunded this money only after the fact.

- **Deceptively signed up and charged borrowers for add-on products:** When servicing borrowers' mortgage loans, Ocwen allegedly enrolled some consumers in add-on products through deceptive solicitations and without their consent. Ocwen then billed and collected payments from these consumers.

- **Failed to assist heirs seeking foreclosure alternatives:** Ocwen allegedly mishandled accounts for successors-in-interest, or heirs, to a deceased borrower. These consumers included widows, children, and other relatives. As a result, Ocwen failed to properly recognize individuals as heirs, and thereby denied assistance to help avoid foreclosure. In some instances, Ocwen foreclosed on individuals who may have been eligible to save these homes through a loan modification or other loss mitigation option.

- **Failed to adequately investigate and respond to borrower complaints:** If an error is made in the servicing of a mortgage loan, a servicer must generally either correct the error identified by the borrower, called a notice of error, or investigate the alleged error. Since 2014, Ocwen has allegedly routinely failed to properly acknowledge and investigate complaints, or make necessary corrections. Ocwen changed its policy in April 2015 to address the difficulty its call center had in recognizing and escalating complaints, but these changes fell short. Under its new policy, borrowers still have to complain at least five times in nine days before Ocwen automatically escalates their complaint to be resolved. Since April 2015, Ocwen has received more than 580,000 notices of error and complaints from more than 300,000 different borrowers.

- **Failed to provide complete and accurate loan information to new servicers:** Ocwen has allegedly failed to include complete and accurate borrower information when it sold its rights to service thousands of loans to

new mortgage servicers. This has hampered the new servicers' efforts to comply with laws and investor guidelines.

***The Bureau also alleges that Ocwen has failed to remediate borrowers for the harm it has caused, including the problems it has created for struggling borrowers who were in default on their loans or who had filed for bankruptcy***. For these groups of borrowers, Ocwen's servicing errors have been particularly costly.

(Emphasis added.)

6.      On that same day, it was further reported that the North Carolina Office of the Commissioner of Banks and state regulators from more than twenty states issued a cease-and-desist order (the "Order") to Ocwen's subsidiaries as a result of the Company's mishandling of consumer escrow accounts and a deficient financial condition.  The Order "specifically prohibits the acquisition of new mortgage servicing rights and the origination of mortgage loans by Ocwen Loan Servicing (NMLS number 1852), a subsidiary of Ocwen, until the company is able to prove it can appropriately manage its consumer mortgage escrow accounts."

7.      On this news, Ocwen's share price fell $2.91, or 53.89%, to close at $2.49 on April 20, 2017.

8.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

10.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act.

11.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b). Ocwen's principal executive offices are located within this Judicial District.

12.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

13.     Plaintiff, as set forth in the attached Certification, acquired Ocwen securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

14.     Defendant Ocwen is incorporated in Florida.  The Company's principal executive offices are located at 1661 Worthington Road, Suite 100, West Palm Beach, Florida 33409. Ocwen's shares trade on the NYSE under the ticker symbol "OCN."

15.     Defendant Ronald M. Farris ("Farris") has served as the Company's Chief Executive Officer ("CEO") since October 2010, as its President since March 2001 and as its Director since May 2003.

16.     Defendant Michael R. Bourque Jr. ("Bourque") has served as the Company's Chief Financial Officer ("CFO") and Executive Vice President since June 2014.

17.     The defendants referenced above in ¶¶ 15-16 are sometimes referred to herein as the "Individual Defendants."

**SUBSTANTIVE ALLEGATIONS**

**Background**

7

18.     Ocwen Financial Corporation is diversified financial services holding company. The Company's primary businesses are the acquisition, servicing, and resolution of sub-performing and nonperforming residential and commercial mortgage loans, as well as the related development of loan servicing technology and business-to business e-commerce solutions for the mortgage and real estate industries.

**Materially False and Misleading Statements Issued During the Class Period**

19.     The Class Period begins on May 11, 2015, when Ocwen filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2014 (the "2014 10-K").  For the quarter, Ocwen reported a net loss of $598.37 million, or $4.77 per diluted share, on net revenue of $366.18 million, compared to net income of $135.28 million, or $0.95 per diluted share, on net revenue of $488.83 million for the same period in the prior year.  For 2014, Ocwen reported a net loss of $469.80 million, or $3.60 per diluted share, on net revenue of $1.59 billion, compared to net income of $310.42 million, or $2.13 per diluted share, on net revenue of $1.65 billion for 2013.

20.     In the 2014 10-K, the Company stated, in part:

> Our business is subject to extensive regulation by federal, state and local governmental authorities, including the Consumer Financial Protection Bureau (CFPB), the Department of Housing and Urban Development (HUD), the Securities and Exchange Commission (SEC) and various state agencies that license, audit and conduct examinations of our mortgage servicing, origination and collection activities. In addition, we operate under a number of regulatory settlements that subject us to ongoing monitoring or reporting. From time to time, we also receive requests from federal, state and local agencies for records, documents and information relating to the policies, procedures and practices of our mortgage servicing, origination and collection activities. The GSEs and their conservator, the Federal Housing Finance Authority (FHFA), Ginnie Mae, the United States Treasury Department, various investors, non-Agency securitization trustees and others also subject us to periodic reviews and audits.
>
> As a result of the current regulatory environment, we have faced and expect to continue to face increased regulatory and public scrutiny as well as stricter and more comprehensive regulation of our business. ***We continue to work diligently to***

*assess and understand the implications of the regulatory environment in which we operate and to meet the requirements of the changing environment in which we operate. We devote substantial resources to regulatory compliance, while, at the same time, striving to meet the needs and expectations of our customers, clients and other stakeholders.* Our failure to comply with applicable federal, state and local laws, regulations and licensing requirements could lead to any of the following: (i) loss of our licenses and approvals to engage in our servicing and lending businesses, (ii) governmental investigations and enforcement actions, (iii) administrative fines and penalties and litigation, (iv) civil and criminal liability, including class action lawsuits, (v) breaches of covenants and representations under our servicing, debt or other agreements, (vi) inability to raise capital or (vii) inability to execute on our business strategy.

We must comply with a large number of federal, state and local consumer protection laws including, among others, the Gramm-Leach-Bliley Act, the Fair Debt Collection Practices Act, the Real Estate Settlement Procedures Act (RESPA), the Truth in Lending Act (TILA), the Fair Credit Reporting Act, the Service members Civil Relief Act, the Homeowners Protection Act, the Federal Trade Commission Act, the Equal Credit Opportunity Act, the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act) and state foreclosure laws. These statutes apply to loan origination, debt collection, use of credit reports, safeguarding of non-public personally identifiable information about our customers, foreclosure and claims handling, investment of and interest payments on escrow balances and escrow payment features, and mandate certain disclosures and notices to borrowers. These requirements can and do change as statutes and regulations are enacted, promulgated, amended, interpreted and enforced. The recent trend among federal, state and local lawmakers and regulators has been toward increasing laws, regulations and investigative proceedings with regard to residential real estate lenders and servicers.

(Emphasis added.)

21.     The 2014 10-K contained signed certifications pursuant to the Sarbanes Oxley Act of 2002 ("SOX") by the Individual Defendants, stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

22.     On May 18, 2015, Ocwen filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q1 2015 10-Q").  For the quarter, Ocwen reported net income of $34.36 million, or $0.27

per diluted share, on net revenue of $423.03 million, compared to net income of $60.5 million, or $0.43 per diluted share, on net revenue of $420.9 million for the same period in the prior year.

23.     The Q1 2015 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q1 2015 10-Q was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

24.     On July 31, 2015, Ocwen filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q2 2015 10-Q").  For the quarter, Ocwen reported net income of $9.74 million, or $0.08 per diluted share, on net revenue of $373.70 million, compared to net income of $66.96 million, or $0.48 per diluted share, on net revenue of $422.64 million for the same period in the prior year.

25.     The Q2 2015 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q2 2015 10-Q was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

26.     On October 29, 2015, Ocwen filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 10-Q").  For the quarter, Ocwen reported a net loss of $66.87 million, or $0.53 per diluted share, on net revenue of $333.57 million, compared to a net loss of $75.38 million, or $0.58 per diluted share, on net revenue of $382.77 million for the same period in the prior year.

27.     The Q3 2015 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q3 2015 10-Q was

accurate and disclosed any material changes to the Company's internal controls over financial reporting.

28.     On February 29, 2016, Ocwen filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2015 (the "2015 10-K").  For the quarter, Ocwen reported a net loss of $224.24 million, or $1.79 per diluted share, on net revenue of $230.67 million, compared to a net loss of $598.37 million, or $4.77 per diluted share, on net revenue of $366.18 million for the same period in the prior year.  For 2015, Ocwen reported a net loss of $247.02 million, or $1.97 per diluted share, on net revenue of $1.36 billion, compared a net loss of $469.80 million, or $3.60 per diluted share, on net revenue of $1.59 billion for 2014.

29.     In the 2015 10-K, the Company stated, in part:

> Our business is subject to extensive regulation by federal, state and local governmental authorities, including the Consumer Financial Protection Bureau (CFPB), the Department of Housing and Urban Development (HUD), the Securities and Exchange Commission (SEC) and various state agencies that license, audit and conduct examinations of our loan servicing, origination and collection activities. In addition, we operate under a number of regulatory settlements that subject us to ongoing monitoring or reporting. From time to time, we also receive requests from federal, state and local agencies for records, documents and information relating to the policies, procedures and practices of our loan servicing, origination and collection activities. The GSEs and their conservator, the Federal Housing Finance Authority (FHFA), Ginnie Mae, the United States Treasury Department, various investors, non-Agency securitization trustees and others also subject us to periodic reviews and audits.

> In the current regulatory environment, we have faced and expect to continue to face increased regulatory and public scrutiny as an organization as well as stricter and more comprehensive regulation of the entire mortgage sector. ***We continue to work diligently to assess and understand the implications of the regulatory environment in which we operate and to meet the requirements of the changing environment in which we operate. We devote substantial resources to regulatory compliance, while, at the same time, striving to meet the needs and expectations of our customers, clients and other stakeholders.*** Our failure to comply with applicable federal, state and local laws, regulations and licensing requirements could lead to any of the following (i) loss of our licenses and approvals to engage in our servicing and lending businesses, (ii) governmental investigations and

enforcement actions, (iii) administrative fines and penalties and litigation, (iv) civil and criminal liability, including class action lawsuits, (v) breaches of covenants and representations under our servicing, debt or other agreements, (vi) inability to raise capital or (vii) inability to execute on our business strategy.

We must comply with a large number of federal, state and local consumer protection laws including, among others, the Gramm-Leach-Bliley Act, the Fair Debt Collection Practices Act, the Real Estate Settlement Procedures Act (RESPA), the Truth in Lending Act (TILA), the Fair Credit Reporting Act, the Servicemembers Civil Relief Act, the Homeowners Protection Act, the Federal Trade Commission Act, the Telephone Consumer Protection Act, the Equal Credit Opportunity Act, the Dodd-Frank Wall Street Reform and Consumer Protection Act and state foreclosure laws. These statutes apply to many facets of our business, including loan origination, default servicing and collections, use of credit reports, safeguarding of non-public personally identifiable information about our customers, foreclosure and claims handling, investment of and interest payments on escrow balances and escrow payment features, and mandate certain disclosures and notices to borrowers. These requirements can and do change as statutes and regulations are enacted, promulgated, amended, interpreted and enforced. The recent trend among federal, state and local lawmakers and regulators has been toward increasing laws, regulations and investigative proceedings with regard to residential real estate lenders and servicers.

(Emphasis added.)

30.     The 2015 10-K contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the 2015 10-K was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

31.     On April 28, 2016, Ocwen filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2016 (the "Q1 2016 10-Q").  For the quarter, Ocwen reported a net loss of $111.33 million, or $0.90 per diluted share, on net revenue of $230.03 million, compared to net income of $34.36 million, or $0.27 per diluted share, on net revenue of $423.03 million for the same period in the prior year.

32.     The Q1 2016 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q1 2016 10-Q was

accurate and disclosed any material changes to the Company's internal controls over financial reporting.

33.     On July 28, 2016, Ocwen filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2016 (the "Q2 2016 10-Q").  For the quarter, Ocwen reported a net loss of $87.38 million, or $0.71 per diluted share, on net revenue of $288.01 million, compared to net income of $9.74 million, or $0.08 per diluted share, on net revenue of $373.70 million for the same period in the prior year.

34.     The Q2 2016 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q2 2016 10-Q was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

35.     On October 27, 2016, Ocwen filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2016 (the "Q3 2016 10-Q").  For the quarter, Ocwen reported net income of $9.39 million, or $0.08 per diluted share, on net revenue of $259.31 million, compared to a net loss of $66.87 million, or $0.53 per diluted share, on net revenue of $333.57 million for the same period in the prior year.

36.     The Q3 2016 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q3 2016 10-Q was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

37.     On February 17, 2017, Ocwen issued a press release entitled "Ocwen enters into comprehensive settlement with California Department Of Business Oversight," announcing a

comprehensive settlement with the State of California in connection with allegations on non-compliance with state laws, brought in 2015 after Ocwen failed to turn over documents and an auditor "found Ocwen committed hundreds of violations of state and federal laws and regulations." In the press release, the Company stated, in part:

> WEST PALM BEACH, Fla., Feb. 17, 2017 (GLOBE NEWSWIRE) -- Ocwen Financial Corporation (NYSE:OCN) (Ocwen or the Company) today announced a comprehensive settlement and termination of the January 2015 Consent Order between Ocwen Loan Servicing, LLC and the State of California Department of Business Oversight (DBO), without admitting any wrongdoing.

> Under this settlement, the DBO will lift its prior restriction on Ocwen's ability to acquire mortgage servicing rights associated with California properties, and will terminate the engagement of the independent  auditor, which has been in place under the prior Consent Order in California.

> In addition, Ocwen has agreed to pay a cash settlement of $25 million to the DBO. As previously communicated, the Company has reserved for this settlement as of September 30, 2016. Ocwen will also provide an additional $198 million in debt forgiveness through loan modifications to existing California borrowers over a three year period, as permitted under various servicing agreements.

> "Ocwen is pleased to have reached a comprehensive settlement with the DBO related to matters the agency raised, and we will quickly move forward to implement all terms associated with this agreement," commented Ron Faris, President and CEO of Ocwen. "The settlement resolves claims between Ocwen and the DBO without the Company admitting to any wrongdoing, and will allow us to focus on our business going forward, while reducing a significant expense by terminating the engagement of the independent auditor."

38.     On February 23, 2017, Ocwen filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2016 (the "2016 10-K").  For the quarter, Ocwen reported a net loss of $10.44 million, or $0.08 per diluted share, on net revenue of $224.80 million, compared to a net loss of $224.24 million, or $1.79 per diluted share, on net revenue of $230.67 million for the same period in the prior year.  For 2016, Ocwen reported a net loss of $199.76 million, or $1.61 per diluted

share, on net revenue of $1 billion, compared to a net loss of $247.02 million, or $1.97 per diluted

share, on net revenue of $1.36 billion for 2015.

39.     In the 2016 10-K, the Company stated, in part:

Our business is subject to extensive oversight and regulation by federal, state and local governmental authorities, including the CFPB, HUD, the SEC and various state agencies that license, audit and conduct examinations of our loan servicing, origination and collection activities. From time to time, we also receive requests (including requests in the form of subpoenas and civil investigative demands) from federal, state and local agencies for records, documents and information relating to the policies, procedures and practices of our loan servicing, origination and collection activities. In addition, we operate under a number of regulatory settlements that subject us to ongoing monitoring or reporting. See the next risk factor below for examples of matters we settled in 2014 and 2015, respectively, with the State of New York and the State of California. The GSEs (and their conservator, the FHFA), Ginnie Mae, the United States Treasury Department, various investors, non-Agency securitization trustees and others also subject us to periodic reviews and audits.

In the current regulatory environment, we have faced and expect to continue to face heightened regulatory and public scrutiny as an organization as well as stricter and more comprehensive regulation of the entire mortgage sector. ***We must devote substantial resources to regulatory compliance, and we incur, and expect to continue to incur, significant ongoing costs to comply with new and existing laws and governmental regulation of our business.*** If we fail to effectively manage our regulatory and contractual compliance obligations, the resources we are required to devote and our compliance expenses would likely increase.

We must comply with a large number of federal, state and local consumer protection laws including, among others, the Dodd-Frank Act, the Gramm-Leach-Bliley Act, the Fair Debt Collection Practices Act, RESPA, TILA, the Fair Credit Reporting Act, the Service members Civil Relief Act, the Homeowners Protection Act, the Federal Trade Commission Act, the Telephone Consumer Protection Act, the Equal Credit Opportunity Act, as well as individual state licensing and foreclosure laws and federal and local bankruptcy rules. These statutes apply to many facets of our business, including loan origination, default servicing and collections, use of credit reports, safeguarding of non-public personally identifiable information about our customers, foreclosure and claims handling, investment of and interest payments on escrow balances and escrow payment features, and mandate certain disclosures and notices to borrowers. These requirements can and do change as statutes and regulations are enacted, promulgated, amended, interpreted and enforced. See "Business - Regulation" for additional information regarding our regulators and the laws that apply to us.

(Emphasis added.)

40.     The 2016 10-K contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the 2016 10-K was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

41.     The statements referenced in ¶¶ 19-36 and 38-40 were materially false and misleading because defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, defendants made false and/or misleading statements and/or failed to disclose that: (i) Ocwen engaged in significant and systemic misconduct at nearly every stage of the mortgage servicing process; (ii) the foregoing conduct, when it became known would subject the Company to heightened regulatory scrutiny and potential criminal sanctions; (iii) as a result of the foregoing, Ocwen's public statements were materially false and misleading at all relevant times.

## The Truth Emerges

42.     On April 20, 2017, the CFPB issued a press release entitled "Consumer Financial Protection Bureau sues Ocwen for failing borrowers throughout mortgage servicing process," reporting that the Company had generated errors in borrowers' accounts, failed to credit payments, illegally foreclosed on homeowners, and charged borrowers for add-on products without their consent.  The press release, in part:

> **WASHINGTON, D.C.** — The Consumer Financial Protection Bureau (CFPB) today sued one of the country's largest nonbank mortgage loan servicers, Ocwen Financial Corporation, and its subsidiaries for failing borrowers at every stage of the mortgage servicing process. ***The Bureau alleges that Ocwen's years of widespread errors, shortcuts, and runarounds cost some borrowers money and others their homes. Ocwen allegedly botched basic functions like sending accurate monthly statements, properly crediting payments, and handling taxes and insurance. Allegedly, Ocwen also illegally foreclosed on struggling borrowers, ignored customer complaints, and sold off the servicing rights to loans without fully disclosing the mistakes it made in borrowers' records***. The Florida Attorney General took a similar action against Ocwen today in a separate lawsuit. Many state financial regulators are also independently issuing cease-and-desist and

16

license revocation orders against Ocwen for escrow management and licensing issues today.

"Ocwen has repeatedly made mistakes and taken shortcuts at every stage of the mortgage servicing process, costing some consumers money and others their homes," said CFPB Director Richard Cordray. "Borrowers have no say over who services their mortgage, so the Bureau will remain vigilant to ensure they get fair treatment."

Ocwen, headquartered in West Palm Beach, Fla., is one of the nation's largest nonbank mortgage servicers. As of Dec. 31, 2016, Ocwen serviced almost 1.4 million loans with an aggregate unpaid principal balance of $209 billion. It services loans for borrowers in all 50 states and the District of Columbia. A mortgage servicer collects payments from the mortgage borrower and forwards those payments to the owner of the loan. It handles customer service, collections, loan modifications, and foreclosures. Ocwen specializes in servicing subprime or delinquent loans.

***The CFPB uncovered substantial evidence that Ocwen has engaged in significant and systemic misconduct at nearly every stage of the mortgage servicing process.*** The CFPB is charged with enforcing the Dodd-Frank Wall Street Reform and Consumer Protection Act, which protects consumers from unfair, deceptive, or abusive acts or practices, and other federal consumer financial laws. In addition, the Bureau adopted common-sense rules for the mortgage servicing market that first took effect in January 2014. The CFPB's mortgage servicing rules require that servicers promptly credit payments and correct errors on request. The rules also include strong protections for struggling homeowners, including those facing foreclosure. In its lawsuit, the CFPB alleges that Ocwen:

- **Serviced loans using error-riddled information**: Ocwen uses a proprietary system called REALServicing to process and apply borrower payments, communicate payment information to borrowers, and maintain loan balance information. Ocwen allegedly loaded inaccurate and incomplete information into its REALServicing system. And even when data was accurate, REALServicing generated errors because of system failures and deficient programming. To manage this risk, Ocwen tried manual workarounds, but ***they often failed to correct inaccuracies and produced still more errors. Ocwen then used this faulty information to service borrowers' loans. In 2014, Ocwen's head of servicing described its system as "ridiculous" and a "train wreck."***

- **Illegally foreclosed on homeowners**: Ocwen has long touted its ability to service and modify loans for troubled borrowers. But allegedly, Ocwen has failed to deliver required foreclosure protections. As a result, the Bureau alleges that ***Ocwen has wrongfully initiated foreclosure proceedings on at least 1,000 people, and has wrongfully held foreclosure sales. Among other illegal practices, Ocwen has initiated the foreclosure process before***

***completing a review of borrowers' loss mitigation applications.*** In other instances, Ocwen has asked borrowers to submit additional information within 30 days, but foreclosed on the borrowers before the deadline. Ocwen has also foreclosed on borrowers who were fulfilling their obligations under a loss mitigation agreement.

- **Failed to credit borrowers' payments**: Ocwen has allegedly failed to appropriately credit payments made by numerous borrowers. Ocwen has also failed to send borrowers accurate periodic statements detailing the amount due, how payments were applied, total payments received, and other information. Ocwen has also failed to correct billing and payment errors.

- **Botched escrow accounts**: Ocwen manages escrow accounts for over 75 percent of the loans it services. Ocwen has allegedly botched basic tasks in managing these borrower accounts. Because of system breakdowns and an over-reliance on manually entering information, Ocwen has allegedly failed to conduct escrow analyses and sent some borrowers' escrow statements late or not at all. Ocwen also allegedly failed to properly account for and apply payments by borrowers to address escrow shortages, such as changes in the account when property taxes go up. One result of this failure has been that some borrowers have paid inaccurate amounts.

- **Mishandled hazard insurance:** If a servicer administers an escrow account for a borrower, a servicer must make timely insurance and/or tax payments on behalf of the borrower. Ocwen, however, has allegedly failed to make timely insurance payments to pay for borrowers' home insurance premiums. Ocwen's failures led to the lapse of homeowners' insurance coverage for more than 10,000 borrowers. Some borrowers were pushed into force-placed insurance.

- **Bungled borrowers' private mortgage insurance:** Ocwen allegedly failed to cancel borrowers' private mortgage insurance, or PMI, in a timely way, causing consumers to overpay. Generally, borrowers must purchase PMI when they obtain a mortgage with a down payment of less than 20 percent, or when they refinance their mortgage with less than 20 percent equity in their property. Servicers must end a borrower's requirement to pay PMI when the principal balance of the mortgage reaches 78 percent of the property's original value. Since 2014, Ocwen has failed to end borrowers' PMI on time after learning information in its REALServicing system was unreliable or missing altogether. Ocwen ultimately overcharged borrowers about $1.2 million for PMI premiums, and refunded this money only after the fact.

- **Deceptively signed up and charged borrowers for add-on products:** When servicing borrowers' mortgage loans, Ocwen allegedly enrolled some consumers in add-on products through deceptive solicitations and without

their consent. Ocwen then billed and collected payments from these consumers.

- ▪ **Failed to assist heirs seeking foreclosure alternatives:** Ocwen allegedly mishandled accounts for successors-in-interest, or heirs, to a deceased borrower. These consumers included widows, children, and other relatives. As a result, Ocwen failed to properly recognize individuals as heirs, and thereby denied assistance to help avoid foreclosure. In some instances, Ocwen foreclosed on individuals who may have been eligible to save these homes through a loan modification or other loss mitigation option.

- ▪ **Failed to adequately investigate and respond to borrower complaints:** If an error is made in the servicing of a mortgage loan, a servicer must generally either correct the error identified by the borrower, called a notice of error, or investigate the alleged error. Since 2014, Ocwen has allegedly routinely failed to properly acknowledge and investigate complaints, or make necessary corrections. Ocwen changed its policy in April 2015 to address the difficulty its call center had in recognizing and escalating complaints, but these changes fell short. Under its new policy, borrowers still have to complain at least five times in nine days before Ocwen automatically escalates their complaint to be resolved. Since April 2015, Ocwen has received more than 580,000 notices of error and complaints from more than 300,000 different borrowers.

- ▪ **Failed to provide complete and accurate loan information to new servicers:** Ocwen has allegedly failed to include complete and accurate borrower information when it sold its rights to service thousands of loans to new mortgage servicers. This has hampered the new servicers' efforts to comply with laws and investor guidelines.

*The Bureau also alleges that Ocwen has failed to remediate borrowers for the harm it has caused, including the problems it has created for struggling borrowers who were in default on their loans or who had filed for bankruptcy.* For these groups of borrowers, Ocwen's servicing errors have been particularly costly.

(Emphasis added.)

43.     On that same day, it was further reported that the North Carolina Office of the

Commissioner of Banks and state regulators from more than twenty states issued a cease-and-

desist order (the "Order") to Ocwen's subsidiaries as a result of the Company's mishandling of

consumer escrow accounts and a deficient financial condition.  The Order "specifically prohibits

the acquisition of new mortgage servicing rights and the origination of mortgage loans by Ocwen

Loan Servicing (NMLS number 1852), a subsidiary of Ocwen, until the company is able to prove it can appropriately manage its consumer mortgage escrow accounts."

44.     On this news, Ocwen's share price fell $2.91, or 53.89%, to close at $2.49 on April 20, 2017.

45.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

46.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Ocwen securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

47.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Ocwen securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Ocwen or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

48.      Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

49.      Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

50.      Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Ocwen;

- whether the Individual Defendants caused Ocwen to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Ocwen securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

51.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

52.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Ocwen securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Ocwen securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

53.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

54.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## <u>COUNT I</u>

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

55.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

56.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

57.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Ocwen securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Ocwen securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

58.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Ocwen securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Ocwen's finances and business prospects.

59.     By virtue of their positions at Ocwen, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended

thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.  Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

60.     Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or directors of Ocwen, the Individual Defendants had knowledge of the details of Ocwen's internal affairs.

61.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Ocwen.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Ocwen's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Ocwen securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Ocwen's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Ocwen securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

62.     During the Class Period, Ocwen securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Ocwen securities at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Ocwen securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Ocwen securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

63.     By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

64.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

65.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

66.     During the Class Period, the Individual Defendants participated in the operation and management of Ocwen, and conducted and participated, directly and indirectly, in the conduct of Ocwen's business affairs.  Because of their senior positions, they knew the adverse non-public information about Ocwen's misstatement of income and expenses and false financial statements.

67.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Ocwen's financial condition and results of operations, and to correct promptly any public statements issued by Ocwen which had become materially false or misleading.

68.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Ocwen disseminated in the marketplace during the Class Period concerning Ocwen's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Ocwen to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Ocwen within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Ocwen securities.

69.     Each of the Individual Defendants, therefore, acted as a controlling person of Ocwen.  By reason of their senior management positions and/or being directors of Ocwen, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Ocwen to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Ocwen and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

70.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Ocwen.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: April 21, 2017

Respectfully submitted,

**SHEPHERD, FINKELMAN, MILLER & SHAH LLP**

*/s/ Jayne A. Goldstein*
Jayne A. Goldstein
Florida Bar No. 14408
1625 North Commerce Parkway
Suite 320
Fort Lauderdale, FL 33326
Tel: (954) 515-0123
Fax: (866) 300-7367
jgoldstein@sfmslaw.com

27

**POMERANTZ LLP**
J. Alexander Hood II
Hui M. Chang
600 Third Avenue, 20th Floor
New York, NY 10016
Tel: (212) 661-1100
Fax: (212) 661-8665
ahood@pomlaw.com
hchang@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, IL 60603
Tel: (312) 377-1181
Fax: (312) 377-1184
pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*