UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 17-80500-CIV-Rosenberg/Hopkins

KAREN A. CARVELLI, et al.,

                Plaintiffs,

vs.

OCWEN FINANCIAL CORP., et al.,

                Defendants.
_____/

## ORDER REGARDING APPOINTMENT OF CLASS ACTION LEAD PLAINTIFF AND COUNSEL (DE 27, 28)

**THIS CAUSE** is before this Court upon an Order referring two motions to appoint the lead plaintiff and counsel in this proposed class action lawsuit to the undersigned for final disposition. (DE 41).

Presently before the Court are motions filed by two competing Plaintiffs: Ocwen Investors Group (OIG) and University of Puerto Rico Retirement System (UPR). (DE 27, 28). The Plaintiffs responded to each other's motion on June 28, 2017 (DE 33, 34), and filed reply papers on July 5, 2017 (DE 45, 46). The Court held an evidentiary hearing on July 11, 2017.

### BACKGROUND

Plaintiffs in this consolidated proposed class action have all purchased or otherwise acquired securities of Defendant Ocwen Financial Corporation ("the Corporation") since 2015. Plaintiffs contend that Defendants violated the Securities Exchange Act of 1934 by making materially false and misleading statements about the Corporation's "business, operational and compliance policies," which involved "significant and systemic misconduct at nearly every stage

of the mortgage servicing process." (DE 1 at p. 2). When this misconduct became public on April 20, 2017, the Corporation's share price fell nearly 54%, causing Plaintiffs to suffer significant damages. *Id.* at pgs. 2-6.

Currently before the Court are two competing motions for appointment of lead plaintiff and counsel. The first was filed by OIG, which is comprised of two individual investors (Randy McElhanon and Ryan Huseman), who together claim to have lost approximately $190,161.00, since the beginning of the Class Period, which OIG sets at January 13, 2015. (DE 27 at p. 5). OIG calculates their loss using the "retained shares" approach based on the "last-in-first-out" (LIFO) method of accounting. *Id.* at p. 9. OIG seeks to have Levi & Korsinsky LLP ("L & K") and Glancy, Prongay & Murray, LLP ("GPM") appointed as Co-Lead Counsel for the Class and for the Court to appoint Berman DeValerio ("BD") as Liaison Counsel. *Id.* at p. 5.

The second motion was filed by UPR, an institutional investor. UPR's motion states that it "incurred significant losses" as a result of investments made in the Defendant Corporation since May 11, 2015. (DE 28 at p. 7).[1] Attached to UPR's motion was a schedule of its transactions in the Corporation's securities. (DE 28-1 pgs. 7-9). In its response papers UPR specified that its losses were $192,850.00. (DE 34 at p. 7). In calculating its losses, UPR uses the "first-in, first-out" (FIFO) method of accounting. *Id.* at p. 10.[2] UPR seeks to have Abraham, Fruchter & Twersky, LLP ("AFT") appointed to serve as Lead Counsel. (DE 28 at p. 9).

---

[1] Notably, the Complaint originally filed in this case by Plaintiff Karen Carvelli (who has since withdrawn her motion for lead plaintiff) used a Class Period beginning on May 11, 2015, the same used by UPR. *See Piven v. Sykes Enterprises, Inc.,* 137 F. Supp. 2d 1295, 1303 (M.D. Fla. 2000)(where the class period had not been defined at the "preliminary stage" of appointing a lead plaintiff, court used the class period stated in the complaint since those dates were used in the notice to class members).

[2] UPR admits that using OIG's methodology (LIFO), UPR incurred a "smaller loss." (DE 34 at p. 10, n. 4). OIG calculates UPR's loss as $131,758.00 using the retained shares approach. (DE 33 at p. 3).

## **EVIDENTIARY HEARING**

Three witnesses testified at the evidentiary hearing: the two members of OIG (Randy McElhanon and Ryan Huseman), and Hector Ortiz, Assistant Executive Director of UPR.

Mr. McElhanon testified that he is not a lawyer, but performs "client relations" work for a personal injury firm in Little Rock, Arkansas. McElhanon described his duties as taking calls from new clients, scheduling their appointments, and assisting them in filling out the necessary paperwork to become clients of the firm. He also does investigation work for the firm and conducts background checks. He claims to be "familiar with how litigation operates" based on his work at the law firm.

McElhanon stated that he has been an investor since the late 1990's and first invested in the Defendant Corporation in August 2016, after researching the company and listening to investor conference calls.

Based on the LIFO calculations in OIG's papers, McElhanon lost $151,613.00 when Defendant's share price dropped on April 20, 2017, following the public disclosure of its misconduct. (DE 45 at p. 4). McElhanon testified that he decided to contact the law firm of Levi & Korsinsky LLP in late June 2017, after seeing their advertisement directed to Defendant's investors. Although he had never applied to be appointed the lead plaintiff of a class action before, McElhanon testified, "I felt like somebody had to do it, so why not me?" Thereafter, McElhanon was advised by his attorneys that he would be applying as a co-lead plaintiff with Ryan Huseman. McElhanon agreed to the collaboration noting that, "two heads is [*sic*] better than one."

McElhanon testified that he signed his plaintiff's certification on June 20, 2017 (*see* UPR Exhibit A (DE 27-3 at p. 2)), the same day OIG's motion was filed, and McElhanon believes that

he first spoke to Huseman sometime thereafter; this, notwithstanding that in the Joint Declaration, McElhanon swore that he consulted Huseman *before* filing the joint application. *See* UPR Exhibit B (DE 33-1 at p. 5, ¶ 2) ("After due consideration, and after conferring with my counterpart, I decided to join with Ryan Huseman in seeking appointment as Lead Plaintiff.").[3]

As to the specifics of his agreement with Huseman, McElhanon testified that the attorneys suggested that in the event of a dispute, McElhanon would "get to make the final decision" because he had more shares invested and suffered the heavier loss when Defendant's stock price collapsed. When asked on cross-examination about the purpose of including Huseman in the lead plaintiff application given the futility of his vote, McElhanon was unable to offer an explanation, saying "I can't answer that."

McElhanon also testified on cross-examination about a personal bankruptcy petition filed in August 2013. McElhanon acknowledged owing $160,000.00 on the home he owned with his wife, and admitted filing the petition to avoid foreclosure. McElhanon further admitted that he never followed through on the bankruptcy petition, which was ultimately dismissed by the court. When McElhanon was recalled to the witness stand later in the hearing, he testified that he had not signed the bankruptcy petition, nor did he affix the electronic signature that appeared on it. *See* UPR Exhibit E. McElhanon testified that his wife and her attorneys prepared the petition and affixed his signature without his knowledge. Despite filing for personal bankruptcy in August 2013, McElhanon testified that he subsequently received an inheritance which he used to invest $265,000.00 in the Defendant Corporation three years later in August 2016.

---

[3] When pressed on this discrepancy during cross-examination, McElhanon equivocated. The Court asked McElhanon whether he recalled the testimony he had just given regarding the first time he spoke with Huseman. McElhanon responded "no, I don't remember."

Mr. Huseman testified that he is a licensed engineer for the State of Illinois. He referred to himself as a "value investor," who spends much of his free time researching companies to invest in. After researching the Defendant Corporation, Huseman decided to invest a large part of his portfolio in the company. Shortly after the stock collapsed in April 2017, Huseman became aware through advertisements that a class action lawsuit had been filed. He began interviewing law firms and decided to use Glancy, Prongay & Murray, LLP to file his claim because he found them to be "the most competent." Huseman understood that he would be joining another investor in his application to be lead plaintiff. Huseman testified that he first spoke to McElhanon "somewhere in June," and inquired about "what kind of an investor [McElhanon] was." Huseman stated that, after speaking with McElhanon, he felt comfortable with him, although Huseman acknowledged that he did not conduct any research on McElhanon and did not know that he had filed for personal bankruptcy.

Huseman understood that, in the event of a dispute, he had only a 20% vote and so McElhanon could "out vote" him. While Huseman noted that he would have the ability to "offer [his] thoughts" to McElhanon, he acknowledged that, in the event they disagreed, McElhanon would have ultimate decision-making authority.

The final witness to testify was Hector Ortiz, who traveled from San Juan, Puerto Rico, where he serves as the Assistant Executive Director of UPR. Mr. Ortiz explained that UPR is a retirement trust for University employees and has approximately 20,000 members. He testified that Maria Del Carmen Lopez is the Executive Director who manages the trust, which currently has $1.4 billion in assets. The trust is also overseen by a retirement board and a government board.

Ortiz acknowledged that UPR's auditor issued a "going concern opinion" at the end of UPR's 2015 fiscal year (*see* UPR Exhibit F (DE 45-1 at p. 80)).[4] However, according to Ortiz, even if the University fails, the retirement system will continue to operate for another 15 years because it is not reliant upon employer contributions, and can continue to invest the substantial assets is already has. This opinion is supported by the Ernst & Young audit. *Id.* at p. 102.

Ortiz noted that UPR already acts as a fiduciary to the 20,000 members of its retirement plan and is similarly capable of acting in a fiduciary capacity to all the class members in this lawsuit.[5] Ortiz testified that UPR decided to use Abraham, Fruchter & Twersky, LLP ("AFT") in this litigation because the firm has represented the retirement system for at least five to six years. According to Ortiz, AFT calculated that UPR lost $193,000.00 when the Defendant Corporation's misconduct was publicly disclosed in April 2017. *See* UPR Exhibit G (DE 55-2).

## DISCUSSION

### 1. The Private Securities Litigation Reform Act (PSLRA)

The Private Securities Litigation Reform Act of 1995 ("PSLRA") was enacted to remedy perceived abuses in the class action procedure in securities fraud actions. *Miller v. Dyadic Int'l, Inc.*, 2008 WL 2465286, at *3 (S.D. Fla. Apr. 18, 2008).

The PSLRA provides that within ninety (90) days after publication of a notice to putative class members, "the court shall consider any motion made by a purported class member . . . and shall appoint as lead plaintiff the member or members of the [ ] class that the court determines to

---

[4]  The report issued by Ernst & Young LLP states that UPR's Retirement System is "highly dependent" on funding from the University, which receives its funding from the Commonwealth of Puerto Rico. (DE 45-1 at p. 80). The audit concludes that "[t]he financial difficulties experienced by the Commonwealth, including uncertainty as to its ability to fully satisfy its obligations, also raises substantial doubt about the System's ability to continue as a going concern." *Id.*

[5]  Ortiz stated that UPR is currently serving as lead plaintiff in another class action lawsuit.

be most capable of adequately representing the interests of the class members." 15 U.S.C. § 78u–4(a)(3)(B)(i).

In determining the "most adequate plaintiff," the PSLRA directs the court to "adopt a presumption" that the most adequate plaintiff is the person or group of persons that:

> (aa) has either filed the complaint or made a motion in response to a notice;[6]
>
> (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and
>
> (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u–4(a)(3)(B)(iii)(I).

"The evaluation of financial interest is considered the most significant inquiry, as it effectuates Congress' intent that the PSLRA serve to ensure that the lead plaintiff be the person or group with the interest and ability to control the litigation and to monitor closely the lead counsel." *City Pension Fund for Firefighters & Police Officers in the City of Miami Beach v. Aracruz Cellulose S.A.*, 2009 WL 10664427, at *2 (S.D. Fla. Aug. 7, 2009) (citation and quotations omitted).

In determining which proposed lead plaintiff has the "largest financial interest" relevant factors are (1) the number of shares purchased during the class period, (2) the amount of the investment, and (3) the alleged loss. *Sheet Metal Workers Local 28 Pension Fund v. Office Depot, Inc.,* 2008 WL 1943955, at *2 (S.D. Fla. May 2, 2008). However, any member of the proposed class may rebut the presumption upon proof that the presumptively most adequate plaintiff "is subject to unique defenses," 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II)(bb), or "will not fairly and adequately protect the interests of the class." 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II)(aa).

---

[6] Both OIG and UPR satisfied this requirement.

2. <u>**Determining the Presumptive Lead Plaintiff**</u>

In considering the PSLRA's directive that the presumptive lead plaintiff should be the party with the greatest financial interest, courts must consider a variety of factors, such as whether to allow a group of investors to aggregate their losses, the method of calculation used, and whether the difference in losses incurred by the competing plaintiffs is substantial enough to warrant application of the presumption. Unfortunately, the PSLRA "does not specify a formula for calculating which plaintiff has the 'largest financial interest' . . ." *Topping v. Deloitte Touche Tohmatsu CPA, Ltd.*, 2015 WL 1499657, at *5 (S.D.N.Y. Mar. 27, 2015).

In this regard, *Randall v. Fifth Street Finance Corp.,* 2016 WL 462479 (S.D.N.Y. Feb. 1, 2016) is instructive. In *Randall*, one of the groups competing for lead plaintiff was made up of two individual investors, who used the LIFO method to calculate their combined losses of $212,328.00. However, the court declined to consider them as a group because "they appear[ed] to be complete strangers brought together by their proposed counsel in an effort to maximize their combined losses." *Id.* at *2.[7]

The other potential lead plaintiff in *Randall* was an institutional investor (a police pension and retirement plan). It used the FIFO method to calculate its losses at $115,195.00. Applying this method to the two proposed individual investors resulted in losses of $90,550.00 and $70,738.00.

Considering these competing methods of calculating losses, the court found that "[t]here is no need [ ] to list all possible permutations here, because the difference in their alleged losses would be insubstantial no matter how they are calculated." *Id.* The court continued,

---

[7] Their individual losses using LIFO were $112,664.00 and $99,665.00. Under the LIFO method, the competing institutional investor lost $92,831.00.

> As the difference among competing plaintiffs' alleged losses shrinks, so too does the persuasiveness of the presumption. Indeed, some courts have declined to afford this presumption to movants -- particularly individual investors -- when the difference between their alleged losses and those of competing movants -- particularly institutional investors -- was "minimal."

*Id.* at *3 (citing *Juliar v. Sunopta Inc.*, 2009 WL 1955237, at *2 (S.D.N.Y. Jan. 30, 2009) ("[Institutional investor] claims losses of $210,993, approximately $30,000 less than [individual investor group's] aggregated losses. This difference is minimal and, in this case, does not overcome a presumption inherent in Congress' enactment of the PSLRA that institutional investors serve as better lead plaintiffs."); *see also Freedman v. Weatherford Int'l Ltd.*, No. 12–cv–2121 (LAK), DI 31, (S.D.N.Y. July 10, 2012) (appointing institutional investor lead plaintiff over competing individual investor who allegedly lost $165,000 more during the class period, when institutional investor was more "sophisticated" and had selected a larger, better-known law firm with extensive experience in securities litigation)).

The court in *Randall* "decline[d] to untangle the web of competing accounting and valuation methods at issue," and instead "assume[d]" that each of the proposed lead plaintiff's losses were "approximately equal and that each movant has much the same economic incentive to monitor and control the litigation and economic interest in the possible recovery." Thus, the court concluded that based on "the Congressional preference for institutional lead plaintiffs in private securities class actions," it would appoint the police pension and retirement plan as the lead plaintiff. *Id.* at *3.

*Randall* is also significant because of the court's refusal to allow the two individual investors to pool their losses to ensure the largest financial interest, and thus, secure the presumption of lead plaintiff. While this Court recognizes that "aggregation of individual losses to form a small group is acceptable and derives from the language of the PSLRA" (*see In re 21st

*Century Holding Co. Sec. Litig.*, 2007 WL 9220955, at *4 (S.D. Fla. Nov. 20, 2007)), and that the PSLRA "contains no requirement mandating that the members of a proper group be 'related' in some manner" (*see Newman v. Eagle Bldg. Techs.*, 209 F.R.D. 499, 503 (S.D. Fla. 2002)), the Court is also mindful that "Congress intended [ ] the statute [to] prevent 'lawyer driven' litigation." *McIlvaine v. ArthroCare Corp.,* 2008 WL 11331999, at *3 (S.D. Fla. July 16, 2008). To this end, courts routinely reject lead plaintiff applications filed by groups of investors who are "simply an artifice cobbled together by cooperating counsel for the obvious purpose of creating a large enough grouping of investors to qualify as 'lead plaintiff,' which can then select the equally artificial grouping of counsel as 'lead counsel' . . ." *In re Razorfish, Inc. Sec. Litig.*, 143 F. Supp. 2d 304, 308 (S.D.N.Y. 2001). *See also In re Doral Fin. Corp. Sec. Litig.,* 414 F.Supp.2d 398, 401–02 (S.D.N.Y.2006)(by allowing such groups to aggregate losses, "a strong possibility emerges that lawyers will form such groups to manipulate the selection process, and thereby gain control of the litigation").[8]

  Here, the Court finds that OIG's two individual investors, McElhanon and Huseman, do not have the greater interest and ability to monitor closely the lead counsel. *City Pension Fund*, 2009 WL 10664427, at *2. First, their pairing is precisely the sort of lawyer-driven, manufactured grouping proscribed by the PSLRA and the courts. Second, the fact that OIG seeks the appointment of three law firms to represent this two-person group suggests that this is

---

[8] This Court favors the approach taken in *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 589 F. Supp. 2d 388 (S.D.N.Y. 2008). There, the court required the proposed group to proffer an evidentiary showing that "unrelated members of a group will be able to function cohesively and to effectively manage the litigation apart from their lawyers." *Id.* at 392. Factors considered by the court in making this determination included: (1) the existence of a pre-litigation relationship between group members; (2) involvement of the group members in the litigation thus far; (3) plans for cooperation; (4) the sophistication of its members; and (5) whether the members chose outside counsel, and not vice versa. *Id.* Based on the testimony of McElhanon and Huseman, they could only satisfy the third factor, assuming their Joint Declaration is legitimate and not a "sham," "form declaration" routinely used by Levi & Korsinsky, as alleged by UPR.

not a cohesive group.  At least one court has concluded, "[t]he sheer number of attorneys seeking to represent the [proposed lead plaintiff] suggests that counsel, rather than the [lead plaintiff], would control this litigation, in contravention of the PSLRA's intent." *In re Gemstar-TV Guide Int'l, Inc. Sec. Litig.*, 209 F.R.D. 447, 452 (C.D. Cal. 2002).  The court further found that the proposed lead plaintiff "would require a liaison -- effectively defeating the purpose of appointing a lead plaintiff -- suggests that [they] would not be able to manage this litigation and the three firms acting as lead counsel." *Id.*

Third, the testimony of McElhanon and Huseman revealed that neither knew of the other's existence until their lawyers introduced them <u>after</u> their joint motion was filed.  Their interactions since then have been minimal.  Most importantly, and contrary to OIG's closing argument, neither McElhanon nor Huseman is a sophisticated investor.  Indeed, with his testimony, McElhanon, who, if appointed, would have complete decision-making authority for the class, exposed himself as patently unfit to control counsel or lead the class.  McElhanon's claim that he was an unwitting petitioner in bankruptcy court, while simultaneously admitting that the sole purpose of the petition was to fraudulently avoid foreclosure, suggests that he is at best naïve and lacking the awareness and ethical standards needed to perform this role.  Accordingly, this Court is compelled to conclude that McElhanon is woefully unqualified to lead this class action.

For these reasons, and the fact that the difference in the losses incurred by McElhanon and UPR are minimal (regardless of the method of calculation), this Court declines to apply the presumption typically afforded the "largest financial interest."  Rather, this Court will apply the "presumption inherent in Congress' enactment of the PSLRA that institutional investors serve as better lead plaintiffs."  *Juliar,* 2009 WL 1955237, at *2.

### 3. Rule 23 Requirements

At this early stage of the litigation, only the Rule 23 requirements of typicality and adequacy must be fulfilled. *In re 21st Century Holding Co. Sec. Litig.,* 2007 WL 9220955, at *3 (S.D. Fla. Nov. 20, 2007)(proposed lead plaintiff must show that its claims or defenses are typical of the claims or defenses of the class, and that it will fairly and adequately protect the interests of the class) (citing Fed. R. Civ. P. 23(a)). If the "claims or defenses of the class and the class representatives arise from the same event or pattern or practice and are based on the same legal theory" then the typicality requirement has been fulfilled. *In re 21st Century Holding Co.,* at *5 (quoting *Cheney v. Cyberguard Corp.*, et al., 213 F.R.D. 484, 491 (S.D. Fla. 2003)),

Whether a proposed lead plaintiff can demonstrate that it will provide fair and adequate representation depends on a showing of common interests between the lead plaintiff and the class and its willingness and ability to vigorously prosecute the action. *Id.* at *6. The lead plaintiff "should not have any interests antagonistic to the other class members, and most importantly, must demonstrate that [it] will vigorously prosecute the action by providing both adequate financing and competent counsel." *Id.* (citation omitted).

Here, the Court finds that UPR is typical of the other class members in that it invested in the Defendant Corporation's securities during the Class Period and suffered losses when the Corporation's misconduct was publicly disclosed in April 2017. Given that UPR's claims and those of the other class members arise from the same set of events and are based on the same legal theories, UPR satisfies the typicality requirement. *See Miller*, 2008 WL 2465286, at *6 (finding lead plaintiff's claims satisfied typicality requirement because it sought to "represent a class who, like itself, (a) purchased [defendant's] securities, (b) at market prices artificially

inflated as a result of Defendants' violations of the securities laws, and (c) suffered damages thereby.").

Similarly, UPR has demonstrated that it will provide fair and adequate representation of the class. UPR and the other class members share a common interest, namely, to recover as much of their investment losses as possible from the Defendant Corporation. UPR has conveyed its willingness and ability to lead this class in that it (1) sent a representative from San Juan, Puerto Rico to testify at the hearing, (2) established its financial stability for at least the next 15 years, (3) retained experienced counsel with whom UPR has a long-standing relationship, and (4) has experience serving as lead plaintiff in a class action. Based on these factors, this Court is confident that UPR will fairly and adequately represent the class. *See id.* (lead plaintiff's adequacy established by willingness to participate and retention of competent class counsel); *Alkhoury v. Lululemon Athletica, Inc.,* 2013 WL 5496171, at *2 (S.D.N.Y. Oct. 1, 2013)(sheriff's pension fund satisfied adequacy requirement because it was a "sophisticated institutional investor with substantial resources, expertise, and experience serving as lead plaintiff in securities class actions").

### 4. Appointment of Lead Counsel

The PSLRA further provides that once the most adequate plaintiff is selected, the "most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u–4(a)(3)(B)(v). The decision to approve counsel selected by the lead plaintiff is a matter within the discretion of the district court. *Vincelli v. Nat'l Home Health Care Corp.*, 112 F. Supp. 2d 1309, 1315 (M.D. Fla. 2000).

Here, AFT's firm resume states that

> [its] attorneys have a broad range of experience in representing investors in securities and shareholder litigation in both trial and appellate courts throughout

> the United States. In regard to shareholder rights, we litigate individual and representative actions involving claims of corporate fraud, mismanagement, insider trading and breaches of fiduciary duties. The Firm's mission is to protect investors and maximize shareholder value through the diligent and capable representation of our clients.

(DE 28-1 at p. 15). AFT's resume goes on to list a variety of cases where it served as lead counsel and secured multi-million dollar settlements on behalf of the class. *Id.* at pgs. 15-16. Based on AFT's history in representing class plaintiffs in similar actions, this Court approves the appointment of AFT as lead counsel in this case. *See In re 21st Century Holding Co. Sec. Litig.*, 2007 WL 9220955, at *7 (upon review of the proposed firm's credentials, court concluded that it possessed "extensive experience in litigating securities class actions and will no doubt ardently represent the interests of the class members").

## CONCLUSION

Based on the foregoing, it is hereby **ORDERED** that the motion by Ocwen Investors Group for appointment of lead plaintiff (DE 27) be **DENIED**, and that the University of Puerto Rico Retirement System's motion for appointment of lead plaintiff and approval of Abraham, Fruchter & Twersky, LLP as lead counsel (DE 28) be **GRANTED.**

**DONE AND ORDERED** in Chambers this 13th day of July, 2017 at West Palm Beach in the Southern District of Florida.

_____
JAMES M. HOPKINS
United States Magistrate Judge

cc:     Counsel of Record