**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 17-cv-80500-RLR**

KAREN A. CARVELLI, Individually and on
Behalf of All Others Similarly Situated,

Plaintiff(s),

v.

OCWEN FINANCIAL CORPORATION,        **JURY TRIAL DEMANDED**
RONALD M. FARIS, and MICHAEL R.
BOURQUE, JR.,

Defendants.

**CONSOLIDATED SECURITIES CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.  NATURE OF THE ACTION ................................................................................2

II.  JURISDICTION AND VENUE .........................................................................6

III.  THE PARTIES...................................................................................................7

    A.  Lead Plaintiff ........................................................................................7

    B.  Defendants .............................................................................................7

IV.  BACKGROUND AND NATURE OF THE FRAUD AT OCWEN ...................8

    A.  Ocwen's Role As A Mortgage Servicer And The Development Of REALServicing.......................................................................................8

    B.  Ocwen's Rapid Growth Draws The Scrutiny Of Federal And State Regulators, And Ocwen Is Found To Have Engaged In Years Of Loan Servicing Misconduct ..........................................................................11

    C.  Defendants Falsely Mislead The Market Concerning Ocwen's Compliance With The Regulator Settlements.......................................19

    D.  Throughout The Class Period, REALServicing Was So Fraught With Deficiencies That It Could Not Properly Function As A System Of Record And Caused Ocwen To Violate Various Federal And State Mortgage Servicing Laws...............................................................21

    E.  Ocwen's Reliance On REALServicing Causes Disastrous Results For Borrowers.............................................................................................30

        i.  Ocwen's Mishandling Of Borrowers' Payments .......................30

        ii.  Ocwen's Mishandling Of Escrow Accounts..............................31

        iii.  Ocwen's Mishandling Of Borrowers' Hazard Insurance...........32

        iv.  Ocwen's Mishandling Of Borrowers' Private Mortgage Insurance ..........33

        v.  Ocwen Failed To Respond To Borrower Complaints And NOEs.............34

        vi.  Ocwen Illegally Foreclosed On Borrowers' Homes..................35

i

F.      Former Ocwen Employees Corroborate REALServicing's Many Loan
        Servicing Failures ...................................................................................38

V.      PARTIAL DISCLOSURES AND THE EMERGENCE OF THE FULL IMPACT
        OF THE FRAUD ...................................................................................42

VI.     POST-CLASS PERIOD EVENTS ...........................................................51

VII.    DEFENDANTS' VIOLATIONS OF GAAP AND SEC RULES ....................................53

        A.      Duties Of The Chief Executive Officer And Chief Financial Officer Under
                GAAP And SEC Rules ...................................................................... 55

        B.      GAAP And SEC Rules ...................................................................... 56

                1.      Defendants' Obligations Under And Violations Of Item 303 .................... 56

                2.      Defendants' Obligations Under And Violations Of FAS5/ASC 450 .......... 59

        C.      Ocwen's Ineffective Disclosure Controls And Procedures And Ineffective
                Internal Controls Over Financial Reporting ........................................ 60

VIII.   OCWEN'S MATERIALLY FALSE AND MISLEADING STATEMENTS AND
        OMISSIONS DURING THE CLASS PERIOD................................................61

        A.      January 13, 2015 Press Release ........................................................62

        B.      Ocwen's First Quarter 2015 Earnings Call.........................................64

        C.      Ocwen's 2014 Form 10-K ................................................................64

        D.      Ocwen's First Quarter 2015 10-Q.....................................................69

        E.      Ocwen's Second Quarter 2015 10-Q .................................................71

        F.      Ocwen's July 30, 2015, Press Release...............................................73

        G.      Ocwen's Second Quarter 2015 Earnings Call ....................................74

        H.      Ocwen's September 2015 Investor Presentation ................................75

        I.      Ocwen's Third Quarter 2015 Earnings Call ......................................77

        J.      Ocwen's Third Quarter 2015 10-Q ...................................................78

        K.      Ocwen's 2015 10-K .........................................................................79

L.     Ocwen's First Quarter 2016 10-Q..................................................84

M.    Ocwen's April 27, 2016 Conference Call.................................86

N.    Ocwen's Second Quarter 2016 10-Q ......................................86

O.    Ocwen's July 27, 2016 Press Release......................................88

P.    Ocwen's Second Quarter 2016 Earnings Call .......................89

Q.    Ocwen's August 25, 2016 8-K................................................90

R.    Ocwen's Third Quarter 2016 10-Q ........................................91

S.    Ocwen's Third Quarter 2016 Earnings Call .........................92

T.    Ocwen's 2016 10-K ................................................................93

U.    Ocwen's Fourth Quarter 2016 Earnings Call........................95

IX.    ALLEGATIONS CONFIRMING DEFENDANTS' SCIENTER...................97

X.    LOSS CAUSATION.................................................................106

XI.    PRESUMPTION OF RELIANCE.................................................108

XII.    INAPPLICABILITY OF STATUTORY SAFE HARBOR ...........................110

XIII.    PLAINTIFF'S CLASS ACTION ALLEGATIONS.....................................110

XIV.    CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT...............112

XV.    PRAYER FOR RELIEF ...............................................................117

XVI.    DEMAND FOR TRIAL BY JURY ...............................................118

1.  Lead Plaintiff the University of Puerto Rico Retirement System ("Lead Plaintiff" or the "UPRS" and with the putative class, collectively "Plaintiffs"), by and through its undersigned counsel, brings this federal securities class action on behalf of all persons and entities who purchased or otherwise acquired the common stock of Ocwen Financial Corporation ("Ocwen" or the "Company") between January 13, 2015 and April 20, 2017, inclusive (the "Class Period"), and who were damaged as a result of Defendants' wrongdoing as alleged herein (the "Class"). The securities claims asserted herein are alleged against Ocwen, Ocwen's Chief Executive Officer Ronald M. Faris ("Faris"), and Ocwen's Chief Financial Officer Michael R. Bourque, Jr. ("Bourque") (collectively "Defendants").   As explained further below, Lead Plaintiff seeks to recover damages caused by Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.  Lead Plaintiff alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge.   Lead Plaintiff's information and belief are based upon counsel's investigation, which included review and analysis of, *inter alia*:  (i) regulatory filings made by Ocwen with the United States Securities and Exchange Commission (the "SEC"); (ii) press releases and media reports issued by and disseminated by the Company; (iii) analyst reports concerning Ocwen; (iv) interviews with former Ocwen employees; (v) news articles; (vi) regulatory settlements entered into by the Company; (vii) other publicly available information concerning the Defendants, including pending and closed litigation matters involving Ocwen; and (viii) consultation with experts, including a forensic accounting expert.  Counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

I.   **NATURE OF THE ACTION**

2.     This case involves the rampant and systemic failures of Ocwen, one of the largest mortgage servicing companies in the United States, to remediate ongoing compliance violations occurring at every level of the Company and its concomitant material misrepresentations to the investing public about those failures.  In conjunction with Ocwen's use of its critically flawed proprietary technological platform system used to service loans, REALServicing, Ocwen failed borrowers at all stages of the mortgage servicing process, including committing widespread errors in clients' escrow accounts, requiring borrowers to pay for insurance and other products they did not need, and illegally foreclosing on homes.  Regulators intervened and sanctioned Ocwen for this misconduct by, among other things, requiring numerous regulatory monitors within the Company and denying it the ability to acquire new mortgage servicing rights ("MSRs") until it remediated its systemic deficiencies.  Ocwen countered with an ongoing public relations push to convince investors that the Company was in the process of complying with regulators' demands.  During the Class Period, Ocwen told the investing public that it was making progress in remediating its mortgage servicing failures by making significant investments in "risk management, compliance, service excellence and technology," enforcing a company-wide risk management program called the "Three Lines of Defense," remediating harm caused to borrowers as a result of its prior mortgage servicing-related misconduct, and fostering a "culture of compliance" from top to bottom within the Company.  In reality, and well-known to Defendants at the time they made these statements, none of these purported improvements were having any effect within the Company in any meaningful way.  Indeed, the truth about Ocwen's continued unremediated state of affairs was fully revealed when the U.S. Consumer Financial Protection Bureau ("CFPB") and other regulators took action against Ocwen in April 2017 for its continued failures to its customers and violations of state and federal lending, real estate and debt

collections laws, shocking the market and causing the price of Ocwen stock to drop precipitously.

3.       Founded in 1988, Ocwen is a diversified financial services company headquartered in West Palm Beach, Florida.  The Company's primary businesses, through its subsidiaries, are the acquisition, servicing, and resolution of sub-performing and nonperforming residential and commercial mortgage loans, as well as the related development of loan servicing technology and business-to-business e-commerce solutions for the mortgage and real estate industries.  Ocwen Mortgage Servicing, Inc. ("OMS") is wholly owned by and is the primary operating subsidiary of Ocwen.  Ocwen Loan Servicing, LLC ("OLS") is wholly owned by OMS.  Ocwen, OMS, and OLS share and have shared the same key executives, including Faris and Bourque, share offices and employees, and file consolidated financial statements with Ocwen's public disclosures.

4.       Prior to the Class Period, Ocwen entered into settlements with governmental regulators for extensive and systemic violations of consumer protection laws.  The most significant settlement was a December 2013 Consent Order (the "CFPB Consent Judgment") between Ocwen, the CFPB, and 49 state regulators which required Ocwen to provide over $2 billion in relief to wronged homeowners and subject itself to a monitor and a monitoring committee to confirm Ocwen's compliance with applicable servicing standards.  The Company was required to, among other things, substantially overhaul Ocwen's servicing business and bring it into compliance with state and federal laws.

5.       These regulatory settlements caused Ocwen significant reputational harm.  In response, Defendants attempted to change the market's perception of Ocwen from a company that was laboring under the burden of substantial regulatory settlements to a company that was

purportedly poised to emerge as a profitable entity conducting itself in compliance with all laws and regulations.

6.     During the Class Period, Defendants repeatedly represented to investors that Ocwen was in compliance with the terms of the aforementioned settlements and the extensive federal and state regulations that govern mortgage servicers.  As a result, the Company was able to significantly and artificially raise the price of Ocwen common stock to a Class Period high of $11.61 per share and mislead the largest ratings agencies in the world, resulting in substantially higher mortgage servicer ratings following the initial downgrades at the time of the regulatory settlements.

7.     In truth, during the Class Period, Defendants were not in compliance with their pre-Class Period regulatory settlements, nor were they complying with state or federal law. Specifically, Ocwen's servicing system of record, REALServicing, was in a state of disarray throughout the Class Period, resulting in Ocwen's systemically and continuously making errors when it serviced borrowers' mortgages.  These failures were detailed at length in a complaint filed by the CFPB on April 20, 2017 in this District against Ocwen and its related entities, in an action entitled *Consumer Financial Protection Bureau v. Ocwen Financial Corporation et al.*, No. 9:17-cv-80496 (S.D Fla.) (the "CFPB Complaint").

8.     As alleged by the CFPB Complaint, during the Class Period, REALServicing was a mortgage servicing software platform that was critically and systemically flawed. REALServicing's errors, as used by Ocwen, included: (i) loading inaccurate lending information; (ii) wrongfully initiating foreclosure proceedings on at least 1,000 people, leading to wrongful foreclosure sales on these properties; (iii) failing to appropriately credit payments made by numerous borrowers; (iv) failing to send borrowers accurate periodic statements

4

detailing the amount due, how payments were applied, total payments received, and other information, and failed to correct these billing and payment errors; (v) botching the most rudimentary tasks concerning the management of escrow accounts; (vi) failing to make timely insurance payments for home insurance premiums, causing the lapse of homeowners' insurance coverage for more than 10,000 borrowers; (vii) failing to cancel borrowers' private mortgage insurance in a timely manner, causing consumers to overpay for their mortgages; (viii) enrolling some consumers in add-on products through deceptive solicitations or without the borrowers' consent; (ix) routinely failing to properly acknowledge, investigate and remediate consumer complaints; and (x) failing to include complete and accurate borrower information when Ocwen sold its rights to service thousands of loans to new mortgage servicers. The CFPB Complaint alleges that these failures caused Defendants to violate various federal laws governing mortgage servicers, including the Consumer Financial Protection Act of 2010, the Fair Debt Collection Practices Act, the Real Estate Settlement Procedures Act, the Truth in Lending Act, and the Homeowners Protection Act.

9.      The CFPB was not the only governmental entity by the end of the Class Period to sue Ocwen in connection with Defendants' loan servicing misconduct. On April 20, 2017, the Office of the Attorney General for the State of Florida and the Office of Financial Regulation for the State of Florida also filed a complaint in this District, captioned *Office of the Attorney General, the State of Florida et al., v. Ocwen Financial Corporation, et al.*, 9:17-cv-80496 (S.D. Fla.) ("Florida AG Complaint"). The Florida AG Complaint was filed against Ocwen and its related entities for their continued violation of federal law, state law, and industry standards in connection with Ocwen's servicing of loans based on inaccurate and incomplete borrower information. Again, as the Florida AG Complaint alleged, the source of this misconduct was

Ocwen's deficient mortgage servicing software, REALServicing and Defendants' failure to implement the necessary improvements and corrections to fix the software and remediate the problems it was causing.

10.     Lastly, on that same day, April 20, 2017, the North Carolina Office of the Commissioner of Banks, in addition to state regulators from more than twenty states, issued a cease-and desist order (the "Order") to Ocwen's subsidiaries as a result of the Company's gross mishandling of consumer escrow accounts.   As a result of Ocwen's misconduct, the Order "specifically prohibits the acquisition of new mortgage servicing rights and the origination of mortgage loans by Ocwen Loan Servicing (NMLS number 1852), a subsidiary of Ocwen, until the company is able to prove it can appropriately manage its consumer mortgage escrow accounts."

11.     As a result of the fraud alleged herein, the price of Ocwen common stock plunged to $2.49 per common share on April 20, 2017, a drop of more than 53% on that day alone, and a drop of approximately 79% from the Class Period high.   Class members, including Lead Plaintiff, have suffered substantial financial losses by purchasing Ocwen common stock at artificially inflated prices during the Class Period as a result of the Defendants' fraud as alleged herein.

## II.     JURISDICTION AND VENUE

12.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a), 78t-1), and the rules and regulations promulgated thereunder, including Rule 10b-5 (17 C.F.R. §240.10b-5).

13.     This Court has jurisdiction of the subject matter of this Action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa).

14.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b). Many of the acts and transactions giving rise to the violations of law complained of herein occurred in this District. In addition, Ocwen's principal executive offices are located within this Judicial District.

15.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities market.

## III.     THE PARTIES

### A.     Lead Plaintiff

16.     The University of Puerto Rico Retirement System ("Lead Plaintiff" or "UPRS") manages the pension benefits for employees of the University of Puerto Rico, with approximately $1.4 billion in assets under management.   As set forth in its filed Amended Certification (ECF No. 55, Exhibit H), UPRS acquired Ocwen common stock at artificially inflated prices during the Class Period and suffered damages as a result of the conduct complained of herein.   On July 14, 2017, this Court appointed UPRS as Lead Plaintiff for this litigation.

### B.     Defendants

17.     Defendant Ocwen is incorporated in Florida. The Company's principal executive offices are located at 1661 Worthington Road, Suite 100, West Palm Beach, Florida 33409. Ocwen's shares trade on the New York Stock Exchange under the ticker symbol "OCN."   Ocwen services and subservices home mortgage loans secured by residential properties and is currently the second largest non-bank mortgage servicer in the United States.   As of December 31, 2016, Ocwen serviced approximately 1,393,766 loans with an aggregate unpaid principal balance of

7

approximately $209 billion.  Dating back to at least 2014, the Company has been the subject of a myriad regulatory complaints and lawsuits concerning its mortgage servicing practices.

18.    Defendant Faris has served as the Company's Chief Executive Officer ("CEO") since October 2010, as its President since March 2001 and as a director on its Board of Directors since May 2003.  During the Class Period, Faris was a member of the Company's Executive Committee, and, as a member of this committee, Faris was responsible to act on behalf of Ocwen's Board of Directors during the intervals between meetings of the Company's Board of Directors.

19.    Defendant Bourque has served as the Company's Chief Financial Officer ("CFO") and Executive Vice President since June 2014.

20.    Defendants Faris and Bourque are collectively referred to herein as the "Individual Defendants."

## IV.    BACKGROUND AND NATURE OF THE FRAUD AT OCWEN

### A.    Ocwen's Role As A Mortgage Servicer And The Development Of REALServicing

21.    During the Class Period, Ocwen's core business was mortgage servicing, which entails, among other things, processing borrower payments, administering loan loss mitigation processes, and managing foreclosures. Occasionally, the entity that issues the mortgage will also act as the mortgage servicer.  In most cases, a mortgage servicer, such as Ocwen, purchases the MSRs from the original lender.  During the Class Period, Ocwen originated mortgages and also acquired MSRs for previously existing loans with unpaid principal balances ("UPB").

22.    During the Class Period, Defendants touted mortgage servicing as Ocwen's primary business.  Ocwen admitted in the Company's 2014, 2015, and 2016 Forms 10-K, all filed with the SEC during the Class Period and signed by Defendants Faris and Bourque, that:

"Servicing and Lending are our primary lines of business." Moreover, the bulk of Ocwen's annual revenue derived from mortgage servicing.  For example, Ocwen derived 85% of its 2016 revenue from mortgage servicing and 89% of its 2015 revenue from mortgage servicing, as demonstrated by the figure below:

| Selected Operations Data | 2016 | | 2015 | |
|---|---|---|---|---|
| Revenue: | | | | |
| Servicing and subservicing fees | $ | 1,186,620 | $ | 1,531,797 |
| Gain (loss) on loans held for sale | | 90,391 | | 134,969 |
| Other | | 110,152 | | 74,332 |
| Total revenue | | 1,387,163 | | 1,741,098 |

**Figure 1**[1]

23.     Mortgage servicers, including Ocwen, are subject to substantial state and federal regulation. Some of the key regulations that mortgage servicers are subject to are the Real Estate Settlement Procedures Act, 12 U.S.C. § 2605 ("RESPA"), and the regulations promulgated thereunder at Regulation X, 12 C.F.R. part 1024 ("Regulation X"), the Consumer Financial Protection Act, 12 U.S.C. §5564 ("CFPA"), the Fair Debt Collections Practices Act ("FDCPA"), the Truth in Lending Act ("TILA") and the Service Members Civil Relief Act ("SCRA"). Indeed, Ocwen in the past has admitted that it operates in a "highly regulated environment." These laws and regulations are, among other things, designed to protect borrowers from predatory practices, such as the misuse of escrowed funds, improper interest rate applications, the charging of improper fees and threats of unwarranted legal actions.  As described below, federal and state regulators determined that, during the Class Period, Ocwen engaged in all of these abuses, among others.

---

[1] Ocwen Form 10-K/A filed for the fiscal year ended December 31, 2016.

24.     Mortgage servicers are responsible for various aspects of handling mortgages. The primary functions of a mortgage servicer include processing and applying borrower payments, communicating payment information to borrowers, managing escrow accounts, maintaining accurate loan balance information, responding to borrower inquiries, handling loss mitigation requests and initiating foreclosure proceedings.  To carry out these functions, mortgage servicers use electronic databases referred to as "systems of record" to manage the vast amounts of information required to service loans.  According to the CFPB, "[s]ystems of record are essential to a servicer's ability to service loans in accordance with applicable legal requirements."[2]

25.     During the Class Period, Ocwen used a proprietary system of record called REALServicing.  Notably, no other mortgage servicer uses REALServicing.[3]  REALServicing was originally created in-house by Ocwen, but, in 2009, Ocwen spun off its internal technology department as a separate company, Altisource Portfolio Solutions ("Altisource"). Since the spinoff, Altisource owns and maintains the REALServicing platform, and Ocwen contracts with Altisource to use it.

26.     Notably, there was no clean break between Ocwen and Altisource after the spin-off, with significant overlap in executives and directors between the two companies.  William C. Erbey ("Erbey"), the founder and Chairman of the Board of Ocwen until 2015, also served as Chairman of the Board of Altisource from its inception until January 2015 and owned over 30% of Altisource's common stock as of March 2015. Moreover, Altisource has derived much of its revenue from Ocwen pursuant to a Master Services Agreement under which Ocwen contracted for the use of technology from Altisource, including the right to use REALServicing.   Between

---

[2] CFPB Complaint ¶ 29.
[3] CFPB Complaint ¶¶ 27-30.

2012 and 2013, when Erbey was Chairman of the Boards of both Altisource and Ocwen, Ocwen extended the contract with Altisource through 2025. This arrangement and additional transactions between Ocwen and Altisource have drawn the scrutiny of regulators and investors in direct and derivative lawsuits alleging conflicts of interests, including a securities class action which settled for $32 million in May 2017.

**B.**    **Ocwen's Rapid Growth Draws The Scrutiny Of Federal And State Regulators, And Ocwen Is Found To Have Engaged In Years Of Loan Servicing Misconduct**

27.    Prior to the beginning of the Class Period, from 2009 to 2012, Ocwen engaged in numerous acquisitions.  During this period, Ocwen purchased a large number of MSRs, expanding its portfolio over four-fold from 351,595 loans with a UPB of $50 billion to 1,219,956 residential loans with an aggregate UPB of $203.7 billion.  As a result of these acquisitions, Ocwen quickly became one of the largest mortgage servicers in the United States.

28.    Ocwen's rapid pre-Class Period expansion raised substantial concerns amongst regulators and drew significant scrutiny from the CFPB, the Attorneys General of 49 States, (collectively the "State AGs"), the New York Department of Financial Services ("NYDFS"), and the California Department of Business Oversight ("CDBO").  These regulators found that Ocwen was "violating consumer financial laws at every stage of the mortgage servicing process," according to a statement by CFPB Director Richard Cordray in a December 19, 2013 conference call.

29.    As a result of this pre-Class Period misconduct, the CFPB and the State AGs alleged numerous violations of federal and state laws. In particular, in early 2012, in a complaint filed by the CFPB and the State AGs, these regulators accused Ocwen of:

(a) failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements;

11

(b)  charging unauthorized fees for default-related services;

(c)  imposing force-placed insurance when Ocwen knew or should have known that borrowers already had adequate coverage;

(d)  providing false and misleading information in response to borrower complaints;

(e)  providing false and misleading information to borrowers regarding loans that had been transferred from other servicers;

(f)  failing to provide accurate and timely information to borrowers regarding loans that had been transferred from other servicers;

(g)  falsely advising borrowers concerning qualifications needed to obtain a loan modification;

(h)  providing false and misleading information to borrowers concerning the status of loss mitigation review and the status of foreclosure proceedings;

(i)  failing to properly calculate borrowers' eligibility for loan modification programs, failing to properly process applications for loan modifications, improperly denying loan modification relief to eligible borrowers, and providing false and misleading reasons for denial of loan modifications;

(j)  failing to honor the terms of in-process loan modifications and enforcing the terms of the prior, unmodified loans; and

(k)  preparing and filing false and misleading documents and affidavits with courts and government agencies as part of foreclosure proceedings (also known as "robosigning").

30.     On December 19, 2013, the CFPB Consent Judgment that settled this matter required Ocwen to provide over $2 billion in relief to wronged homeowners and subject itself to

12

a monitor (the "National Mortgage Settlement Monitor") and a monitoring committee to confirm Ocwen's compliance with applicable servicing standards. A forty-six page list of these standards was attached as Exhibit A to the CFPB Consent Judgment. The standards included:

> Servicer shall ensure that factual assertions made in pleadings (complaint, counterclaim, cross-claim, answer or similar pleadings), bankruptcy proofs of claims (including any facts provided by Servicer or based on information provided by the Servicer that are included in any attachment and submitted to establish the truth of such facts) ("POC"), Declarations, affidavits, and sworn statements filed by or on behalf of Servicer in non-judicial foreclosures are accurate and complete and are supported by competent and reliable evidence. Before a loan is referred to non-judicial foreclosure, Servicer shall ensure that it has reviewed competent and reliable evidence to substantiate the borrower's default and the right to foreclose, including the borrower's loan status and loan information.
> …
>
> Servicer shall ensure that affidavits, sworn statements and Declarations executed by Servicer's affiants are based on the affiant's review and personal knowledge of the accuracy and completeness of the assertions in the affidavit, sworn statement or Declaration, set out facts that Servicer reasonably believes would be admissible in evidence, and show that the affiant is competent to testify on the matters stated…
>
> …
>
> Servicer shall maintain procedures to ensure accuracy and timely updating of borrower's account information, including posting of payments and imposition of fees. Servicer shall also maintain adequate documentation of borrower account information...
>
> For any loan on which interest is calculated based on a daily accrual or daily interest method and as to which any obligor is not a debtor in a bankruptcy proceeding without reaffirmation, Servicer shall promptly accept and apply all borrower payments…Servicer shall ensure that properly identified payments shall be posted no more than two business days after receipt at the

13

address specified by Servicer and credited as of the date received to borrower's account…

…

Servicer shall ensure that all information provided for or on behalf of Servicer to Third-Party Providers in connection with providing of Servicing Activities is accurate and complete.

…

Servicer shall not move to judgment or order of sale or proceed with a foreclosure sale under any of the following circumstances:

a.      The borrower is in compliance with the terms of a trial loan modification, forbearance, or repayment plan.

b.      A short sale or deed-in-lieu of foreclosure has been approved by all parties (including, for example, first lien investor, junior lien holder, and mortgage insurer, as applicable), and proof of funds or financing has been provided to Servicer.

…

All default, foreclosure and bankruptcy-related service fees, including third-party fees, collected from the borrower by Servicer shall be bona fide, reasonable in amount, and disclosed in detail to the borrower as provided in paragraphs [below].

…

Servicer may collect a default-related fee only if the fee is for reasonable and appropriate services actually rendered and one of the following conditions is met:

a.      the fee is expressly or generally authorized by the loan instruments and not prohibited by law or this Agreement;

b.      the fee is permitted by law and not prohibited by the loan instruments or this Agreement; or

c.      the fee is not prohibited by law, this Agreement or the loan instruments and is a reasonable fee for a specific service requested by the borrower that is collected only after clear and conspicuous disclosure of the fee is made available to the borrower.

> …
> Servicer shall not obtain force-placed insurance unless there is a
> reasonable basis to believe the borrower has failed to comply with
> the loan contract's requirements to maintain property insurance.
> For escrowed accounts, Servicer shall continue to advance
> payments for the homeowner's existing policy, unless the borrower
> or insurance company cancels the existing policy.

31.     One year later, the NYDFS entered into a settlement with Ocwen arising out of
the Company's mortgage servicing misconduct.   Specifically, on December 19, 2014, the
NYDFS entered in a consent order with Ocwen (the "NYDFS Consent Order") stemming from
a 2011 Agreement between NYDFS and Ocwen called the Agreement of Mortgage Servicing
Practices (the "2011 Agreement").   The Agreement was put into place amid concerns about
Ocwen's rapid growth and ability to properly service its expanding portfolio of home loans, and
required Ocwen to put into place a "system of robust internal controls and oversight" with
respect to its mortgage servicing practices and those of third-party vendors such as foreclosure
attorneys.   In 2012, the NYDFS conducted an examination of Ocwen and determined that
Ocwen had violated the 2011 Agreement by failing to adequately institute such controls.   As a
result, Ocwen was required to retain a compliance monitor for two years.   At the end of that
time period, according to the NYDFS Consent Order, "the [NYDFS] and the [c]ompliance
[m]onitor identified numerous significant additional violations of the 2011 Agreement, as well
as New York laws and regulations."   These violations included: (i) failing to confirm that it had
the right to foreclose before initiating foreclosure proceedings; (ii) failing to ensure that its
statements to the court in foreclosure proceedings were correct; (iii) pursuing foreclosure even
while modification applications were pending ("dual tracking"); (iv) failing to maintain records
confirming that it was not pursuing foreclosure of service members on active duty; (v) failing to
assign designated customer service representatives; and (vi) inadequate and ineffective

information technology systems and personnel.

32.     The NYDFS determined that REALServicing was at the heart of the Company's mortgage servicing misconduct.  Indeed, the NYDFS Consent Order noted that "Ocwen's core servicing functions rely on its inadequate systems" but that despite the systems' problems, Ocwen continued to rely on them, leading it to employ fewer trained personnel than its competitors.  Furthermore, the Company was moving towards using offshore customer care personnel. The NYDFS Consent Order noted that "Ocwen's Chief Financial Officer recently acknowledged, in reference to its offshore customer care personnel, that Ocwen is simply 'training people to read the scripts and dialogue engines with feeling.'"  Ocwen would then penalize or terminate personnel who did not follow the scripts closely, frustrating struggling borrowers with complex issues exceeding the bounds of the scripts.  The NYDFS Consent Order also recounted that Ocwen's customer care personnel would in many cases provide conflicting responses to borrowers' questions, and fail to properly record these interactions, leading to inaccurate records of issues raised by borrowers and inevitably more errors in servicing.

33.     The NYDFS Consent Order mandated severe penalties for Ocwen. Specifically, the NYDFS Consent Order required Ocwen to pay $150 million in fines and restitution, provide all New York borrowers with their complete loan files upon request, and subject itself to an on-site operations monitor that would assess the adequacy and efficacy of Ocwen's operations, including information technology systems, number of personnel and their training, controls in identifying and correcting errors, risk management functions, and fees charged to borrowers. The monitor would then identify any necessary corrective measures and create progress benchmarks.  Ocwen would be required to meet certain benchmarks in order to gain NYDFS'

permission to acquire new MSRs.  The NYDFS Consent Order also required Ocwen's founder, Erbey, to resign from his position as Executive Chairman.

34.     In addition to these settlements, Ocwen also entered into a consent order with the CDBO (the "CDBO Consent Order") on January 23, 2015 as a result of an action filed by the CDBO to suspend Ocwen's license to conduct lending and/or servicing business in California. The CDBO filed this action after Ocwen repeatedly failed to comply with subpoenas and requests for information by the CDBO in connection with a routine regulatory examination. The CDBO Consent Order required Ocwen to pay a $2.5 million penalty and cease acquiring any new MSRs in California until the Company could satisfactorily comply with the CDBO's requests for information in a regulatory exam.  It also required the appointment of a third-party auditor, Fidelity Information Services, for an initial term of two years, to be paid for by Ocwen, to assess Ocwen's servicing policies and procedures and implement corrective measures.

35.     The CFPB Consent Judgment, the NYDFS Consent Order, and the CDBO Consent Order shall be referred to herein as the "Regulator Settlements."  In addition to imposing onerous monitoring costs on Ocwen, the Regulator Settlements significantly restricted Ocwen's ability to grow its mortgage servicing business.  For example, these settlements imposed myriad compliance terms under which Ocwen was unable to efficiently acquire MSRs, or prohibited from acquiring MSRs at all.

36.     The terms of the Regulator Settlements and additional oversight that Ocwen was forced to implement quickly transformed Ocwen's mortgage servicing business from a profitable business line to an unprofitable one.  Analysts recognized that the terms of the Regulator Settlements, and the truth concerning Ocwen's loan servicing misconduct which the Regulator Settlements revealed, would risk Ocwen's financial future. For example, a January

14, 2015 analyst report from Barclay's expressed concern about "margin compression" in Ocwen's servicing business.  It also noted a sell off of Ocwen stock due to concerns that Ocwen would be forced to sell off MSRs at distressed prices as a result of its troubles with the CDBO. In a report dated January 26, 2015, Compass Point Research and Trading ("Compass Point") echoed these concerns, lowering its price target for Ocwen from $14 per share to $7.50. According to the January 26 report, the price target downgrade was "due to the significant overhang of additional litigation and the potential for Ocwen to be a forced seller [of their MSRs]." This forced sale of Ocwen's MSRs, Compass Point explained, could result in buyers refusing to give Ocwen a fair value for its MSRs due to Ocwen's weakened negotiating position and need for capital to satisfy litigation risks.

37.    Ratings agencies were also concerned about the effect of this regulatory scrutiny on Ocwen.  On January 29, 2015, Moody's Corporation ("Moody's") downgraded Ocwen Loan Servicing's servicer and special servicer ratings from SQ3 to SQ3-.[4] The Moody's SQ ratings are based on a servicer's combined servicing ability and servicing stability. Servicing ability includes factors such as customer service, collections, loss mitigation, and repossession and/or liquidation or redeployment of collateral for secured obligations. Servicing Stability combines financial stability with operational stability and includes factors such as ownership, profitability, earnings diversity, legal and regulatory risks, compliance and oversight.

38.    Moody's downgrade also perturbed the market.  For example, in a report dated January 30, 2015, Compass Point noted that Moody's servicer ratings downgrade reflected

---

[4] The Moody's Servicer Quality Ratings ("Moody's SQ Ratings") range from SQ1 (strong servicing ability and servicing stability) to SQ5 (weak combined servicing ability and servicing stability). A SQ3 rating represents an average combined servicing ability and servicing stability. The + and - modifiers represent where the servicer ranks within its designated rating category.  *See* Jason Grohotolski & Wen V. Zhang, *Updated Moody's Servicer Quality Rating Scale and Definitions,* Structured Finance,  (May 10, 2005),  http://www.1stsss.com/referencematerials/Moodys_Rating_Methodology.pdf (last visited August 1, 2017).

"heightened regulatory scrutiny and legal developments, and their negative impact on Ocwen's servicing stability."  Most importantly, a ratings downgrade to SQ3- was considered a "termination event" under the purchase agreement between Home Loans Servicing Solutions, Ltd. ("HLSS") and Ocwen, pursuant to which Ocwen had purchased MSRs representing $67.5 billion in UPB in 2012 and $120 billion in UPB in 2013.  A "termination event" would allow HLSS to transfer its loans to another servicer.  Compass Point observed that this downgrade also  "increase[d] the risk of further 'events of default' within the private label M[ortgage] B[acked] S[ecurities] pooling and servicing agreements and likely would lead to further servicer termination votes being conducted by trustees."

### C.   Defendants Falsely Mislead The Market Concerning Ocwen's Compliance With The Regulator Settlements

39.    In the face of this negative publicity, Defendants, rather than actually fix the operational and technological deficiencies within Ocwen that had caused all these problems in the first place, began a public relations campaign to falsely convince the market that Ocwen was turning over a new leaf. For example, on an April 30, 2015 earnings call with investors discussing Ocwen's First Quarter 2015 financial results, Defendant Faris stated that: "we expect the next round of results from the National Mortgage Settlement monitor to show that *we have made progress in improving our internal testing and compliance monitoring*."[5]  On that same call, Defendant Faris also stated that: "we take all compliance examinations and findings seriously, and *we are committed to correcting any deficiencies remediating any borrower harm and improving our compliance management systems and customer service.*"  Further, in acknowledging that the Company would incur an expected $50 million in regulatory monitoring costs for the year, an increase of $12 million from 2014, Faris reassured investors that "over

---

[5] All emphasis herein is added unless otherwise indicated.

time, *as we demonstrate ongoing compliance and as the monitors roll off, we should see these expenses decline*."[6]

40.    Analysts credited Defendants' materially false and misleading statements and omissions.  On August 4, 2015, just 5 days after a July 30, 2015 conference call, an analyst with Oppenheimer & Co ("Oppenheimer") reported that: "we think [Ocwen] will be battle proven, well capitalized and regulators will have gone through their operations with a fine tooth comb." Likewise, in a report dated August 26, 2015, Compass Point upgraded Ocwen common stock from a "sell" rating to a "neutral" rating, noting that Ocwen would take charges to settle any regulatory overhang but that those charges had already been priced into the stock.

41.    Defendants' fraud continued throughout the Class Period.  For example, Defendant Bourque told analysts on an October 28, 2015 earnings call discussing Ocwen's financial results for the period ended September 30, 2015 that: "we are improving our cost structure to better align to a smaller servicing business, but also one that *better leverages technology and improved processes*." On that same call, Defendant Faris informed analysts that: "*we are balanced between meeting our obligations to our customers, meeting the various regulatory compliance requirements*, and delivering for our shareholders."

42.    The market, along with ratings agencies, believed these and other materially false and misleading statements and omissions detailed at length herein to be true.  For example, in a report dated October 29, 2015, Oppenheimer stated that Ocwen "has made significant strides" in part because "the regulatory environment is getting better (open state exams down)" and "Management has been strategically executing to turn the ship around … the current open state regulatory exams declined from 18 in 2Q15 to 12 in 3Q15. We believe this shows much needed progress." Similarly, in a report dated February 19, 2016, Fitch Ratings ("Fitch") upgraded

---

[6] Emphasis added throughout unless otherwise indicated.

Ocwen's Mortgage Servicer Rating[7] from RPS4 to RPS3-, and from RMS4 to RMS3-. The primary reason for the upgrades were "Ocwen's improved governance and operational controls, refocus on private label securities servicing, and highly integrated technology environment." In that same report, Fitch went on to note, "Ocwen's corporate governance and operational framework have been key factors in Fitch's servicer ratings. [...] The enhancements made by Ocwen are expected to result in improved compliance and effectiveness in working within a more regulated servicing environment." Fitch focused on Ocwen's use of "highly integrated systems, resulting in a strong technology environment. The Company's primary and special servicing operations leverage a number of systems from Altisource Portfolio Solutions S.A. (Altisource), including its core servicing system REALServicing."

43.     As set forth in detail herein, throughout the Class Period, Ocwen falsely represented to the investing public that it had: (i) substantially complied with the terms of the Regulator Settlements; (ii) strengthened its corporate governance, and internal controls; (iii) that Ocwen was committed to serving borrowers; and (iv) corrected any issues that existed with the REALServicing platform. Ocwen, however, had done none of the above.

> **D.     Throughout The Class Period, REALServicing Was So Fraught With Deficiencies That It Could Not Properly Function As A System Of Record And Caused Ocwen To Violate Various Federal And State Mortgage Servicing Laws**

44.     While Defendants were publicly touting Ocwen's improved internal controls, servicing standards, compliance, and cooperation with state and federal regulators, Defendants

---

[7] Fitch Servicer Ratings are designed to be an indication of a servicer's ability to effectively service commercial mortgage backed securities and residential mortgage backed securities. The ratings are done based on a scale of 1-5 with 1 being the highest rating. The ratings are written with a C, R SB, CLL, or AB prefix to denote the asset class to which it applies: 'C' for commercial mortgage loans, 'R' for residential mortgage loans, 'SB' for small balance commercial mortgage loans, 'CLL' for commercial loan level, and 'AB' for assert-backed and/or unsecured loans. Following the asset class prefix is an abbreviation denoting the servicer type: 'PS' for primary servicer, 'MS' for master servicer, 'SS' for special servicer, or 'CLS' for construction loan servicer. The rating can also be followed by a + or a –.

privately knew (or recklessly disregarded) that the system of record that served as the backbone of Ocwen's entire enterprise, and upon which Ocwen's successful regulatory compliance depended, REALServicing, was woefully inadequate. Defendants knew that the errors and inefficiencies within the REALServicing system of record directly led to errors throughout the servicing process that caused them to breach the terms of the Regulator Settlements, violate state and federal law, and substantially harm borrowers.

45.     During the Class Period, pursuant to various federal regulations, including the CFPA, TILA, FDCPA and RESPA, and similar state analogues, Ocwen was required to provide its borrowers with clear information concerning interest rates, fees and penalties.

46.     REALServicing, in conjunction with Ocwen's lack of effective internal controls, resulted in Ocwen's violating these federal and state regulations in several ways.  First, Ocwen sent many borrowers periodic statements that contained inaccurate information – such as the date when Ocwen received a borrower payment or the payment amount owed by a borrower – because of inaccurate information in REALServicing. Even when REALServicing contained accurate information, other deficiencies resulted in Ocwen sending borrowers statements with inaccurate information related to: (i) interest; (ii) late fees; (iii) escrow accounts; (iv) prepayment penalty statuses; (v) payment amounts; (vi) deferred principal balance amounts; and (vii) payments that Ocwen should have credited but refused to credit and returned to borrowers.

47.     REALServicing was the critical software platform that was relied on when Ocwen would acquire a mortgage.  For example, when Ocwen acquired servicing rights for loans, it would transfer, or "board" the records for those loans onto REALServicing. One of the key issues with REALServicing was that, during the Class Period, it was a proprietary system. During Ocwen's pre-Class Period acquisition binge, when Ocwen acquired the rights to service

22

millions of residential loans, all pertinent loan servicing data was transferred from the systems of records that the previous mortgage servicers used and placed onto Ocwen's REALServicing system.

48.    This boarding process led to critical errors in data sharing, accessing, monitoring, and updating for Ocwen and its employees. For example, the systems of records that other mortgage servicers used contained data fields that were different from the data fields in REALServicing. To check whether it was correctly transferring information from the old systems of record onto REALServicing, Ocwen employees would have to verify the critical loan data fields – interest rate, property type, and unpaid principal balance – by matching it with the data in the borrowers' loan documentation.  If the information in REALServicing did not match what Ocwen found in the documents, Ocwen was supposed to correct the error in REALServicing.

49.    Ocwen's goal was to complete this loan verification process within 60 days of boarding the loan onto REALServicing.  According to the CFPB Complaint, however, Ocwen did not complete this process within 60 days, meaning that errors went uncorrected for much longer.   Rather, the Company would rely on "unverified loan information for months— sometimes more than a year—to service hundreds of thousands of loans."[8]  According to the CFPB, by the end of 2014, Ocwen had a backlog of 1.3 million unverified loans from one acquisition, and, by April 2016, 263,000 of those same loans were still backlogged.[9]  The servicing of these unverified loans was problematic when Ocwen was finding, pursuant to its own internal tracking, extraordinarily high numbers of loans it was servicing based upon erroneous information.  For example, in March 2016, *90 percent* of the loans Ocwen verified

---

[8] CFPB Complaint ¶ 38.
[9] CFPB Complaint ¶ 39.

contained errors or incomplete information that required correction.[10]

50.     According to the CFPB, as a result of Ocwen's own internal tracking, the Company determined between September 2014 and April 2016 that it needed to make more than 870,000 corrections in REALServicing, including more than 43,000 corrections to the maximum late fees a borrower could be charged, 31,000 corrections to the loans' maturity dates; 27,000 corrections to loan terms; 24,000 corrections to loans' first interest rate cap maximum, and 5,000 corrections to loans' interest rates.[11]

51.     Ocwen's problems with onboarding, as alleged by the CFPB, were the result of the "fundamental system architecture and design flaws" of REALServicing.[12]  These myriad flaws included that:

(1) REALServicing required the use of more than 10,000 comment codes and flags, but lacked a complete data dictionary defining them, resulting in a lack of common understanding between Ocwen personnel as to what they mean or how they should be used;

(2) Ocwen employees didn't understand how changes to certain codes impacted other codes or processes.  According to the CFPB, Ocwen's former Head of Compliance from August 2013 to September 2015 testified in May 2016 that he repeatedly requested information on the meaning of the codes and their impact on upstream and downstream activities, but that neither Ocwen nor Altisource could provide that information;

(3) REALServicing lacked necessary automation and functionality, resulting in excessive "manual workarounds", which were prone to human error; and

(4) REALServicing lacked the system capacity to process the large number of loans acquired by Ocwen, resulting in long periods of system unavailability.

52.     Prior to the Class Period, Defendants knew that REALServicing suffered from myriad, critical failures, rendering it incapable of functioning as a system of record for the

---

[10] CFPB Complaint ¶ 45.
[11] CFPB Complaint ¶ 46.
[12] CFPB Complaint ¶ 58.

Company. Specifically in an internal communication sent to Defendant Faris in 2014, Ocwen's Head of Servicing described Ocwen's technology as *"[a]n absolute train wreck*. I know there's no shot in hell but *if I could change systems tomorrow I would*." [13]   Further explaining his exasperation with REALServicing, the Head of Servicing wrote to Defendant Faris that: "I can't tell you the number of hours I and others spend on basic servicing technology blocking and tackling. I'm not talking about differentiators here, *I'm talking about getting system to stay online, escrow analysis to work, letters to print, etc. It's ridiculous.*"[14] Indeed, REALServicing was incapable of completing even the most rudimentary of functions, including staying online or printing letters.

53.    The many failures of REALServicing made it impossible for Ocwen to be in compliance with the governing federal and state mortgage lending laws. According to the CFPB, Ocwen's former Head of Servicing Compliance testified in May 2016 that she was "'absolutely' concerned that Ocwen could not service loans on REALServicing in compliance with applicable laws when she worked at the Company between 2014 and 2015."[15]   She further testified that: "she, other members of the Compliance Department, and the leaders of Servicing Operations, Loss Mitigation, and other Ocwen business units 'frequently' and 'loudly' raised this concern."[16] Furthermore, as to the causes of this problem, she recounted "'*the answer would almost always be REALServicing and the processes that we're using*, would be the answer we would get from business .... [It was a] commonality across all of [the business units].... Everything in servicing, every department in servicing.'"[17]

54.    Likewise, in late 2014, as alleged in the CFPB Complaint, the Head of Ocwen's

---

[13] CFPB Complaint ¶ 50.
[14] CFPB Complaint ¶ 50.
[15] CFPB Complaint ¶ 51.
[16] CFPB Complaint ¶ 51.
[17] CFPB Complaint ¶ 51.

Escrow Department wrote an email which was forwarded to Ocwen's Chief Executive Officer, stating that:

> *I've stressed importance of getting the … escrow balance issues fixed … It's a system issue* because a bucket that determines the amount of money that a customer sends for their monthly payment can change with no record of why on the system . . . . *Please help get the importance across on this issue* … Even with a control report to catch them, there is still risk the balance will be wrong when you actually analyze the account.

55.     In late 2014, as noted by the CFPB Complaint, Ocwen's then Head of Servicing emailed Defendant Faris to request additional consulting resources to handle Ocwen's escrow deficiencies because, as Ocwen's Head of Servicing Operations reported:  "*you are familiar with this issue* - the BK escrow balance bucket is wrong and requires every BK loan to be manually reviewed and we can still have errors."

56.     The RealServicing problems were echoed by an outside consultant that Ocwen hired in 2015. Indeed, both Ocwen and its consultant concluded that REALServicing lacked the basic system architecture and design necessary to properly service loans.[18]   Deficiencies identified by the consultant included: (i) a high volume of loan errors requiring manual revision; (ii) limited available data fields causing various groups to use and reuse the same fields for different information; and (iii) limited system functionality to accommodate the Service Members Civil Relief Act requirements (in other words, not providing the required accommodations to members of the United States Armed Services who were in active duty) such as the inability to stop fees if a fee was in place prior to a borrower becoming eligible under the Service Members Civil Relief Act.[19]

57.     Ocwen's own internal investigation into its servicing issues further revealed critical problems concerning REALServicing.  Since 2014, Ocwen had created a system to track

---

[18] CFPB Complaint ¶ 52.
[19] CFPB Complaint ¶ 48.

its regulatory violations, risk areas, and other failures in spreadsheets called "Risk Convergence Reports."[20] Each item was assigned a risk rating. The ratings ranged from "R1" to "R5." R1 was the highest risk rating which included the following issues: "'potential adverse impact of over $5 million'; '***actual or high possibility of fraud***, waste or abuse'; 'breach of company policy or procedures (frequent, repeat, or disregarding policy)'; '***noncompliance with the law or regulation***'; or 'material errors or irregularities are a reasonable possibility.'"[21] As of August 2015, Ocwen had 2,803 issues on its Risk Convergence Report, more than 550 of which had been assigned the highest risk rating, R1. The CFPB Complaint recounts that, following the August 2015 Risk Convergence Report, in 2016, Ocwen's Chief Information Officer and other personnel conducted an analysis of REALServicing, and this analysis found that REALServicing had "***significant deficiencies represent[ing] significant risk and expense to Ocwen***" and that "'the most important dimensions of Core Technology' to REALServicing, such as performance and scalability, loan type support, risk exposure, and organizational capability, compare[d] 'unfavorably' to other mortgage platforms."[22]

58.     After analyzing REALServicing and interviewing Ocwen executives, Ocwen's outside consultant determined that REALServicing contained numerous, critical failures. Specifically, Ocwen's outside consultant determined that: (i) Ocwen's "lack of business process automation had resulted in excessive manual processes;" (ii) "manual workarounds and reporting were widely used to compensate for insufficient system functionality to complete, track, or control processes;" and (iii) "while appearing cost effective, manual controls posed significant risk in a heightened compliance environment."[23] Importantly, the use of manual processes could

---

[20] CFPB Complaint ¶ 53.
[21] CFPB Complaint ¶¶ 53-54.
[22] CFPB Complaint ¶ 57.
[23] CFPB Complaint ¶ 64.

result in substantial human errors, and, as the former Head of Compliance who worked at Ocwen from August 2013 through September of 2015 testified, human error is "one of the sort of classic reasons one automates a manual process."[24] Ocwen's former head of Servicing Compliance put it succinctly when he stated: ***"Every business unit in the entire organization' lacked sufficient controls to prevent mistakes and to detect when mistakes occurred***."[25]   In other words, REALServicing was woefully ineffective, and its continued use guaranteed future loan servicing errors.

59.     Ocwen business leaders knew that these substantial deficiencies would result in significant compliance failures subjecting the Company to further sanctions, loss of MSRs, and financial losses. According to the CFPB Complaint, in 2015, Ocwen's outside consultant conducted interviews with Ocwen business leaders who identified 67 failures representing "functional and/or technical deficiencies" that "stemm[ed] from systematic and manual processes," including:

    i.    With respect to escrow: a technical gap causing escrow analysis to be conducted incorrectly and a manual bankruptcy workaround for loans acquired already in bankruptcy, caused information to be deleted from history as new information was updated;

    ii.    With respect to insurance disbursements: no systematic controls exist to prevent duplicate disbursements in REALServicing resulting in 6,000-12,000 incidents per year. Personnel must manually remove necessary codes;

    iii.    With respect to loan modification processes: upon review of a loan modification package, terms are found to be incorrect approximately 80% of the time;

    iv.    With respect to foreclosure data: data between REALResolution (the REALServicing application for foreclosures) and REALServicing is not always in sync due to

---

[24] CFPB Complaint ¶ 67.
[25] CFPB Complaint ¶ 68.

lack of adequate system mapping; and

v.   With respect to the payment of borrower taxes: although tax assessment information is supposed to be used to project more accurate payments, REALServicing automatically uses last years billing amounts even if installments for the current year are different.[26]

In other words, Ocwen's own executives admitted that, during the Class Period, REALServicing caused critical failures in numerous aspects of the Company's core servicing responsibilities.

60.   Further, according to the CFPB Complaint, by at least spring of 2016, "Ocwen had concluded that REALServicing was broken in a number of ways that adversely affected borrowers whose loans were subject to bankruptcy protections" including that:

i.   When REALServicing made a contractual payment using pre- or post-petition funds, the payment covered only the principal and interest component. Escrow was not paid. This was contrary to what bankruptcy courts expected;

ii.   There was no connection between the proof of claim as determined in Equator/REALResolution (the system Ocwen uses to process bankruptcy) and the pre-petition arrearage balances in REALServicing; and

iii.   The process of converting a bankruptcy trustee payment to a payment batch was highly manual and, therefore, both inefficient and at risk of error.[27]

61.   Despite knowing of these system failures and REALServicing's woeful ineffectiveness in servicing loans, Defendants continued to use REALServicing for at least another three years, until the end of the Class Period.  Throughout that time, Defendants touted the Company's purported compliance with the Regulator Settlements, its supposed commitment to borrowers, and the effectiveness of the Company's internal controls over financial reporting, while at the same time failing to disclose that REALServicing was a dysfunctional system incapable of servicing mortgages for the Company.

---

[26] CFPB Complaint ¶ 70.
[27] CFPB Complaint ¶ 90.

### E. Ocwen's Reliance On REALServicing Causes Disastrous Results For Borrowers

62. The utter ineffectiveness of REALServicing manifested itself in numerous ways which severely harmed borrowers, causing them to pay unwarranted fees and penalties, pay for products and insurance they did not need, and, tragically, in many cases lose their homes due to unwarranted foreclosures.

### i. Ocwen's Mishandling Of Borrowers' Payments

63. According to the CFPB Complaint, Ocwen's cashiering department, which dealt with crediting incoming borrower payments and making disbursements for taxes or insurance, had to manually enter, pull and match entries in REALServicing for more than 45,000 borrower-related transactions each day.  Ocwen's internal business units requested that Ocwen automate REALServicing because the volume of transactions created an "immense need" to do so to reduce the risk of data loss or corruption.[28]  Yet, Ocwen failed to make such changes, as explained in the CFPB Complaint, resulting in its routine failure to send timely and accurate periodic statements, failure to timely and accurately credit and apply borrower payments, and failure to correct billing and payment errors.[29]

64. Further according to the CFPB Complaint, these deficiencies caused Ocwen to violate Regulation Z (under TILA), Regulation X (under RESPA), the CFPA and/or the FDCPA by, *inter alia*, sending borrowers periodic statements with inaccurate information on interest, fees, escrow amounts, penalties, payment amounts, balance amounts, and payments that Ocwen should have credited but refused to credit and instead returned to borrowers; failing to credit payments from borrowers' suspense accounts when the amounts had accumulated sufficient

---

[28] CFPB Complaint ¶ 90.
[29] CFPB Complaint ¶¶ 74-76.

funds to cover a full payment; and misapplying payments vis a vis principal, interest and fees.[30]

65.     One example from the CFPB complaint is that of a customer who attempted to prepay her mortgage in April 2016.  She sent Ocwen two checks—one for principal and interest, and one for her escrow payment, on or about April 2, 2016 to pay her May 2016 mortgage payment.  Even though the borrower sent the checks in the same envelope, Ocwen records showed that it received and processed the payments on different days.  Then, when the borrower received her May 2016 mortgage statement, she saw that Ocwen had misapplied her April 2016 principal and interest payment into a suspense account.  As a result, even though she had *prepaid* her mortgage, Ocwen changed her status to delinquent, charged her late fees, and made "disruptive and embarrassing calls to her" at home and work.[31]

### ii.   Ocwen's Mishandling Of Escrow Accounts

66.     Ocwen also failed to perform even the most basic tasks associated with managing borrowers' escrow accounts.  According to the CFPB Complaint, Ocwen miscalculated borrowers' escrow amounts by incorrectly paying borrowers' insurance premium charges twice; disbursing borrowers' insurance premiums to the wrong insurance companies; creating escrow accounts even though borrowers were already paying their insurance premiums or taxes directly to their insurance companies or taxing authorities; and failing to account for accurate escrow amounts in borrowers' loan modification payment amounts, which borrowers learned of only after accepting the new modified amount. These errors resulted in Ocwen charging, collecting, or attempting to collect incorrect escrow amounts from borrowers.[32]

67.     During the Class Period, issues with Ocwen's controls related to escrow accounts were raised by Ocwen's auditors.  For example, in another example of the deficiencies with

---

[30] CFPB Complaint ¶¶ 81-89.
[31] CFPB Complaint ¶ 97.
[32] CFPB Complaint ¶¶ 116-17.

REALServicing's lack of automation, Ocwen's personnel had to manually enter a comment code in REALServicing when a borrower paid an escrow shortage. In a March 30, 2016 audit, Ocwen's auditor found that Ocwen did not have adequate controls over the entry of these comment codes and therefore Ocwen could not detect when its personnel failed to manually enter appropriate comment codes relating to escrow shortages. Ocwen's auditors found that this resulted in "the continued collection of escrow shortage amounts" that borrowers already paid. Ultimately, "Ocwen failed to timely process escrow shortage payments for what Ocwen estimates to be 5,000-10,000 borrowers."[33] The CFPB Complaint recounts that "from April 2015 to April 2016, Ocwen received more than 53,000 complaints relating to its handling of escrow accounts."[34]  These failures once again caused Ocwen to be in violation of RESPA, the CFPA, and the FDCPA, which require servicers to perform escrow analyses, refund overpayments, and have adequate policies and procedures designed to ensure that the servicer is providing timely and accurate disclosures.  Borrowers in bankruptcy were especially affected by the lack of timely escrow analysis because the courts expected accurate information within certain time periods.  In June 2016, Ocwen's Head of Bankruptcy testified that 22,000 borrowers in bankruptcy were impacted by these failures.[35]

### iii.  Ocwen's Mishandling Of Borrowers' Hazard Insurance

68.    During the Class Period, Ocwen also violated the RESPA, the CFPA and the FDCPA due to its errors concerning borrowers' hazard insurance.  Specifically, "due to syncing and updating failures between REALServicing and Ocwen's insurance vendors' systems, Ocwen's insurance vendor did not recognize that numerous Ocwen borrowers had escrow

---

[33] CFPB Complaint ¶ 115.
[34] CFPB Complaint ¶ 123.
[35] CFPB Complaint ¶ 110.

accounts and therefore failed to make payments to these borrowers' insurance companies."[36] Further, incorrect account data in REALServicing led Ocwen to make double payments for the same insurance policy on approximately 3,275 accounts, disburse premiums to the wrong payee and fail to timely make approximately 40,000 insurance payments.[37]

69.     Ocwen's use of inaccurate insurance data also caused Ocwen to charge borrowers for insurance premiums related to policies that borrowers did not need.[38]  For example, in 2015, when Ocwen audited flood zone data, it uncovered over 3,000 loans for which the flood-zone-related data in REALServicing was not correct.[39] Auditors also found that Ocwen "lack[ed] sufficient controls to ensure lender-placed flood insurance policies do not exceed regulatory required coverage amounts," and that  "there were instances where gap insurance policies were created, even though the customer independently purchased sufficient flood insurance."[40]

70.     These insurance-related failures led Ocwen to improperly quote customers their premiums owed, or whether premiums were due at all, causing a significant number of complaints. According to the CFPB, from April 2015 to April 2016, Ocwen received complaints from more than 19,000 borrowers related to the borrowers' insurance policies. Specifically, Ocwen made multiple errors relating to the imposition of unneeded force-placed insurance, failing to pay borrowers' hazard insurance, or failing to timely issue refunds.[41]

### iv.  Ocwen's Mishandling Of Borrowers' Private Mortgage Insurance

71.     During the Class Period, Ocwen also failed to timely cancel borrowers' private mortgage insurance ("PMI"). Borrowers are typically required to purchase PMI when they put

---

[36] CFPB Complaint ¶ 133.
[37] CFPB Complaint ¶ 133.
[38] CFPB Complaint ¶ 136.
[39] CFPB Complaint ¶ 139.
[40] CFPB Complaint ¶ 139.
[41] CFPB Complaint ¶¶ 140-141.

less than 20 percent down on a home purchase, or when they refinance their mortgage but have less than 20 percent equity in their home. Under the Homeowner's Protection Act ("HPA"), servicers must automatically terminate a borrower's PMI upon certain benchmarks, typically, on the date when the principal balance of the mortgage reaches 78 percent of the original value of the property.[42]  However, during the Class Period, Ocwen repeatedly violated the HPA by failing to timely terminate borrowers' PMI.  These problems stemmed from unreliable or often missing termination data in REALServicing.[43]  The CFPB reported that Ocwen overcharged borrowers approximately $1.2 million in PMI premiums.[44]

### v. Ocwen Failed To Respond To Borrower Complaints And NOEs

72.     As a result of the substantial errors at every stage of the loan servicing process, it was crucial that Ocwen adequately monitor, investigate, and respond to borrower complaints and notices of errors ("NOEs"). An NOE is a written borrower notice sent to an Ocwen-designated address alleging certain types of errors or inaccuracies with the borrower's account.  The submission of an NOE entitles borrowers to additional protections under federal regulations, including Regulation X, which requires that mortgage servicers have policies and procedures for the investigation and response to NOEs.  Between April 2015 and April 2016 alone, Ocwen received more than 68,000 complaints from borrowers related Ocwen's improper processing of borrower payements.  During that same period, Ocwen received more than 19,000 complaints from borrowers related to Ocwen's mishandling of the borrowers' insurance policies. Moreover, during the Class Period, Ocwen received more than 53,000 complaints relating to its improper handling of escrow accounts.  Indeed, since April 2015, Ocwen has received more than half a

---

[42] CFPB Complaint ¶¶ 144-145.
[43] CFPB Complaint ¶ 146.
[44] CFPB Complaint ¶ 146.

million complaints and written notices of error from more than 300,000 different borrowers.[45]

73.    However, during the Class Period, Ocwen failed to implement policies and procedures to effectively respond to NOEs and correct errors. According to the CFPB, this was due to "insufficient policies and procedures and an over-reliance on rigid scripting."[46] Contrary to the requirements set forth in the Regulatory Settlements concerning the maintenance of adequate customer care personnel and procedures, Ocwen's policies severely inconvenienced borrowers by requiring borrowers to complain multiple times, at least five times in nine days, before the borrower's complaint could be escalated.[47]

74.    Additionally, the CFPB Complaint details that "Ocwen has relied on inaccurate data in REALServicing, and the Ocwen personnel who investigated borrowers' complaints and NOEs are not required to cross-reference Ocwen's known and documented systemic errors, such as payment processing and application, escrow, and insurance errors, and thus did not consider that information in their investigations."[48]    According to the CFPB, Ocwen would simply respond to the NOEs with the erroneous information contained in REALServicing.[49] In other words, Ocwen's responses to its own REALServicing-caused errors contained errors – because those responses were created in part by REALServicing.

### vi.   Ocwen Illegally Foreclosed On Borrowers' Homes

75.    Under the CFPA and Regulation X, mortgage servicers are prohibited from engaging in unfair, deceptive, and abusive acts and practices in the context of foreclosure activity.  During the Class Period, Ocwen used foreclosure attorneys to handle foreclosures but violated this law and regulation by failing to accurately maintain foreclosure-related information

---

[45] CFPB Complaint ¶¶ 163-65.
[46] CFPB Complaint ¶ 168.
[47] CFPB Complaint ¶¶ 167-69.
[48] CFPB Complaint ¶ 173.
[49] CFPB Complaint ¶¶ 170-73.

necessary to ensure that it provided borrowers with required foreclosure protections.  As a result

of these and other failures, Ocwen wrongfully initiated foreclosure proceedings and wrongfully

conducted foreclosure sales.[50]

76.     Specifically, in a 2015 audit, Ocwen's auditors found that Ocwen's foreclosure

law firms had failed to provide Ocwen with accurate information. These included Ocwen's

largest foreclosure firm in Florida failing to accurately update Ocwen's systems with the correct

foreclosure milestone dates for *100 percent* of the loans tested, one of Ocwen's Oregon

foreclosure firms failing to timely upload documentation to Ocwen's system for *80 percent* of

the loan files tested, and one of its foreclosure firms in New Jersey failing to upload all

documents to Ocwen's system for *60 percent* of the loan files tested.[51]   The impact of these

massive failures meant that Ocwen did not have the ability to view and ensure all documents

completed by the attorney were accurate.[52]

77.     Similar results occurred in Ocwen's own audits of its foreclosure practices during

the Class Period. For example, in March 2016, Ocwen conducted an internal audit of its

foreclosure operations and found that for foreclosures initiated between July and December

2015, there was a failure to upload relevant documents thirteen percent of the time, delays in

uploading documents thirty percent of the time, and a failure to update accurate event completion

dates in Ocwen's system sixty percent of the time.[53]

78.     Upper management at Ocwen and other key Ocwen personnel were aware of

Ocwen's foreclosure attorneys' failure to provide accurate and current information. They were

also aware that this failure had negatively impacted Ocwen's ability to service loans. Ocwen's

---

[50] CFPB Complaint ¶¶ 177-83.
[51] CFPB Complaint ¶ 186.
[52] CFPB Complaint ¶¶ 185-86.
[53] CFPB Complaint ¶ 187.

Head of Loss Mitigation testified in December 2015 that he had become aware earlier in 2015 that "Ocwen's systems had missing or inaccurate foreclosure sale dates."[54]  These failures were important because Ocwen's Loss Mitigation employees needed accurate dates to, among other things, determine return dates for missing documents in borrowers' loss mitigation applications. Ocwen's Head of Loss Mitigation told Ocwen's Head of Foreclosure that the Loss Mitigation Department needed these dates to be accurate, but he "was unaware whether Ocwen took to ensure that this actually occurred."[55]

79.     In May 2016, Ocwen's Head of Foreclosure testified that he was aware of the Company's lack of proper foreclosure information.  However, he explained that Ocwen's policies and procedures did not require the Company's attorney managers to test the accuracy of the data Ocwen's foreclosure firms entered into its systems, and that Ocwen's system prevented foreclosure attorneys from making any changes to the foreclosure sale date when there was a foreclosure hold on an account.[56]  Moreover, Ocwen did not require its foreclosure attorneys to contact Ocwen with updated foreclosure sale date information so that Ocwen employees could input that information themselves.[57]

80.     As a result of these failures, Ocwen improperly initiated foreclosures, obtained foreclosure judgments, and conducted foreclosure sales on borrowers' accounts in which there were foreclosure holds.[58]  These included cases where borrowers were supposed to be protected from foreclosure under Regulation X because they had filled out complete loan modification applications.  The CFPB alleges that Ocwen told borrowers that their applications required additional information when they were, in fact, complete, or when additional information was

---

[54] CFPB Complaint ¶ 188.
[55] CFPB Complaint ¶ 188.
[56] CFPB Complaint ¶ 189.
[57] CFPB Complaint ¶ 189.
[58] CFPB Complaint ¶ 190.

required, foreclosed on the borrowers prior to the deadline it had given borrowers to submit the information.[59]   In addition, according to the CFPB, Ocwen was foreclosing on homes whose borrowers had accepted and were performing upon the terms of loan modification agreements.[60]

81.     The CFPB Complaint quotes an internal email from Ocwen's Head of Loss Mitigation admitting that Ocwen should not be engaged in these improper practices.  An official in his department wrote him questioning:

> Please confirm if our missing letter states that if they don't send a complete package we will go ahead with the sale irrespective of the missing doc due date.  To me that does not sound right, where we inform the borrower to send in documents by a date but go ahead with sale prior to expiration of that date.

The Head of Loss Mitigation responded:

> ***If there is no denial on the current instance you should not be going to sale, period*** … You need to think like a customer which is with a denial you will still think you have time.[61]

**F.     Former Ocwen Employees Corroborate REALServicing's Many Loan Servicing Failures**

82.     Former Ocwen employees have explained that, throughout the Class Period, REALServicing was woefully ineffective, rending any purported compliance, or attempt at compliance, with the Regulator Settlements impossible.

83.     A former Ocwen employee ("FE1") who was a senior manager of examinations for Ocwen during the Class Period from June 2015 until June 2016, corroborates many of these issues.   FE1's position was part of the Compliance Department, and FE1 supervised 18 compliance personnel, including 4 managers.  At the beginning of FE1's employment at Ocwen, FE1 reported directly to Ocwen's Vice President of Compliance Ben Purser ("Purser").   Later

---

[59] CFPB Complaint ¶ 196-97.
[60] CFPB Complaint ¶ 200.
[61] CFPB Complaint ¶ 199.

during FE1's time at Ocwen, FE1 reported directly to Ocwen's Chief Compliance Officer, Michael Hollerich ("Hollerich").

84.     FE1 was responsible for facilitating and maintaining Ocwen's relationships with both state examiners and federal regulatory bodies.  FE1 was the sole point person at Ocwen for the regulatory agencies and examinations and distributed periodic reports to both the Chief Compliance Officer and Chief Risk Officer at Ocwen.  FE1 was also responsible for working with the risk department to identify, assess and mitigate operational and compliance efforts inside of his operation, which was examinations.

85.     Every week and month, FE1 generated a report detailing the status of each ongoing regulatory exam (the information requested by government agencies) as well as any remediation efforts.  These reports would contain the total count of open exams and their status, as well as detailing the lines of business affected by those exams and any fines resulting from these exams.  Once an exam was announced, FE1 would provide reporting to all lines of businesses involved.  FE1 confirmed that these reports were distributed to Purser, Hollerich, and Ocwen's Chief Risk Officer, Marcelo Cruz.  FE1 knew that these reports were distributed to Defendant Faris because Faris was very hands-on and wanted to know what was going on concerning Ocwen's compliance with its regulators.

86.     FE1 worked with the lines of the businesses that were responsible for REALServicing.  When regulators would request information about RealServicing, he would request information from the lines of businesses that used that platform.  FE1 explained that based on responses FE1 received from those business lines, there were constantly issues with REALServicing. For example, often records that were supposed to be available on the REALServicing system simply weren't retrievable. Specifically FE1 recounted "within the

[REALServicing] system glitches or system problems made some information permanently unavailable."

87.     According to FE1, responses requested by regulators about RealServicing could not always be provided by the relevant lines of business.  Further, FE1 revealed that responses to the regulators would never be as transparent as the full extent of Ocwen's problems.  FE1 confirmed that Ocwen's leadership, including Purser and Hollerich, was aware of these issues, including the problems with REALServicing, from the time he started working at Ocwen.  Further, FE1 explained that a compliance manager FE1 knew who dealt with remediation efforts at Ocwen, Bruce Gerbotch, reported directly to the Company's Chief Technology Officer.

88.     Another former Ocwen employee ("FE2") corroborates these and similar problems arising out of REALServicing.  FE2 was a loan servicing supervisor for OLS from April 2014 through June 2015.  FE2 reported to the Director of Customer Care Call Center Cindy McGovern, who in turn reported to OLS Director Trent Littleton.  FE2 noted that the lack of information available through Ocwen's REALServicing platform made it difficult or impossible to address most borrower complaints.  "There [were] always problems with REALServicing," FE2 reported.  "We didn't see what was entered -- all you could see was whatever was going on with the mortgage [currently]: the address, whether it's a [bank-owned] property, the broker information; you could see payments."   Because there was no way to look back and see what information had been entered when, it was all but impossible to identify errors.

89.     FE2 detailed that half of the calls OLS's customer service department received each day were complaints from borrower after borrower alleging the same problems outlined in the CFPB Complaint against the Company.  The complaints weren't often minor.  Borrowers

called after receiving their bills and claimed their payments weren't reflected correctly on their statement or that their loan balance was wildly off.  The dollar figure discrepancies were significant and many callers were in serious distress.  Borrowers complained that their account statements contained inaccurate information, that the Company had made errors entering information about their account into their system or had failed to credit their payments, or that they were being charged for services they had not requested.  Others called distraught, having received a notice indicating they were nearing foreclosure, though they thought they were up to date with payments.

90.     FE2 explained, "All day every day customers were calling in to complain -- every other call was a complaint. They said the information in their account was wrong; that there was improper lien holder info; improper escrow info – everything."  The sheer volume of complaints about the accuracy of the account information stored by REALServicing was staggering. But despite the similarities between the content of the complaints pouring in from different customers and the persistence of those grievances over the duration of FE2's tenure, there was nothing he or his colleagues could do to confirm, deny, change or correct information within the system.  FE2 reported, "The problems borrowers were experiencing were typically similar, but REALServicing didn't provide a … means to get to the bottom of these," FE2 said.

91.     Further, when FE2's team could identify a mistake in a borrower's account, FE2's team could not and were not supposed to fix it.  Instead, they were mandated to send an email to Ocwen's India office where the employees could make corrections in REALServicing.  Sometimes the representative in India who investigated a complaint added their findings in a note in REALServicing, but there was no guarantee that a borrower would ever receive any additional information once a complaint was forwarded.

92.     FE2 and his team didn't have any visibility once a borrower's complaint was sent to the team in India. FE2 explained that the loan servicing division of Ocwen never provided his team with the tools they needed to get borrowers the answers necessary to put their minds at rest, or even save their homes in some cases. All they could really do was forward the complaints to India for investigation. The customer services representatives were also told that under no circumstances were they to let the borrowers know their complaints were being forwarded to India and would be dealt with from abroad moving forward.

93.     FE2's team forwarded about 100 complaints to India each day.  He explained that at no point during his tenure was a new policy laid out at Ocwen for dealing with complaints. For the duration of his employment, the policy was to escalate everything requiring a correction to India.

94.     Finally, FE2 reported that within Ocwen, it was understood that the borrowers' complaints were legitimate, but as media reports and negative regulatory attention increased, Defendant Faris instructed employees via email to continue doing everything the same way, despite the clear problems REALServicing was creating for Ocwen's customers.  Specifically, FE2 recounted that "Faris sent emails telling us to just disregard the complaints [from customers]; disregard and just keep business moving. The only thing that mattered was that we keep business moving."  These emails were sent from Faris's office to the entire customer service team and bore his name in the email signature.  FE2 received these emails at least three times spread out during his tenure, which approximately included the first five months of the class period.

**V.     PARTIAL DISCLOSURES AND THE EMERGENCE OF THE FULL IMPACT OF THE FRAUD**

95.     Beginning on February 29, 2016 and through the end of the Class Period, the true

facts concerning Ocwen's failure to comply with the terms of the Regulator Settlements, the woeful and unremediated state of Ocwen's RealServicing technology, and the true financial condition of the Company, including Ocwen's internal control failures, were revealed to investors and the public.

96.    On February 29, 2016, Ocwen released its Form 10-K for fiscal year ended December 31, 2015 (the "2015 10-K."). The 2015 10-K was signed by Defendants Faris and Bourque. In the 2015 10-K, Ocwen reported higher than expected costs in connection with monitoring of and compliance with the NYDFS Consent Order and other regulatory and litigation matters concerning lending misconduct arising out of the woeful state of REALServicing.  Specifically, Ocwen stated that: "The decline from 2014 [in charges related to regulatory settlements] to these expenses was offset in part by higher regulatory monitoring and compliance costs, litigation expenses and fees paid to advisers assisting us with strategic initiatives. Legal expenses increased primarily due to the costs of defending ourselves in proceedings alleging violations of federal, state and local laws and regulations …"

97.    Similarly, in a Company presentation held on February 29, 2016 concerning increased operating expenses in the fourth quarter of 2015, Ocwen noted that "Significant Cost Drivers" included both "Servicing Expenses" for reserves for uncollectible advances and "Legal Expenses" for higher legal defense spending.  Likewise, in supplemental comments made in connection with this earning release, the Company stated that, "We incurred $22 million of monitoring expenses in the quarter driven by increases in amounts charged by the California Auditor" and that "We also expect to have elevated legal costs in 2016, especially the first half of the year, as we continue to vigorously defend various legal matters."  During a conference call with investors and analysts held after the close of business on February 29, 2016, Defendants

Bourque explained these increased costs by stating that: "generally I would say monitors, consultants, outside counsel … the biggest driver right now is the monitoring costs, and we need to continue to work with those regulators to help bring them down."  Defendant Faris further explained these costs when he stated, "Just adding up those things that I just mentioned, I think account for over $170 million of costs in 2015. And that doesn't cover some of the other things that [Defendant Bourque] mentioned there. So there's a lot of things that we incurred this year that hopefully we will start to see decline over time."

98.     Analysts were dismayed by this news.  In a report dated March 1, 2016, Piper Jaffray stated that "The earnings miss was primarily due to higher operating expenses in spite of OCN's best efforts to reduce capacity while shrinking their servicing portfolio. The cost of meeting regulatory demands and defending against litigation continues to be a heavy burden … OCN has little choice but to defend itself against the various litigations and satisfy regulatory demands, which makes us believe higher operating expenses will persist through 2016 and into 2017."

99.     Likewise, the market reacted swiftly and negatively to this news.  Following this news, the price of Ocwen common stock plunged approximately 58%, falling from an opening price per share on February 29, 2016 of $5.02, to close at $2.11 per share on March 1, 2016 on extremely heavy trading.

100.     Defendants, despite the February 29, 2016, partial disclosure, continued to make materially false and misleading statements and omissions in order to artificially re-inflate the price of Ocwen common stock during the remainder of the Class Period.  For example, in the  in the Company's Form 10-Q dated July 28, 2016 (the "Second Quarter 2016 10-Q") signed by Defendant Bourque, the Company stated that: "***we are …  intensely focused on improving our***

*operations to enhance borrower experiences and improve efficiencies, both of which we believe will drive stronger financial performance through lower overall costs*." Also in the Second Quarter 2016 10-Q, Defendants stated that Ocwen: "***believe[d] its significant investments in [its] servicing operations, risk and compliance infrastructure over recent years will position us favorably relative to our peers***" should the acquisition of new MSRs become possible. Likewise, in a July 27, 2016 conference call with investors and analysts held after the close of markets discussing the Company's Second Quarter 2016 financial results, Defendants Faris stated that: "***[a]s a Company we continue to make progress in resolving our legacy issues…this legal spend is now largely behind us***" and "***[w]e remain focused on compliance, risk management, and service excellence. We are striving to regain approvals to be able to acquire MSRs again. We want to resolve our remaining legacy, regulatory, and legal concerns***."

101. Analysts credited Defendants materially false and misleading statements about the Company's purported focus on improving its operations and its investments in Ocwen's servicing operations and compliance and its purported progress to resolving its regulatory concerns. For example, in a report dated July 28, 2016, Compass Point noted that:

> OCN traded up sharply after yesterday's close on renewed optimism about there being some light at the end of the regulatory expense tunnel. Ocwen disclosed that it is working toward a settlement with its monitor from the California Department of Business Oversight (CADBO), which could potentially terminate its consent order … bottom-line: … it is good to see a little fight left in the dog.

102. The markets reacted favorably to Defendants' false reassurances. In response to Defendants' false reassurances, the price of Ocwen common stock surged 7.1% to close at $1.81 per share on July 28, 2016.

103. Defendants continued to make similar materially false and misleading statements

and omissions concerning Ocwen's purported progess resolving its regulatory matters throughout the Class Period. For example, on October 26, 2016, in a press release issued in connection with Ocwen's financial results for the period ended September 30, 2016 (the "Third Quarter 2016"), Phyllis Caldwell ("Caldwell"), a member of Ocwen's Board of Directors, stated that: "***We remain focused on putting legacy matters behind us. We received the much awaited Standard & Poor's upgrade to our servicer ranking in August. We continue to progress towards a potential resolution with the California Department of Business Oversight to end the current consent order and associated third party auditor before year-end***."

104. Once again, analysts were reassured by Defendants' materially false and misleading statements. For example, in a report dated October 26, 2016, Compass Point noted that: "OCN's CoB commented that the company continues to make progress on a potential resolution with the CA state regulator … We continue to view OCN getting out from under its various consent orders as a critical second leg of the regulatory relief rally." Likewise, in a report dated that same day, Oppenheimer noted that "the key this quarter in our mind is that the expense base now appears to be back under control at the same time that the monitoring and legal expenses are declining."

105. The markets reacted favorably to Defendants' false reassurances. In response to Defendants' false reassurances, the price of Ocwen common stock surged 10.8% to close at $4.12 per share on October 27, 2016.

106. Then, in February 2017, the truth concerning Defendants' fraud began to emerge once again. On February 16, 2017, Altisource revealed in its 2016 Form 10-K dated that day that the CFPB was investigating the relationship between Altisource and Ocwen. Specifically, Altisource revealed that, "on November 10, 2016, Altisource received a Notice and Opportunity

to Respond and Advise ("NORA") letter from the Consumer Financial Protection Bureau ("CFPB") indicating that the CFPB is considering a potential enforcement action against Altisource relating to an alleged violation of federal law that primarily concerns certain technology services provided to Ocwen." Indeed the technological services referred to by Altisource was REALServicing. Altisource went on to state that the CFPB's investigation could have a "material adverse impact on our business, reputation, financial condition and results of operations."

107.    Analysts responded negatively to this news. For example, in a report dated February 20, 2017, Compass Point noted that the NORA letter from the CFPB disclosed by Altisource was a "previously overlooked risk for investors."

108.    The market reacted swiftly to Altisource's disclosure. Following Altisource's disclosure of the CFPB investigation, the price of Ocwen common stock plunged approximately 11.7%, falling from $5.82 on February 16, 2017 to close at $5.15 per share that day on extremely high trading.

109.    On February 22, 2017, Ocwen filed with the SEC its Form 10-K for the period ended December 31, 2016 (the "2016 Form 10-K"). The 2016 Form 10-K was signed by Defendants Faris and Bourque.  In the 2016 Form 10-K, Defendants disclosed that, in connection with the ongoing CFPB investigations of Ocwen, the Company had accrued a $12.5 million reserve charge.  Moreover, on February 23, 2017, Ocwen held a conference call with investors and analysts to discuss the Company's Fourth Quarter 2016 financial results. During the call, Defendant Faris referenced the possibility of Ocwen's being the subject of a CFPB enforcement action and that resolving such an action was a purported "priority" for the Company.

110.    Once again, analysts reacted negatively to this news. In a report dated February

24, 2017, Oppenheimer, referring to the CFPB investigation, noted the increase in "regulatory monitoring costs" affecting Ocwen and that there would be "uncertainty around ultimate resolution."  Likewise, in a report dated February 27, 2017, Compass Point noted unexpected losses to Ocwen concerning the CFBP investigation, specifically of Ocwen accruing a loss of $12.5 million in conjunction with Ocwen's purportedly monitoring and fixing REALServicing, that "[W]hile we don't know the extent of the issues, the $12.5M accrual was unexpected, and the new CFPB-related disclosure in the 10-K raises the spectre of further regulatory fines and operational handcuffs. The additional disclosure from OCN's servicing technology provider, Altisource Portfolio Solutions (ASPS), that it also received a NORA letter from the CFPB adds to uncertainty about whether the companies may need to change something about how they conduct business with each other going forward."

111.    The market reacted swiftly and negatively to this disclosure.  Following this news, the price of Ocwen stock plummeted approximately 18.1%, falling from an opening price that day of $5.50 per share to close at $4.42 per share on heavy trading volume.

112.    On that same day, April 20, 2017, the North Carolina Office of the Commissioner of Banks (the "NCCOB"), in addition to state regulators from more than twenty states (collectively the "Multi-State Mortgage Committee" or "MMC"), issued a cease-and desist order (the "Order") to Ocwen's subsidiaries as a result of the Company's gross mishandling of consumer escrow accounts.  As a result of Ocwen's misconduct, the Order, which was the result of the "culmination of several years of examinations and monitoring that revealed the company is mismanaging consumer mortgage escrow accounts," the Order "specifically prohibits the acquisition of new mortgage servicing rights and the origination of mortgage loans by Ocwen Loan Servicing …, a subsidiary of Ocwen, until the company is able to prove it can appropriately

manage its consumer mortgage escrow accounts." According to the Order, Ocwen "has engaged in, or is engaging in, or is about to engage in, acts or practices constituting violations of state and federal law and applicable regulations."

113.    The Order was based on over two years of compliance examinations conducted by numerous states. Specifically, on February 28, 2015, the states of Florida, Maryland, Massachusetts, Mississippi, Montana, and Washington conducted a multi-state examination of Ocwen in order to determine Ocwen's compliance with applicable federal and state laws and regulations, financial condition, and control and supervision of the licensed mortgage servicing operations. The examination covered both a period of time prior to and during the Class Period, January 1, 2013 through February 28, 2015 (the "Examination Period"), and, based on Ocwen misconduct during the Examination Period, the investigators identified "several violations of state and federal law, including, but not limited to, consumer escrow accounts that could not be reconciled and willful and ongoing unlicensed activity in certain states."

114.    The MMC investigation found numerous examples of mortgage servicing misconduct committed by Ocwen. For example, the examination found that Ocwen was "unable to accurately reconcile many of the consumer escrow accounts in its portfolio." The examination also found that Ocwen "failed to make timely disbursements to pay for taxes and insurance from escrow accounts on numerous loans." Similarly, the examination found that Ocwen "routinely sent consumers inaccurate, confusing, and/or misleading escrow statements." Additionally, the examination found that in 2015, Ocwen failed to provide key financial documents and reconcilements of its financial statements to regulators. Notably, the investigation also determined that Ocwen's financial condition was "significantly deteriorating."

115.    Significantly though, while the examination found that Ocwen subsidiaries were

49

conducting unlicensed servicing activity in numerous jurisdictions as referenced above, Ocwen made it difficult of the examining states to conduct the examination because "Ocwen's management failed to respond to requests for information in a timely manner."

116.   Based on the findings of the examinations, Ocwen entered into a "Memorandum of Understanding" on December 7, 2016 (the "MOU") with the MMC.   The MOU required Ocwen to retain an independent auditing firm to perform a comprehensive audit and reconciliation of all Ocwen consumer escrow accounts.   Ocwen was required to provide that audit to the MMC no later than January, 13, 2017.

117.   But by January 13, 2017, Ocwen did not provide that audit or an acceptable response to the MMC.   Specifically, Ocwen's response to the MMC was that reconciliation of escrow accounts, which "is paramount to ensuring the appropriate management of consumer funds," would cost $1.5 billion and "be well beyond Ocwen's financial capacity to fund." Instead of properly reconciling its escrow accounts, as mandated by the MOU, Ocwen suggested that a sample of only 457 escrow accounts be reconciled out of 2.5 million accounts that Ocwen had serviced since January 2013 – approximately .01% of the applicable accounts.   This proposal was woefully unworkable for the MMC because it would "leave a vast number of consumer with unaudited and inaccurate escrow accounts."   In other words, instead of paying $1.5 billion to properly reconcile its escrow accounts, Ocwen's suggested remediation efforts continued to place the Company's financial interests ahead of its borrowers.

118.   The MOU also mandated that Ocwen provide a "viable going forward business plan that encompassed an analysis of its financial condition going forward."   Once again, Ocwen did not comply with the terms of the MOU, as the Order explaint that Ocwen submitted a business plan in response to the MOU that "did not provide a complete assessment of its

financial condition because it excluded significant liabilities."   In response to Ocwen's insufficient going forward plan, the MOU explained that, "If the going forward plan accurately accounted for known or anticipated regulatory penalties and other operational costs, including, but not limited to, the expenses of moving to a new servicing platform and complete reconciliation of consumer escrow accounts with restitution to impacted borrowers, it would indicate that Ocwen continuing as a going concern would be in doubt."   In other words, based on the findings of the MMC, if Ocwen complied with the terms of the MOU, it would have demonstrated that Ocwen's future was in grave jeopardy.

119.    As a result of the MMC's examination and Ocwen's failure to comply with the MOU, the Order severely penalized Ocwen. Specifically, the Order mandated that Ocwen "immediately cease acquiring new mortgage servicing rights, and acquiring or originating new residential mortgages serviced by Ocwen, until Ocwen can show it is a going concern by providing a financial analysis that encompasses all of the liabilities Ocwen currently maintains, as well as liabilities it has knowledge it will incur in the course of its business" and that Ocwen had to "immediately cease from acquiring new mortgage servicing rights, and acquiring or originating new residential mortgages serviced by Ocwen, until Ocwen can provide the state regulators with a reconcilement of its escrow accounts showing that consumer funds are appropriately collected, properly calculated, and disbursed accurately and timely."

120.    The market reacted negatively in response to this news.   Indeed, the price of Ocwen common stock plunged approximately 53.9%, falling from an opening price on April 20, 2017 of $5.46 to share to close at $2.49 per share that day on heavy trading volume.

## VI.    POST-CLASS PERIOD EVENTS

121.    Ocwen's troubles did not end at the close of the Class Period. Shortly after the end of the Class Period, on May 15, 2017, Ocwen filed Amendment No. 1 to its 2016 Form 10-K

for the fiscal year ended December 31, 2016 (the "2016 10-K/A").  The 2016 10-K/A was signed by Defendant Faris.  In the 2016 10-K/A, Defendants revealed two material and negative events which shed light on Defendants' Class Period misconduct alleged herein: (i) a restatement of the Company's 2016 financial statements; and (ii) a material weakness in internal controls over financial reporting.

122.    As to the restatement, Defendants admitted that Ocwen's 2016 10-K could no longer be relied upon in light of: (i) the December 2016 MOU with the MMC covering the period of January 1, 2013 through February 28, 2015, which contained numerous provisions relating to misconduct arising out of Ocwen's servicing practices, as well as a remedial requirement to develop a plan for submission to the MMC to address concerns from the review by the MMC; and (ii) the MMC's April 20, 2017 Order prohibiting a range of core servicing activities, including: (a) acquiring new MSRs in 17 states; (b) originating or acquiring new mortgage loans in 13 states, (c) originating or acquiring new mortgage loans in 4 states; and (d) conducting foreclosure activities in 2 states.  Defendants also noted that, as a result of the Order, Ocwen could be barred from conducting mortgage servicing in various states altogether.

123.    Defendants also admitted to a material weakness in the Company's internal controls over financial reporting.  Specifically, Ocwen stated that: "Management has concluded that the Company's disclosure controls and procedures and internal controls over financial reporting were not effective as of December 31, 2016 [as a result of] a material weakness that resulted in the failure to provide disclosure of the MOU" and that "Ocwen's controls related to certain regulatory matters were not operating effectively to enable it to ensure timely disclosure of confidential matters in the consolidated financial statements."  In other words, Ocwen's internal controls were so ineffective that the Company could not accurately share the loan

servicing documentation which the MMC sought in order to monitor servicing practices and ensure compliance with applicable federal and state mortgaging laws. Moreover, Defendants thereby admitted that their representations concerning the purported efficacy of the Company's internal controls made in Ocwen's 2016 10-K were materially false and misleading.

124.    Ocwen provided investors with an update concerning this material weakness in the Company's disclosure abilities the Company's Second Quarter Form 10-Q for the period ended June 30, 2017, which was filed on August 3, 2017 (the "Second Quarter 2017 10Q").   The Second Quarter 2017 10-Q was signed by Defendant Bourque.   As to further information concerning the material weakness, Defendants stated: "We will test the ongoing operating effectiveness of the new controls in future periods. The material weakness cannot be considered remediated until the applicable remedial controls operate for a sufficient period of time."   In other words, Ocwen had not yet resolved this issue, and the material weakness concerning disclosure of information pertaining to its mortgage servicing misconduct was still unremediated.

## VII.    DEFENDANTS' VIOLATIONS OF GAAP AND SEC RULES

125.    During the Class Period, quarter after quarter, Ocwen and the Individual Defendants failed to disclose that its Services Business was critically impaired and was not being successfully remediated, as was necessary for the Company to be in compliance with the Regulator Settlements and for it to continue to generate revenue.

126.    As alleged above in ¶25, Ocwen's core business segment, its Servicing Business, relied on the Company's REALServicing technology to handle all aspects of Ocwen's mortgage servicing. Moreover, as alleged above in ¶¶44-61, REALServicing was so fraught with flaws that it was effectively unusable because it could not perform reliably the important tasks for which it was designed and even the most rudimentary of tasks

127.    These failures existed prior to the Class Period and, contrary to Defendants'

statements concerning Ocwen's purported compliance with the Regulator Settlements, continued to be unremediated throughout the Class Period.  Indeed, prior to the Class Period and as early as December 2013, as alleged above in ¶¶29-35, Ocwen was the subject of numerous federal and state investigations, including those by the CFPB, the NYDFS, and the CDBO, the findings of which concerned Ocwen's woefully poor ability to properly service loans, facets of its servicing business which were dependent on Ocwen's use of and reliance on REALServicing.  Moreover, as the Company itself admitted towards the end of the Class Period, and over three years after the CFPB first began its investigation and over two years after the NYDFS issued its Consent Order, Ocwen admitted (although not publicly) on January 13, 2017, in connection with MMC Order and MOU, that it would cost Ocwen $1.5 billion for Ocwen to remediate an issue with REALServicing concerning the proper reconciliation of escrow accounts. Not only was this but only one issue of many plaguing REALServicing prior to and throughout the Class Period, but Ocwen admitted that it did not have the money to pay for this remediation effort.  Throughout the Class Period, Defendants failed to disclose these material facts that: (i) Defendants had not, as they were mandated to by the Regulator Settlements, remediated REALServicing; (ii) their failure to remediate REALServicing would materially impair, if not make impossible, Ocwen's ability to further generate additional revenue; and (iii) that the remediation efforts would cost more money than Ocwen could afford.

128.    Ocwen's January 13, 2017 admission that $1.5 billion was needed to cure its loan servicing deficiencies, an amount Ocwen admitted was well beyond the Company's financial capacity to fund, explains why these loan servicing problems associated with REALServicing went unremediated during the Class Period. In contravention of generally accepted accounting principles ("GAAP") and related SEC Rules as described below, Defendants concealed this

material information from the investing public.

129.    GAAP are those principles recognized by the accounting profession and the SEC as the uniform rules, conventions, and procedures necessary to define accepted accounting practices at a particular time. GAAP principles are the official standards accepted by the SEC and promulgated in part by the American Institute of Certified Public Accountants ("AICPA"). SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading or inaccurate, despite footnote or other disclosures. SEC Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying the most recent annual financial statements. 17 C.F.R. § 210.10-01(a)(5). Additionally, SEC registrants are required under SEC rules to maintain sufficient systems of internal controls to ensure fair reporting in conformity with GAAP.

### A.    Duties Of The Chief Executive Officer And Chief Financial Officer Under GAAP And SEC Rules

130.    During the Class Period, Defendants Faris and Bourque, as CEO and CFO of Ocwen, respectively, were ultimately responsible for adopting, implementing and enforcing sound accounting policies and for establishing and maintaining a system of internal controls sufficient to result in accurate and reliable recording of transactions and the fair presentation of the Company's financial results, including its loss contingencies. This responsibility included adequately reporting loss contingencies, including the critical impairment of its core business line, Services Business, related to the incapability of REALServicing to accurately store, represent, share and report loan data.

131.    Defendants Faris and Bourque, as the CEO and CFO of Ocwen during the Class

Period, were ultimately responsible for executing certifications to Ocwen's Forms 10-Q and 10-K acknowledging such responsibilities. Such certifications, pursuant to Section 302 and 906 of the Sarbanes-Oxley Act of 2002, specifically acknowledged that Defendants Faris and Bourque were responsible for establishing and maintaining disclosure controls and procedures, internal control over financial reporting and the fair presentation of the Company's financial statements, including related footnotes, in accordance with GAAP. Such certifications represented that the Company's consolidated financial statements: (a) did not contain any untrue statements of material facts, (b) did not omit any material facts necessary to make the statements in its consolidated financial statements not misleading; (c) fairly presented in all material respects the financial condition, results of operations, and cash flows, to management's (*i.e.*, Ocwen's CEO's and CFOs') knowledge; and (4) complied with the Securities Exchange Act of 1934. Defendants Faris and Bourque further certified that they evaluated the effectiveness of the Company's disclosure controls and procedures and internal control over financial reporting, and deemed them effective.

**B.     GAAP And SEC Rules**

**1.   Defendants' Obligations Under And Violations Of Item 303**

132.    Item 303 of SEC Regulation S-K requires the disclosure of Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), in both annual and quarterly financial statements, to provide information "***necessary to an understanding*** of [the registrant's] financial condition, changes in financial condition and results of operations." 17 C.F.R. § 229.303(a). In 1989, the SEC issued an interpretation providing guidance regarding MD&A, stating that the SEC had long recognized a "…need for narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings

and the likelihood that past performance is indicative of future performance." This interpretation also stated that the general purpose of MD&A requirements is "…to give investors an opportunity to look at the registrant through the eyes of management…[,]" particularly with emphasis on the registrant's prospects for the future.[62] The SEC again, in December 2003, issued an interpretation that provided additional guidance regarding MD&A, stating that the MD&A requirements are intended to meet three principal objectives:

> *[T]o provide a narrative explanation of a company's financial statements that enables investors to see the company through the eyes of management;*
>
> [T]o enhance the overall financial disclosure and *provide the context within which financial information should be analyzed*; and
>
> [T]o provide information about the quality of, and potential variability of, a company's earnings and cash flow, so that investors can ascertain the likelihood that past performance is indicative of future performance.

133.    Regulation S-K speaks to the importance of disclosures in a company's public filings and provides specific guidance on what the SEC expects to see in such filings. It requires the MD&A to include the following with respect to a company's results of operations, in relevant part:

> Describe any *known trends or uncertainties that have had or that the registrant reasonably expects will have material favorable or unfavorable impact* on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues…, the change in the relationship shall be disclosed.

17 C.F.R. § 229.303(a)(3)(ii); *see also* 17 C.F.R. § 229.303(a)(1).

134.    GAAP regulation ASC 275-1 similarly requires that a company disclose risks and uncertainties that could significantly affect the amounts reported in financial statements in the near term and particularly calls for disclosure if the volumes of business transacted with

---

[62] SEC Interpretation: *Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures,* dated May 18, 1989.

particular customers could be severely impacted in the near term.

135.     Accordingly, as the SEC has repeatedly emphasized, the "specific provisions in Item 303 [set forth above] require disclosure of forward-looking information." Indeed, the SEC has stated that Item 303 is "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company…with particular emphasis on the registrant's prospects for the future." *See* Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989). Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects." *See* Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 8350, 2003 WL 22996757, at *11 (December 19, 2003).

136.     Disclosure of known trends and forward-looking information concerning the registrant's revenue are required by Item 303 "where a trend, demand, commitment, event or uncertainty is both [i] presently known to management and [ii] reasonably likely to have material effects on the registrant's financial condition or results of operations." *See* Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 6835, 1989 WL 1092885, at *4 (May 18, 1989).

137.     Both of these conditions were satisfied here. First, the growing trend of constrained revenue, and the Company's inability to generate new revenue because of the pre-existing and unremediated problems associated with REALServicing, as well as both the potential and the reality of the crippling regulatory sanctions prohibiting the Company from

acquiring new MSRs, was "known" to Defendants. The facts set forth above establish that this trend was "reasonably likely to have material effects on [Ocwen's] financial condition or results of operations." Second, as a direct result of this trend, Ocwen's near-term financial condition, in fact the Company's very solvency and its ability to continue as a going concern, would be dramatically impacted as the Company's regulators determined in April 2017 that Ocwen should be barred from acquiring new MSRs as a result of ongoing violations of state and federal mortgage servicing laws throughout the Class Period.

138.    Accordingly, pursuant to Item 303, Defendants were required to disclose: (i) the existence of trends within the Company, namely that Ocwen's servicing business was critically impaired because of continued unremediated weaknesses in its REALServicing platform, hampering Ocwen's ability to generate revenue and risking the very solvency of the Company; and the fact that (ii) whether these facts would have a "material…unfavorable impact on…revenues."

### 2.  Defendants' Obligations Under And Violations Of FAS5/ASC 450

139.    In addition to requiring disclosure of trends under Item 303, GAAP also provides a series of rules for how and when to account for loss contingencies, including business segment impairments, such as Ocwen's REALServicing.   Chief among these is FASB's Accounting Standards Codification ("ASC" Topic 450, formerly known as Statement of Financial Accounting No. 5 ("FAS 5").[63]

---

[63] In June 2009, the FASB issued Statement of Financial Accounting Standards No. 168, which announced the launch of its Accounting Standards Codification ("ASC" or the "Codification"), declaring it "the single source of authoritative nongovernmental U.S. generally accepted accounting principles." The Codification, effective as of September 2009, organizes the many existing pronouncements that constituted U.S. GAAP at the time into a consistent, searchable format organized by Topics. The standards are referenced herein under both their original designations and as referred to under the Codification.

140.    ASC Topic 450 governs when companies such as Ocwen are required to recognize loss contingencies, including those resulting from impaired business segments, the remediation of those segments, and the adverse outcome of litigation concerning these matters. Specifically, Ocwen is required to record and disclose a loss contingency when two criteria are met: (i) based on information available prior to the issuance of the financial statements, it is probable that the loss will occur, and (ii) the amount of the loss can be reasonably estimated based on Ocwen's experience.  If no accrual is made for a loss contingency because one or both of the conditions are not met, disclosure of the contingency shall be made when there is at least a reasonable possibility that a loss or an additional loss may have been incurred.  The mandated disclosure of this loss contingency shall provide the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made.

141.    Defendants' materially false and misleading statements and omissions during the Class Period about Ocwen's purported "progress" concerning its compliance with the State Regulators' orders and its supposed remediation of REALServicing, as alleged herein, caused material and knowing violations of these GAAP provisions.

## C.    Ocwen's Ineffective Disclosure Controls And Procedures And Ineffective Internal Controls Over Financial Reporting

142.    Throughout the Class Period, the Company lacked adequate disclosure controls and procedures, and internal control over financial reporting, despite Defendants' certifications and other statements to the contrary.

143.    The Exchange Act requires the Company to maintain effective disclosure control and procedures, and effective internal control over financial reporting. The Company's management, including its principal executive and financial officers, must evaluate (a) the effectiveness of its disclosure controls and procedures as of the end of each fiscal quarter-end,

(b) the effectiveness of its internal control over financial reporting as of the end of each fiscal year-end, and (c) any changes in its internal control over financial reporting that occurred during each fiscal quarter that materially affected, or were reasonably likely to materially affect, its internal control over financial reporting. 17 C.F.R. §§ 240.13a-15, 240.15d-15. SEC Regulation S-K requires the Company's principal executive and financial officers to quarterly and annually, as applicable, disclose the conclusions of such evaluations. 17 C.F.R. §§ 229.307, 229.308.

144.    Further, in connection with the Sarbanes Oxley Act of 2002, the tenets of which have now been incorporated into Regulation S-K, management of public companies is required to report, at least annually, on the effectiveness of the company's internal controls over financial reporting. The ultimate goal of this process is for company management to express an opinion on the effectiveness of the company's internal control over financial reporting because a company's internal control cannot be considered effective if one or more material weaknesses exist. 17 C.F.R. § 229.308.

145.    Throughout the Class Period, Ocwen was obligated under the applicable accounting rules to properly account for and disclose that REALServicing and its business Servicing Business segment were impaired, including the loss of revenue the Company would incur as a result of the impairment, the costs of adverse results associated with litigation resulting from the impairment, and the costs of remediating this impairment.  However, Defendants did not do so.  Rather, at every turn, Defendants sought to cover up and hide from investors the true costs and risks arising from the woeful state of REALServicing, in violation of GAAP. Moreover, Defendants' May 15, 2017 admission in the Company's 2016 10-K/A that Ocwen's financial results could not be relied on and that Ocwen's internal controls over financial reporting were ineffective demonstrate the falsity of Defendants' statements otherwise.

## VIII.   OCWEN'S MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

146.     As summarized below, throughout the Class Period, Defendants materially false and misleading statements concerning, among other things: (i) Ocwen's purported compliance with federal and state laws; (ii) Ocwen's purported progress monitoring and correcting its mortgage servicing practices such that the Company would be compliance with the Regulator Settlements; (iii) its commitment to serving borrowers; and (iv) the efficacy of the Company's internal controls over financial reporting

### A.     January 13, 2015 Press Release

147.     On January 13, 2015, Ocwen issued a press release titled "Ocwen Cooperating with California Dept. of Business Oversight."  In that press release, Defendant Faris stated that, with regard to administrative action to suspend Ocwen's license to conduct lending and/or servicing business in California, "[w]e are cooperating fully with the Department of Business Oversight. Since this notification, we have dedicated substantial resources towards satisfying the DBO's requests. We believe we have provided the requested information in the format requested. We expect that we will receive follow up requests or clarifications and that further document and information exchanges may take place. We expect our ongoing cooperation will result in a satisfactory outcome for all parties."  The press release stated that: "Ocwen believes it has effective controls in place to ensure compliance with the California Homeowners Bill of Rights and all single point of contact requirements under federal and state laws."  Marcelo Cruz, Chief Risk Officer of Ocwen, stated that "we continue to build a world class risk and compliance management system at Ocwen."

148.     The statements in ¶147 above were materially false and misleading because:

        a.   As detailed in ¶¶ 44-81, Ocwen's REALServicing platform was suffering from numerous debilitating problems which (i) made the Company unable

to comply with the California Homeowners Bill of Rights and all single point of contact requirements under federal and state laws; (ii) was evidence that Ocwen did not have effective controls to ensure compliance with that bill of rights and state and federal law requirements; and (iii) meant that the Ocwen was not building a world class risk and compliance management system;

b. As detailed in ¶94, Defendant Faris was telling employees to continue with the same practices and procedures despite their flaws and the resultant high number of complaints, including sending complaints to offshore personnel in India who also did not have the proper tools and procedures to remediate Ocwen's errors on borrower's accounts; and

c. As detailed in ¶¶ 39-43, Ocwen was in direct violation of the Regulator Settlements and would not, and could not, fix those violations because of its REALServicing problems.

149. The January 13, 2015 Press Release also touted Ocwen's commitment to assisting distressed homeowners. Defendant Faris stated "***we have taken a leading role in helping to stabilize communities most affected by the financial crisis. We intend to continue to play a leading role in helping homeowners***."

150. The statements in ¶149 above were materially false and misleading because, as detailed in ¶¶44-81, in many cases Ocwen did not help families stay in their homes or improve financial outcomes for investors because at every stage of the mortgage servicing process, including the foreclosure processes, Ocwen had substantial errors and system deficiencies within REALServicing, was working with outside foreclosure counsel while Ocwen did not have proper systems and procedures in place to obtain this information, and was unlawfully foreclosing on borrowers. Moreover, as detailed in ¶94, Defendant Faris was telling employees to continue with the same practices and procedures despite their flaws and the resultant high number of complaints, including sending complaints to offshore personnel in India who also did not have the proper tools and procedures to remediate Ocwen's errors on borrower's accounts.

## B.   Ocwen's First Quarter 2015 Earnings Call

151.   On April 30, 2015, Ocwen hosted a conference call that was webcast live on the Company's website to discuss Ocwen's preliminary First Quarter 2015 earnings.  On this call, Defendant Faris stated that: "*we expect the next round of results from the National Mortgage Settlement monitor to show that we have made progress in improving our internal testing and compliance monitoring*" and that Ocwen was "*committed to correcting any deficiencies, remediating any borrower harm, and improving our compliance management systems and customer service*."  Defendant Faris further stated that and that the management team expected "*to continue to be profitable and generate strong operating cash flow; continue to demonstrate strong corporate governance, risk management and compliance management; continue to refocus on improving operating margins in the servicing business.*"

152.   The statements in ¶151 above were materially false and misleading because:

    a.   As detailed in ¶¶44-81, Ocwen's REALServicing platform was suffering from numerous debilitating problems which meant that it could not correct deficiencies or remediate borrower harm and that the Company was not in fact improving its compliance management systems and customer service; moreover, these problems would cause a material negative effect on Ocwen's business;

    b.   As detailed in ¶94, Defendant Faris was telling employees to continue with the same practices and procedures despite their flaws and the resultant high number of complaints, including sending complaints to offshore personnel in India who also did not have the proper tools and procedures to remediate Ocwen's errors on borrower's accounts; and

    c.   As detailed in ¶39-43, Defendants failed to disclose and actively concealed that Ocwen was in direct violation of the Regulator Settlements and would not, and could not, fix those violations because of its REALServicing problems.

## C.   Ocwen's 2014 Form 10-K

153.   On May 11, 2015, Defendants belatedly filed a Form 10-K for the fiscal year

ended December 31, 2014 (the "2014 Form 10-K") which was signed by the Individual Defendants.  In this 10-K, Defendants touted the Company's REALServicing Platform and the positive effect it would have on its loan servicing business and costs.  For example, the 10-K stated that "[t]he system utilizes non-linear loss mitigation models that we believe *optimize delinquent borrower resolutions*."   It also stated that "*[w]e believe that our competitive strengths flow from our ability to control and drive down delinquencies through the use of proprietary technology and processes and our lower cost to service.*"  Defendants continued to tout Ocwen as "*a leader in the servicing industry in foreclosure prevention and loss mitigation that helps families stay in their homes and improves financial outcomes for investors*."

154.    The statements in ¶153 above were materially false and misleading because:

a.   As detailed in ¶¶44-81, Ocwen's REALServicing platform was suffering from numerous debilitating problems which compromised its ability to optimize delinquent borrower resolutions and resulted in Ocwen being unable to compete with its industry peers and increasing its cost to service loans, meaning Ocwen did not possess competitive strengths flowing from their ability to control and drive down delinquencies through the use of proprietary technology and processes and lower its cost to service;

b.   As detailed in ¶¶75-81, Ocwen did not help families stay in their homes or improve financial outcomes for investors because at every stage of the mortgage servicing process, including the foreclosure processes, Ocwen had substantial errors with REALServicing, was working with outside foreclosure counsel who failed to provide timely and accurate information while Ocwen did not have proper systems and procedures in place to obtain this information, and was unlawfully foreclosing on borrowers;

c.   As detailed in ¶94, Defendant Faris was telling employees to continue with the same practices and procedures despite their flaws and the resultant high number of complaints, including sending complaints to offshore personnel in India who also did not have the proper tools and procedures to remediate Ocwen's errors on borrower's accounts; and

d.   As detailed in ¶¶39-43, Defendants failed to disclose and actively concealed that Ocwen was in direct violation of the Regulator Settlements and would not, and could not, fix those violations because of its REALServicing problems.

65

155.     As alleged in more detail in ¶¶132-138, Item 303 of SEC Regulation S-K requires the disclosure of Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), in both annual and quarterly financial statements, to provide information "***necessary to an understanding*** of [the registrant's] financial condition, changes in financial condition and results of operations." 17 C.F.R. § 229.303(a).  This includes "any ***known trends or uncertainties that have had or that the registrant reasonably expects will have material favorable or unfavorable impact*** on net sales or revenues or income from continuing operations."  Moreover, as alleged in more detail in ¶¶139-141, ASC 450/FAS5 provides a series of rules for how and when to account for loss contingencies, including business segment impairments, such as Ocwen's REALServicing.

156.     The 2014 Form 10-K was materially false and misleading because, pursuant to Item 303 Defendants were required, but failed, to disclose (i) the existence of trends within the Company, namely that Ocwen's servicing business was critically impaired because of continued unremediated weaknesses in its REALServicing platform, hampering Ocwen's ability to generate revenue and risking the very solvency of the Company; and the fact that (ii) whether these facts would have a "material…unfavorable impact on…revenues."

157.     The 2014 Form 10-K was further materially false and misleading because Defendants' statements and omissions during the Class Period about Ocwen's purported "progress" concerning its compliance with the State Regulators' orders and its supposed remediation of REALServicing caused material and knowing violations of ASC 450/FAS5.

158.     The 2014 Form 10-K stated that under the supervision of and with the participation of Ocwen's management, including the CEO and CFO, the Company conducted an evaluation of Ocwen's internal control over financial reporting as of December 31, 2014 based

on the framework set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in Internal Control – Integrated Framework (2013). Based on that evaluation, management concluded that Ocwen's internal control over financial reporting was effective based on the criteria established in that COSO framework.

159.    The 2014 Form 10-K included certifications from each of the Individual Defendants containing the following language:

> (1) I have reviewed this annual report on Form 10-K of Ocwen Financial Corporation
>
> (2) Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> (3) Based on my knowledge, the financial statements, and the other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> (4) The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a—15(e) and 15d—15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a—15(f) and 15d—15(f)) for the registrant and have:
>
> > a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
> >
> > b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance

regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

(5) The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

160.    The statements in ¶159 above were materially false and misleading because, as detailed in ¶¶139-145, the 2014 Form 10-K failed to disclose the loss contingency that arose as a result of the impairment of Ocwen's REALServicing Platform such that it was incapable of properly performing as a loan servicing platform and would need to be fixed or replaced at enormous cost to the Company.  Moreover, the Company's internal controls were not effective

which Ocwen later admitted after the end of the Class Period.

### D.    Ocwen's First Quarter 2015 10-Q

161.    On May 15, 2015, the Company filed a Form 10-Q with the SEC for the period ended March 31, 2015 (the "First Quarter 2015 10-Q"), signed by Defendant Bourque. In this filing, Defendants touted the completion of the transition of loans to the REALServicing platform and the progress integrating Ocwen's servicing operations.   Specifically, the First Quarter 2015 10-Q stated that:

> Platform Integration: We completed the transition of loans to the REALServicing® platform in October 2014 and have made significant progress integrating our servicing operations. In the first quarter of 2015, we are beginning to realize the benefits on the integration. Compensation and benefits decreased by $10.9 million, primarily as a result of platform integration that reduced the average U.S. based headcount by 21%, offset in part by a 46% increase in average India based and other headcount.

The First Quarter 2015 10-Q also stated that "[w]e also continue to work with our regulators, including the CFPB and state regulators and attorneys general, on enhancing our risk and compliance management systems and remediating deficiencies. *We are currently unaware of any significant unresolved issues with state agencies and not aware of, nor anticipating, any material regulatory fines, penalties or settlements. We are not aware of any pending or threatened actions to suspend or revoke any state licenses*."

162.    The statements in ¶161 above were materially false and misleading because:

    a.    As detailed in ¶¶44-81, Ocwen had not "made significant progress integrating [its] servicing operations" because Ocwen's REALServicing platform was suffering from numerous debilitating problems which compromised its ability to properly perform servicing operations; and

    b.    As detailed in ¶¶39-43, Ocwen was not properly enhancing its risk and compliance management systems and remediating deficiencies because Ocwen was in direct violation of the Regulator Settlements and would not, and could not, fix those violations because of its REALServicing problems.

163.    The First Quarter 2015 10-Q was also materially false and misleading because pursuant to Item 303, as detailed in ¶¶132-138, Defendants were required, but failed, to disclose (i) the existence of trends within the Company, namely that Ocwen's servicing business was critically impaired because of continued unremediated weaknesses in its REALServicing platform, hampering Ocwen's ability to generate revenue and risking the very solvency of the Company; and the fact that (ii) whether these facts would have a "material…unfavorable impact on…revenues."

164.    The First Quarter 2015 10-Q was further materially false and misleading because, as detailed in ¶¶139-141, Defendants' statements and omissions during the Class Period about Ocwen's purported "progress" concerning its compliance with the State Regulators' orders and its supposed remediation of REALServicing caused material and knowing violations of ASC 450/FAS5.

165.    The First Quarter 2015 10-Q stated that the Individual Defendants concluded that, as of March 31, 2015, Ocwen's disclosure controls and procedures were designed, functioning, and operating effectively.  The 10-Q also contained signed certifications by Defendants Faris and Bourque, stating that the financial information contained in the First Quarter 2015 10-Q was accurate and disclosed any material changes to the Company's disclosure controls over financial reporting. The certifications made substantially similar (if not identical) representations to the certifications included in the Company's 2014 Form 10-K, as alleged in ¶159.

166.    The statements in ¶165 above were materially false and misleading because, as detailed in ¶¶139-145, the First Quarter 2015 10-Q failed to disclose the loss contingency that arose as a result of the impairment of Ocwen's REALServicing Platform such that it was incapable of properly performing as a loan servicing platform and would need to be fixed or

replaced at enormous cost to the Company. Moreover, the Company's internal controls were not effective which Ocwen later admitted after the end of the Class Period.

### E.   Ocwen's Second Quarter 2015 10-Q

167.    On July 30, 2015, the Company filed a Form 10-Q with the SEC for the period ended June 30, 2015, (the "Second Quarter of 2015 10-Q"), signed by Defendant Bourque. In Second Quarter 2015 10-Q, the Company touted its work with the CFPB and its remediation efforts. Specifically, the Second Quarter 2015 10-Q stated that:

> *[w]e continue to work with our regulators, including the Consumer Financial Protection Bureau (CFPB) and state regulators and attorneys general, on enhancing our risk and compliance management systems and remediating deficiencies. We are currently unaware of any unresolved issues with state agencies that would have a material financial impact on us. We are not aware of, nor anticipating, any material fines, penalties or settlements from any such agencies. We are not aware of any pending or threatened actions to suspend or revoke any state licenses*.

168.    The Second Quarter 2015 10-Q also stated that: "*[w]e take very seriously our commitments to enhancing the borrower experience, strengthening our risk and compliance infrastructure and delivering strong loss mitigation results and will continue to invest in those important areas*." Additionally, the 10-Q stated that: "Ocwen is a leader in the servicing industry in foreclosure prevention and loss mitigation *that helps families stay in their homes and improves financial outcomes for investors*."

169.    The statements in ¶¶167-168 above were materially false and misleading because:

> a.   As detailed in ¶¶44-81, Ocwen had not strengthened its risk and compliance infrastructure, was not delivering strong loss mitigation results, and had failed to remediate deficiencies as the REALServicing platform was suffering from numerous debilitating problems which compromised its ability to properly perform servicing operations;
>
> b.   As detailed in ¶¶75-81, Ocwen did not help families stay in their homes or

71

improve financial outcomes for investors because at every stage of the mortgage servicing process, including the foreclosure processes, Ocwen had substantial errors with REALServicing, was working with outside foreclosure counsel who failed to provide timely and accurate information while Ocwen did not have proper systems and procedures in place to obtain this information, and was unlawfully foreclosing on borrowers;

c.  As detailed in ¶94, Defendant Faris was telling employees to continue with the same practices and procedures despite their flaws and the resultant high number of complaints, including sending complaints to offshore personnel in India who also did not have the proper tools and procedures to remediate Ocwen's errors on borrower's accounts;

d.  As detailed in ¶¶39-43, Ocwen was in direct violation of the Regulator Settlements and would not, and could not, fix those violations because of its REALServicing problems.

170.  The Second Quarter 2015 10-Q was also materially false and misleading because, pursuant to Item 303, as detailed in ¶¶132-138, Defendants were required, but failed, to disclose (i) the existence of trends within the Company, namely that Ocwen's servicing business was critically impaired because of continued unremediated weaknesses in its REALServicing platform, hampering Ocwen's ability to generate revenue and risking the very solvency of the Company; and the fact that (ii) whether these facts would have a "material…unfavorable impact on…revenues."

171.  The Second Quarter 2015 10-Q was further materially false and misleading, as detailed in ¶¶139-141 because Defendants' statements and omissions during the Class Period about Ocwen's purported "progress" concerning its compliance with the State Regulators' orders and its supposed remediation of REALServicing caused material and knowing violations of ASC 450/FAS5.

172.  The Second Quarter 2015 10-Q stated that the Individual Defendants concluded that, as of June 30, 2015, Ocwen's disclosure controls and procedures were designed, functioning, and operating effectively.  The 10-Q also contained signed certifications by

72

Defendants Faris and Bourque, stating that the financial information contained in the Second Quarter 2015 10-Q was accurate and disclosed any material changes to the Company's disclosure controls over financial reporting. The certifications made substantially similar (if not identical) representations to the certifications included in the Company's 2014 Form 10-K, as alleged in ¶159.

173.    The statements in ¶172 above were materially false and misleading because, as detailed in ¶¶139-145, the Second Quarter 2015 10-Q failed to disclose the loss contingency that arose as a result of the impairment of Ocwen's REALServicing Platform such that it was incapable of properly performing as a loan servicing platform and would need to be fixed or replaced at enormous cost to the Company.  Moreover, the Company's internal controls were not effective which Ocwen later admitted after the end of the Class Period.

**F.  Ocwen's July 30, 2015 Press Release**

174.    On July 30, 2015, the Company issued a press release, which was attacked to a Form 8-K signed by Defendant Bourque, announcing Ocwen's financial results for the period ended June 30, 2015, in which Defendants made materially false and misleading statements and omissions.  Specifically, Defendant Faris stated that "[t]he Company made positive strides on many fronts in the second quarter.  We continue to work closely with our regulators and monitors, and the environment remains stable*.  Our efforts to build out a strong 'bank-like' risk and compliance infrastructure are taking hold*."

175.    Defendant Faris further stated that "[w]e have also launched a cost improvement effort to right size our cost structure in line with the reduction in our assets and revenue.  Our aim is to reduce our costs by over $150 million, *while continuing to enhance the borrower experience, strengthen our risk and compliance infrastructure and deliver strong loss mitigation results*.  Similar to our plan to grow our origination capabilities, this cost

improvement initiative is aggressive, but is a critically important step in our transformation and one that is necessary to ensure our long-term success."

176.    The statements above in ¶¶174-175 was materially false and misleading because:

a.    As detailed in ¶¶44-81, the Company's did not have a strong or "strengthened" compliance infrastructure because the REALServicing platform was suffering from numerous debilitating problems which compromised its ability to properly perform servicing;

b.    As detailed in ¶¶75-81, was not capable of delivering strong loss mitigation results because at every stage of the mortgage servicing process, including the foreclosure processes, Ocwen had substantial errors with REALServicing, was working with outside foreclosure counsel who failed to provide timely and accurate information while Ocwen did not have proper systems and procedures in place to obtain this information, and was unlawfully foreclosing on borrowers;

c.    As detailed in ¶94, Defendant Faris was telling employees to continue with the same practices and procedures despite their flaws and the resultant high number of complaints, including sending complaints to offshore personnel in India who also did not have the proper tools and procedures to remediate Ocwen's errors on borrower's accounts; and

d.    As detailed in ¶39-43, a strong "bank-like" risk and compliance structure was not taking hold because Ocwen was in direct violation of the Regulator Settlements and would not, and could not, fix those violations because of its REALServicing problems.

**G.    Ocwen's Second Quarter 2015 Earnings Call**

177.    On July 30, 2015, Ocwen hosted a conference call with investors and analysts to discuss the Company's Second Quarter 2015 earnings. On this call, Defendant Faris stated that the Company believed that its servicer rating "***should improve to levels similar to other large servicers***" because Ocwen's compliance system was effective and the Company would "***continue to provide strong servicing results***."  Faris further stated that "***[w]e also remain focused and committed to making ongoing enhancements to our servicing operations and technology platforms, which we believe will ensure we continue to enhance the borrower experience while continuing to deliver best-in-class loss mitigation results***."

178.    The statement in ¶177 above were materially false and misleading because, as detailed in ¶¶44-81, Ocwen's compliance system was not effective, the Company was not providing strong servicing results, and was not successful in making enhancements to its servicing operations and technology platforms because the REALServicing platform was suffering from numerous debilitating problems which compromised its ability to properly perform servicing operations.

179.    In that July 30, 2015 conference call, Defendant Faris also stated that ***"[w]e continue to devote substantial resources to our regulatory compliance and risk management efforts, while engaging in frequent and transparent communications with our regulators and monitors***." 

180.    The statement in ¶179 above were materially false and misleading because, as detailed in ¶¶39-43, Defendants failed to disclose and actively concealed that Ocwen was in direct violation of the Regulator Settlements and would not, and could not, fix those violations because of its REALServicing problems.  Moreover, as detailed in ¶87 Ocwen's responses to regulators were not transparent as to the true problems concerning REALServicing.

### H.    Ocwen's September 2015 Investor Presentation

181.    On September 15, 2015, Ocwen filed a Form 8-K with the SEC that attached an investor presentation as an exhibit, including the following slides:



## Ocwen Investment Thesis

- Proven leader in homeownership preservation through loan modifications and lending to seniors; leader in the U.S. Treasury Home Affordable Modification Program completing 20% of all HAMP modifications(a)

- Leader in reverse mortgage lending and building a strong foundation for forward mortgage and alternative lending

- Turbulence of last ~18 months has helped create a stronger company with intense focus on the borrower experience, regulatory compliance and Ocwen's internal risk and compliance operations

- Well capitalized non-bank mortgage servicer that meets all current and proposed capital standards

- Actively reducing leverage with proven history of generating substantial cash flow from operations

- Experienced Board and Management team with proven track record and commitment to customer service and compliance

- Embedded value in Reverse Mortgage Future Draws, MSRs and Deferred Servicing Fees not fully reflected on balance sheet

Ocwen Financial Corporation®   a) Source: Second Quarter 2015 Making Home Affordable Program Performance Report by U.S. Department of the Treasury; includes acquired loans   10

182.    This slides contained numerous false and misleading statements:

a.    the statement concerning Ocwen's leadership in homeownership preservation and HAMP was materially false and misleading because, as detailed in ¶¶75-81, Ocwen did not help families stay in their homes or improve financial outcomes for investors because at every stage of the mortgage servicing process, including the foreclosure processes, Ocwen had substantial errors with REALServicing, which failed to provide timely and accurate information while Ocwen did not have proper systems and procedures in place to obtain this information, and was unlawfully foreclosing on borrowers; and

b.    the statement concerning the turbulence of the last 18 months creating a stronger company with intense focus on the borrower experience, regulatory compliance and the Company's internal risk and compliance operations was materially false and misleading because, as detailed in ¶¶44-81, Defendants failed to disclose that REALServicing platform was

suffering from numerous debilitating problems which compromised its ability to optimize delinquent borrower resolutions; and as detailed in ¶¶39-43, failed to disclose and actively concealed that Ocwen was in direct violation of the Regulator Settlements and would not, and could not, fix those violations because of its REALServicing problems.

## I.     Ocwen's Third Quarter 2015 Earnings Call

183.    On October 28, 2015, Ocwen hosted a conference call that to discuss the Company's financial results for the period ended September 30, 2015. On this call, Defendant Faris stated that:

> [ … ] *we remain focused on enhancing the customer experience, and on the maturation of a comprehensive risk and compliance infrastructure. We continue to expand our leadership in providing sustainable home retention alternatives to struggling families as evidenced by our HAMP volumes and reductions in customer complaint volumes. Additionally, despite the 2014 testing results recently announced by the National Monitor which reflect legacy issues, we feel good about the progress we have made with our national mortgage settlement compliance, and expect to continue to demonstrate progress.*

184.    On this conference call, Defendant Bourque stated that: "we are improving our cost structure to better align to a smaller servicing business, but also one that **better leverages technology and improved processes**."  In response to an analyst's question about the Company's cost structure and compliance, Defendant Faris stated that: "**we are balanced between meeting our obligations to our customers, meeting the various regulatory compliance requirements, and delivering for our shareholders**."

185.    The statements in ¶¶183-84 above were materially false and misleading because:

a.     As detailed in ¶¶44-81, Ocwen was not focused on enhancing the customer experience and the maturation of a comprehensive risk and compliance infrastructure as the REALServicing platform was suffering from numerous debilitating problems which compromised its ability to properly perform servicing operations;

b.     As detailed in ¶¶75-81, Ocwen was not providing sustainable home retention alternatives to struggling families because at every stage of the

mortgage servicing process, including the foreclosure processes, Ocwen had substantial errors with REALServicing, was working with outside foreclosure counsel which substantially harmed borrowers during the foreclosure process, and was unlawfully foreclosing on borrowers; and

c. As detailed in ¶¶39-43, the Company had not made progress with its national mortgage settlement as it failed to disclose and actively concealed that Ocwen was in direct violation of the Regulator Settlements.

**J.      Ocwen's Third Quarter 2015 10-Q**

186.     On October 28, 2015, the Company filed a Form 10-Q with the SEC for the period ended September 30, 2015 (the "Third Quarter 2015 10-Q"), signed by Defendant Bourque.   In this filing the Company touted both its regulatory compliance and satisfying its customers: "*[w]e continue to work diligently to assess and understand the implications of the regulatory environment in which we operate and to meet the requirements of the changing environment in which we operate. We devote substantial resources to regulatory compliance, while, at the same time, striving to meet the needs and expectations of our customers, clients and other stakeholders.*"

187.     The statements in ¶186 above were materially false and misleading because:

a. As detailed in ¶¶44-81, Ocwen was not focused on meeting the needs of its customers as the REALServicing platform was suffering from numerous debilitating problems which compromised its ability to properly perform servicing operations; and

b. As detailed in ¶¶39-43, Ocwen was not meeting the requirements of the changing regulatory environment because it was in direct violation of the Regulator Settlements and would not, and could not, fix those violations because of its REALServicing problems.

188.     The Third Quarter 2015 10-Q was also materially false and misleading because, pursuant to Item 303, as detailed in ¶¶132-138, Defendants were required, but failed, to disclose (i) the existence of trends within the Company, namely that Ocwen's servicing business was critically impaired because of continued unremediated weaknesses in its REALServicing

platform, hampering Ocwen's ability to generate revenue and risking the very solvency of the Company; and the fact that (ii) whether these facts would have a "material…unfavorable impact on…revenues."

189.    The Third Quarter 2015 10-Q was further materially false and misleading because, as detailed in ¶¶139-141, Defendants' statements and omissions during the Class Period about Ocwen's purported "progress" concerning its compliance with the State Regulators' orders and its supposed remediation of REALServicing caused material and knowing violations of ASC 450/FAS5.

190.    The Third Quarter 2015 10-Q stated that the Individual Defendants concluded that, as of September 30, 2015, Ocwen's disclosure controls and procedures were designed, functioning, and operating effectively.   The 10-Q also contained signed certifications by Defendants Faris and Bourque, stating that the financial information contained in the Third Quarter 2015 10-Q was accurate and disclosed any material changes to the Company's disclosure controls over financial reporting. The certifications made substantially similar (if not identical) representations to the certifications included in the Company's 2014 Form 10-K, as alleged in ¶159.

191.    The statements in ¶190 above were materially false and misleading because, as detailed in ¶¶139-145, the Third Quarter 2015 10-Q failed to disclose the loss contingency that arose as a result of the impairment of Ocwen's REALServicing Platform such that it was incapable of properly performing as a loan servicing platform and would need to be fixed or replaced at enormous cost to the Company.   Moreover, the Company's internal controls were not effective which Ocwen later admitted after the end of the Class Period.

**K.    Ocwen's 2015 10-K**

192.    On February 29, 2016 Defendants filed a Form 10-K for the fiscal year ended

December 31, 2015 (the "2015 10-K"), signed by Defendants Faris and Bourque. The 2015 10-K stated that "In the current regulatory environment, we have faced and expect to continue to face increased regulatory and public scrutiny as an organization as well as stricter and more comprehensive regulation of the entire mortgage sector. We continue to work diligently to assess and understand the implications of the regulatory environment in which we operate and to meet the requirements of the changing environment in which we operate. We devote substantial resources to regulatory compliance, while, at the same time, striving to meet the needs and expectations of our customers, clients and other stakeholders."

193.    The statements in ¶192 above were materially false and misleading because:

    a.  As detailed in ¶¶44-81, Ocwen was not focused on meeting the needs of its customers as the REALServicing platform was suffering from numerous debilitating problems which compromised its ability to properly perform servicing operations; and

    b.  As detailed in ¶¶39-43, Ocwen was not meeting the requirements of the changing regulatory environment because it was in direct violation of the Regulator Settlements and would not, and could not, fix those violations because of its REALServicing problems.

194.    The Company also included a detailed discussion of "Operation Risk" in the Form 10-K, making clear the critical importance of protecting against these risks:

Operational risk is inherent in each of our business lines and related support activities. This risk can manifest itself in various ways, including process execution errors, clerical or technological failures or errors, business interruptions and frauds, all of which could cause us to incur losses. Operational risk includes the following key risks:

- legal risks, as we can have legal disputes with borrowers or counterparties;

- compliance risks, as we are subject to many federal and state rules and regulations;

- third-party risks, as we have many processes that have been outsourced to third parties;

- information technology risks, as we operate many information systems that depend on proper functioning of hardware and software;

- information security risk, as our information systems and associates handle personal financial data of borrowers.

195.    The 2015 10-K continued by describing how it purportedly guarded against these

risks:

> To manage operational risk, we have a dedicated team of operational risk managers that oversees these risks on a daily basis, assisted by the third-party risk management and information security departments.
>
> *We have annual Risk Control Self-Assessment (RCSA) programs in which we map all company-wide business processes in order to identify risks and controls in each of them. These controls are tested for efficiency and efficacy and improved if necessary. We monitor these risks and controls on a daily basis through risk coverage teams*.
>
> *In addition, we also have established policies and control frameworks designed to provide a sound and well-controlled operational environment*. We mandate training for our employees in respect to these policies, require business line change control boards and conduct operating reviews on a regular basis. We have also an issue self-identification program, for employees to report to the central operational risk team operational and/or technological issues affecting their operations.
>
> Compliance risk is managed through an enterprise-wide compliance risk management program designed to prevent, detect and deter compliance issues. Our compliance and risk management policies assign primary responsibility and accountability for the management of compliance risk in the lines of business to business line management. Our Chief Compliance Officer oversees the design, execution and administration of the enterprise-wide compliance program.

196.    The 10-K then described Ocwen's "Three Lines of Defense" model to properly

manage risks and controls:

> *We seek to embed in our enterprise-wide approach toward risk management a culture of compliance and business line responsibility for managing operational and compliance risks. Ocwen has adopted a 'Three Lines of Defense' model to enable risks and controls to be properly managed on an on-going basis*. The model delineates business line management's accountabilities and responsibilities over risk management and the control environment and includes mechanisms to assess the effectiveness of executing

these responsibilities.

The first line of defense comprises predominantly business line management who are accountable and responsible for their day-to-day activities, processes and controls. *The first line of defense is responsible for ensuring that key risks within their activities and operations are identified, mitigated and monitored by an appropriate control environment that is commensurate with the operations risk profile. The second line of defense comprises predominantly the corporate functions, such as Risk and Compliance, which are responsible for:*

- *providing assurance, oversight, and challenge over the effectiveness of the risk and control activities conducted by the first line;*

- *establishing frameworks to identify and measure the risks being taken by different parts of the business; and*

- *monitoring risk levels, through the key indicators and oversight/assurance* **programs.**

*The third line of defense, Internal Audit, provides independent assurance as to the effectiveness of the design, implementation and embedding of the risk management frameworks, as well as the management of the risks and controls by the first line and control oversight by the second line.*

197. The statements in ¶¶194-196 above were materially false and misleading because, as detailed in ¶¶39-81, Ocwen's Three Lines of Defense model was failing to manage the Company's risk and controls given that the REALServicing platform was suffering from numerous debilitating problems and the Company continued to be in direct violation of the Regulator Settlements.

198. The 2015 10-K was also materially false and misleading because, pursuant to Item 303, as detailed in ¶¶132-138, Defendants were required, but failed, to disclose (i) the existence of trends within the Company, namely that Ocwen's servicing business was critically impaired because of continued unremediated weaknesses in its REALServicing platform, hampering Ocwen's ability to generate revenue and risking the very solvency of the Company; and the fact that (ii) whether these facts would have a "material…unfavorable impact

on…revenues."

199.    The 2015 Form 10-K was further materially false and misleading because, as detailed in ¶¶139-141, Defendants' statements and omissions during the Class Period about Ocwen's purported "progress" concerning its compliance with the State Regulators' orders and its supposed remediation of REALServicing caused material and knowing violations of ASC 450/FAS5.

200.    The 2015 10-K stated that under the supervision of and with the participation of Ocwen's management, including the CEO and CFO, the Company conducted an evaluation of Ocwen's internal control over financial reporting as of December 31, 2015 based on the framework set forth by COSO in Internal Control – Integrated Framework (2013).  Based on that evaluation, management concluded that Ocwen's internal control over financial reporting was effective based on the criteria established in that COSO framework.  The 2015 Form 10-K also contained signed certifications by Defendants Faris and Bourque, stating that the financial information contained in the 2015 10-K was accurate and disclosed any material changes to the Company's disclosure controls over financial reporting. The Individual Defendants' signed certifications made substantially similar representations to the certifications included in the Company's 2014 Form 10-K, as alleged in ¶159.

201.    The statements in ¶200 above were materially false and misleading because, as detailed in ¶¶139-145, the 2015 Form 10-K failed to disclose the loss contingency that arose as a result of the impairment of Ocwen's REALServicing Platform such that it was incapable of properly performing as a loan servicing platform and would need to be fixed or replaced at enormous cost to the Company.  Moreover, the Company's internal controls were not effective which Ocwen later admitted after the end of the Class Period.

### L.    Ocwen's First Quarter 2016 10-Q

202.    On April 28, 2016, the Company filed a Form 10-Q with the SEC for the First Quarter of 2016 ("First Quarter 2016 10-Q"), which was signed by Defendant Bourque.  In the First Quarter 2016 10-Q, the Company stated that "Our leadership in the industry is evidenced by our high cure rate for delinquent loans and above average rate of continuing performance by homeowners whose loans we have modified. Ocwen has provided more loan modifications under the Federal Government's Home Affordable Modification Program (HAMP) than any other mortgage servicer and 47% more than the next highest servicer, according to data published in the U.S. Treasury's Making Home Affordable Fourth Quarter 2015 Program Performance Report. Overall, Ocwen completed over 660,000 loan modifications from January 1, 2008 through March 31, 2016, including over 55,000 modifications under Ocwen's own Shared Appreciation Modification (SAM) program."

203.    The statements in ¶202 above was materially misleading because the Company failed to disclose, as detailed in ¶¶75-81, Ocwen was not providing sustainable home retention alternatives to struggling families because at every stage of the mortgage servicing process, including the foreclosure processes, Ocwen had substantial errors with REALServicing, was working with outside foreclosure counsel which substantially harmed borrowers during the foreclosure process, and was unlawfully foreclosing on borrowers.

204.    The First Quarter 2016 10-Q also stated that "we take our commitments to enhancing the borrower experience, strengthening our risk and compliance infrastructure and delivering strong loss mitigation results very seriously and, accordingly, we will continue to make appropriate investments in those important areas at the same time we enhance our cost structure through productivity improvements and other initiatives."

205.    The statements in ¶204 above were materially misleading because:

a. Defendants failed to disclose that, as detailed in ¶¶44-81, Ocwen was not focused on meeting the needs of its customers as the REALServicing platform was suffering from numerous debilitating problems which compromised its ability to properly perform servicing operations; and

b. Defendants failed to disclose that, as detailed in ¶¶39-43, Ocwen was not meeting the requirements of the changing regulatory environment because it was in direct violation of the Regulator Settlements and would not, and could not, fix those violations because of its REALServicing problems.

206.    The First Quarter 2016 10-Q was also materially false and misleading because, pursuant to Item 303, as detailed in ¶¶132-138, Defendants were required, but failed, to disclose (i) the existence of trends within the Company, namely that Ocwen's servicing business was critically impaired because of continued unremediated weaknesses in its REALServicing platform, hampering Ocwen's ability to generate revenue and risking the very solvency of the Company; and the fact that (ii) whether these facts would have a "material…unfavorable impact on…revenues."

207.    The First Quarter 2016 10-Q was further materially false and misleading because, as detailed in ¶¶139-141, Defendants' statements and omissions during the Class Period about Ocwen's purported "progress" concerning its compliance with the State Regulators' orders and its supposed remediation of REALServicing caused material and knowing violations of ASC 450/FAS5.

208.    The First Quarter 2016 10-Q stated that the Individual Defendants concluded that, as of March 31, 2016, Ocwen's disclosure controls and procedures were designed, functioning, and operating effectively.  The 10-Q also contained signed certifications by Defendants Faris and Bourque, stating that the financial information contained in the First Quarter 2016 10-Q was accurate and disclosed any material changes to the Company's disclosure controls over financial reporting. The certifications made substantially similar (if not identical) representations to the certifications included in the Company's 2014 Form 10-K, as alleged in ¶159.

209.    The statements in ¶208 above were materially false and misleading because, as detailed in ¶¶139-145, the First Quarter 2016 10-Q failed to disclose the loss contingency that arose as a result of the impairment of Ocwen's REALServicing Platform such that it was incapable of properly performing as a loan servicing platform and would need to be fixed or replaced at enormous cost to the Company.  Moreover, the Company's internal controls were not effective which Ocwen later admitted after the end of the Class Period.

**M.    Ocwen's April 27, 2016 Conference Call**

210.    On April 27, 2016, Ocwen hosted a conference call with analysts and investors to discuss the Company's financial results for the period ended March 31, 2016.  On this call, Defendant Faris stated that: "Since 2008, we've led the industry and completed over 600,000 modifications of which over 311,000 were HAMP modifications.  That number is 47% more than the next highest servicer, a stunning percentage.  Additionally, we have completed almost 97,000 principal reduction modifications over that time.  That is three times more than the next highest servicer."

211.    The statements in ¶210 above was materially misleading  because, as detailed in ¶¶44-81, the foregoing statement was materially misleading because it omitted the material problems Ocwen was experiencing with its loan servicing business, including that the REALServicing platform was suffering from numerous debilitating problems, which compromised its ability to properly perform servicing operations and that Ocwen continued to illegally and improperly foreclose on borrowers during the Class Period.

**N.    Ocwen's Second Quarter 2016 10-Q**

212.    On July 28, 2016, the Company filed a Form 10-Q with the SEC for the period ended June 30, 2016, (the "Second Quarter 2016 10-Q"), signed by Defendant Bourque.  In the Second Quarter 2016 10-Q, Defendants stated that "*we are …  intensely focused on improving*

*our operations to enhance borrower experiences and improve efficiencies, both of which we believe will drive stronger financial performance through lower overall costs.*" Also in the Second Quarter 2016 10-Q, Defendants stated that Ocwen: "***believe[d] its significant investments in [its] servicing operations, risk and compliance infrastructure over recent years will position us favorably relative to our peers***" should the acquisition of new MSRs become possible.

213.    The statements in ¶212 above were materially misleading because they failed to disclose, as detailed in ¶¶39-81, that the REALServicing platform was suffering from numerous debilitating problems which compromised its ability to properly perform servicing operations and that Ocwen was in direct violation of the Regulator Settlements and would not, and could not, fix those violations because of its REALServicing problems.

214.    The Second Quarter 2016 10-Q was also materially false and misleading because, pursuant to Item 303, as detailed in ¶¶132-138, Defendants were required, but failed, to disclose (i) the existence of trends within the Company, namely that Ocwen's servicing business was critically impaired because of continued unremediated weaknesses in its REALServicing platform, hampering Ocwen's ability to generate revenue and risking the very solvency of the Company; and the fact that (ii) whether these facts would have a "material…unfavorable impact on…revenues."

215.    The Second Quarter 2016 10-Q was further materially false and misleading because, as detailed in ¶¶139-141, Defendants' statements and omissions during the Class Period about Ocwen's purported "progress" concerning its compliance with the State Regulators' orders and its supposed remediation of REALServicing caused material and knowing violations of ASC 450/FAS5.

216.    The Second Quarter 2016 10-Q stated that the Individual Defendants concluded that, as of June 30, 2016, Ocwen's disclosure controls and procedures were designed, functioning, and operating effectively.   The 10-Q also contained signed certifications by Defendants Faris and Bourque, stating that the financial information contained in the Second Quarter 2016 10-Q was accurate and disclosed any material changes to the Company's disclosure controls over financial reporting. The certifications made substantially similar (if not identical) representations to the certifications included in the Company's 2014 Form 10-K, as alleged in ¶159.

217.    The statements in ¶216 above were materially false and misleading because, as detailed in ¶139-145, the Second Quarter 2016 10-Q failed to disclose the loss contingency that arose as a result of the impairment of Ocwen's REALServicing Platform such that it was incapable of properly performing as a loan servicing platform and would need to be fixed or replaced at enormous cost to the Company.  Moreover, the Company's internal controls were not effective which Ocwen later admitted after the end of the Class Period.

**O.    Ocwen's July 27, 2016 Press Release**

218.    On July 27, 2016, the Company issued a press release, which was attached to a Form 8-K signed by Defendant Bourque, announcing Ocwen's financial results for the period ended June 30, 2016, in which Defendants made materially false and misleading statements and omissions. Specifically, Defendant Faris stated in this press release that: "***We continue to invest in risk management compliance, service excellence and technology. We maintain our leadership in helping families struggling with their mortgage payments as evidenced by our number one status in the Home Affordable Modification Program (HAMP) and our numerous, well-regarded community outreach efforts…***"

219.    The statements in ¶218 above were materially false and misleading because:

a. As detailed in ¶¶44-81, Ocwen was not making progress in its core business of loan servicing and was not returning to profitability in its core operations as the REALServicing platform was suffering from numerous debilitating problems which compromised its ability to properly perform servicing operations; and

b. As detailed in ¶¶75-81, Ocwen was not maintaining leadership in helping families struggling with their mortgage payments because at every stage of the mortgage servicing process, including the foreclosure processes, Ocwen had substantial errors with REALServicing, was working with outside foreclosure counsel who failed to provide timely and accurate information while Ocwen did not have proper systems and procedures in place to obtain this information, and was unlawfully foreclosing on borrowers.

**P.    Ocwen's Second Quarter 2016 Earnings Call**

220.    On July 27, 2016, Ocwen hosted a conference call with analysts and investors to discuss the Company's financial results for the period ended June 30, 2016.  During this call Defendants made numerous materially false and misleading statements, including when Defendant Faris stated that: "*[a]s we have said in the past, a borrower who has their loan serviced by Ocwen has a much better chance of avoiding foreclosure than if their loan was serviced by any other company.  And we are getting even better*."  Defendant Bourque stated that "*Ocwen's modification and liquidation strategy resulted in more homeowners retaining their homes, and at the same time also resulted in lower overall losses to the associated mortgage trusts.*"

221.    The statements in ¶220 above were materially misleading, as detailed in ¶¶44-81, because they failed to disclose that at every stage of the mortgage servicing process, including the foreclosure processes, Ocwen had substantial errors with REALServicing, was working with outside foreclosure counsel which substantially harmed borrowers during the foreclosure process, and was unlawfully foreclosing on borrowers.

222.     On that same July 27, 2016 conference call, Defendants Faris stated that: "*[a]s a Company we continue to make progress in resolving our legacy issues…this legal spend is now largely behind us.*" Defendant Faris further stated that: "*[w]e remain focused on compliance, risk management, and service excellence.  We are striving to regain approvals to be able to acquire MSRs again.  We want to resolve our remaining legacy, regulatory, and legal concerns*."

223.     The statements in ¶222 was materially false and misleading because:

   a.   As detailed in ¶¶44-81, the REALServicing platform was suffering from numerous debilitating problems which compromised its ability to properly perform servicing operations and meant that Ocwen's legal concerns would not be resolved and the legal spend was not behind the Company; and

   b.   As detailed in ¶¶39-43, Ocwen was in direct violation of the Regulator Settlements and would not, and could not, fix those violations because of its REALServicing problems.

**Q.     Ocwen's August 25, 2016 8-K**

224.     In a Form 8-K dated August 25, 2016 and signed by Defendant Bourque, Ocwen announced that it had entered into a consent order with the Washington State Department of Financial Institutions concerning "activities" under the Washington Consumer Loan Act, for which Ocwen neither admitted nor denied any wrongdoing. In this 8-K, the Company stated, "*Ocwen continues to invest significantly in its risk and compliance infrastructure and remains committed to a culture of compliance with all regulatory requirements*."

225.     The statements in ¶224 above were materially false and misleading because:

   a.   As detailed in ¶¶44-81, the REALServicing platform was suffering from numerous debilitating problems which compromised its ability to properly perform servicing operations; and

   b.   As detailed in ¶¶39-43, Ocwen was not meeting the requirements of the changing regulatory environment because it was in direct violation of the

Regulator Settlements and would not, and could not, fix those violations because of its REALServicing problems.

**R.     Ocwen's Third Quarter 2016 10-Q**

226.    On October 26, 2016, the Company filed a Form 10-Q with the SEC for the period ended September 30, 2016 (the "Third Quarter 2016 10-Q"), signed by Defendant Bourque.   In the Third Quarter of 2016 10-Q. the Company stated that "we take our commitments to enhancing the borrower experience, strengthening our risk and compliance infrastructure and delivering strong loss mitigation results very seriously and, accordingly, we continue to make appropriate investments in those important areas even as we continue to optimize our cost structure through productivity improvements and other initiatives."

227.    The statements in ¶226 above were materially misleading because:

    a.   They omitted to disclosed that as detailed in ¶¶44-81, that the REALServicing platform was suffering from numerous debilitating problems which compromised its ability to properly perform servicing operations;

    b.   They omitted to disclose, as detailed in ¶¶75-81, at every stage of the mortgage servicing process, including the foreclosure processes, Ocwen had substantial errors with REALServicing, was working with outside foreclosure counsel who failed to provide timely and accurate information while Ocwen did not have proper systems and procedures in place to obtain this information, and was unlawfully foreclosing on borrowers; and

    c.   They omitted to disclose that, as detailed in ¶¶39-43, Ocwen was not meeting the requirements of the changing regulatory environment because it was in direct violation of the Regulator Settlements and would not, and could not, fix those violations because of its REALServicing problems.

228.    The Third Quarter 2016 10-Q was also materially false and misleading because, pursuant to Item 303, as detailed in ¶¶132-138, Defendants were required, but failed, to disclose (i) the existence of trends within the Company, namely that Ocwen's servicing business was critically impaired because of continued unremediated weaknesses in its REALServicing platform, hampering Ocwen's ability to generate revenue and risking the very solvency of the

Company; and the fact that (ii) whether these facts would have a "material…unfavorable impact on…revenues."

229.   The Third Quarter 2016 10-Q was further materially false and misleading because, as detailed in ¶¶139-141, Defendants' statements and omissions during the Class Period about Ocwen's purported "progress" concerning its compliance with the State Regulators' orders and its supposed remediation of REALServicing caused material and knowing violations of ASC 450/FAS5.

230.   Defendants stated in the Third Quarter 2016 10-Q that, as of September 30, 2016, Ocwen's disclosure controls and procedures were designed, functioning, and operating effectively.   The 10-Q also contained signed certifications by Defendants Faris and Bourque, stating that the financial information contained in the Third Quarter 2016 10-Q was accurate and disclosed any material changes to the Company's disclosure controls over financial reporting. The certifications made substantially similar (if not identical) representations to the certifications included in the Company's 2014 Form 10-K, as alleged in ¶159.

231.   The statements in ¶230 above were materially false and misleading because, as detailed in ¶¶139-145, the Third Quarter 2016 10-Q failed to disclose the loss contingency that arose as a result of the impairment of Ocwen's REALServicing Platform such that it was incapable of properly performing as a loan servicing platform and would need to be fixed or replaced at enormous cost to the Company.   Moreover, the Company's internal controls were not effective which Ocwen later admitted after the end of the Class Period.

**S.   Ocwen's Third Quarter 2016 Earnings Call**

232.   On October 26, 2016, Ocwen hosted a conference call with analysts and investors to discuss the Company's financial results for the period ended September 30, 2016. During that conference call, Defendant Faris stated: "*[a]s I've said before many times, without question, a*

*homeowner whose loan is serviced by Ocwen has a much better chance of avoiding foreclosure than if their loan is serviced by any other company.*"

233.    The statement in ¶232 above was materially false and misleading because, as detailed in ¶¶44-81, at every stage of the mortgage servicing process, including the foreclosure processes, Ocwen had substantial errors with REALServicing, was working with outside foreclosure counsel which substantially harmed borrowers during the foreclosure process, and was unlawfully foreclosing on borrowers.

**T.    Ocwen's 2016 10-K**

234.    On February 23, 2017, Ocwen filed with the SEC its Form 10-K for the period ended December 31, 2016, (the "2016 10-K"). The 2016 Form 10-K was signed by Defendants Faris and Bourque.   In the 2016 10-K, the Company stated that "In the current regulatory environment, we have faced and expect to continue to face heightened regulatory and public scrutiny as an organization as well as stricter and more comprehensive regulation of the entire mortgage sector. We continue to work diligently to assess and understand the implications of the regulatory environment in which we operate and to meet the requirements of the changing environment in which we operate. We devote substantial resources to regulatory compliance, while, at the same time, striving to meet the needs and expectations of our customers, clients and other stakeholders."

235.    The statements in ¶234 above were materially false and misleading because:

   a.   As detailed in ¶¶44-81, Ocwen was not focused on meeting the needs of its customers as the REALServicing platform was suffering from numerous debilitating problems which compromised its ability to properly perform servicing operations; and

   b.   As detailed in ¶¶39-43, Ocwen was not meeting the requirements of the changing regulatory environment because it was in direct violation of the Regulator Settlements and would not, and could not, fix those violations

because of its REALServicing problems.

236.    In the 2016 10-K, Ocwen praised its purportedly extensive risk and compliance control systems.  Specifically, the Company again touted its "Three Lines of Defense" model: "Ocwen has adopted a 'Three Lines of Defense' model to enable risks and controls to be properly managed on an on-going basis. The model delineates business line management's accountabilities and responsibilities over risk management and the control environment and includes mechanisms to assess the effectiveness of executing these responsibilities.

237.    The statements in ¶236 above were materially false and misleading because, as detailed in ¶¶39-81, Ocwen's Three Lines of Defense model was failing to manage the Company's risk and controls given that the REALServicing platform was suffering from numerous debilitating problems and the Company continued to be in direct violation of the Regulator Settlements.

238.    The 2016 Form 10-K was also materially false and misleading because, pursuant to Item 303, as detailed in ¶¶132-138, Defendants were required, but failed, to disclose (i) the existence of trends within the Company, namely that Ocwen's servicing business was critically impaired because of continued unremediated weaknesses in its REALServicing platform, hampering Ocwen's ability to generate revenue and risking the very solvency of the Company; and the fact that (ii) whether these facts would have a "material…unfavorable impact on…revenues."

239.    The 2016 Form 10-K was further materially false and misleading because, as detailed in ¶¶139-141, Defendants' statements and omissions during the Class Period about Ocwen's purported "progress" concerning its compliance with the State Regulators' orders and its supposed remediation of REALServicing caused material and knowing violations of ASC 450/FAS5.

240.   The 2016 10-K stated that under the supervision of and with the participation of Ocwen's management, including the CEO and CFO, the Company conducted an evaluation of Ocwen's internal control over financial reporting as of December 31, 2016 based on the framework set forth by COSO in Internal Control – Integrated Framework (2013).  Based on that evaluation, management concluded that Ocwen's internal control over financial reporting was effective based on the criteria established in that COSO framework.  The 2016 Form 10-K also contained signed certifications by Defendants Faris and Bourque, stating that the financial information contained in the 2016 Form 10-K was accurate and disclosed any material changes to the Company's disclosure controls over financial reporting. The Individual Defendants' signed certifications made substantially similar representations to the certifications included in the Company's 2014 Form 10-K, as alleged in ¶159.

241.   The statements in ¶240 above were materially false and misleading because, as detailed in ¶¶139-145, the 2016 Form 10-K failed to disclose the loss contingency that arose as a result of the impairment of Ocwen's REALServicing Platform such that it was incapable of properly performing as a loan servicing platform and would need to be fixed or replaced at enormous cost to the Company.  Moreover, the Company's internal controls were not effective which Ocwen later admitted after the end of the Class Period.

**U.   Ocwen's Fourth Quarter 2016 Earnings Call**

242.   On February 22, 2017, Ocwen hosted a conference call with investors and analysts to discuss the Company's financial results for the period ended December 31, 2016.  In that conference call, Defendant Faris stated that "While addressing these challenges and opportunities for Ocwen, we need to remain laser-focused in the near term on putting our legacy concerns behind us so we can reemerge as a strong competitor. Our top-seven priorities for 2017 now that the California settlement is complete are number one is ending our current consent

95

order with the New York DFS; thus substantially reducing or eliminating the costs of New York monitor and regaining the ability to acquire MSRs again.  While some of this has taken and may continue to take more time than we would like, we have made progress and it must occur soon if we are ever able to compete again. We are committed to continuing to demonstrate to the New York DFS and all of our regulators the significant transformation that has occurred at Ocwen over the past couple of years."  Moreover, Defendant Faris stated that: "*we have invested heavily in compliance and risk management. We believe these operations are now mature and delivering improved controls and results*."

243.    The statements in ¶242 above were materially false and misleading because:

    a.  As detailed in ¶¶44-81, the REALServicing platform was suffering from numerous debilitating problems which compromised its ability to properly perform servicing operations which meant the Company was not delivering improved controls and results; and

    b.  As detailed in ¶¶39-43, there was no significant transformation that had occurred at Ocwen over the past couple of years to demonstrate to regulators because the Company was in direct violation of the Regulator Settlements and would not, and could not, fix those violations because of its REALServicing problems.

244.    During this conference call, Defendant Faris also made statements about the Company helping struggling families to remain in their homes and "help[ing] more homeowners through the HAMP program than any other servicer by a wide margin…."

245.    By virtue of the facts alleged in ¶¶75-81, the foregoing statement was materially misleading because it omitted the material problems Ocwen was experiencing with its loan servicing business, including that the REALServicing platform was suffering from numerous debilitating problems which compromised its ability to properly perform servicing operations and that Ocwen continued to illegally and improperly foreclose on borrowers during the class period.

## IX.    ALLEGATIONS CONFIRMING DEFENDANTS' SCIENTER

246.    As alleged above, numerous facts give rise to a strong inference that Defendants Ocwen, Faris, and Bourque knew or recklessly disregarded that their Class Period statements and omissions set forth herein were materially false and misleading, concealed material facts, and lacked any reasonable basis when made.  Among other things, Defendants knew, or recklessly disregarded, that: (i) Ocwen was not in compliance with the Regulator Settlements concerning Ocwen's mortgage servicing practices; (ii) Ocwen's reliance on REALServicing, a mortgage servicing platform plagued with a myriad of known deficiencies, made compliance with the Regulator Settlements an impossibility; (iii) Defendants had no real commitment to borrowers; and (iv) Ocwen reliance on REALServicing rendered the the Company's internal controls ineffective and its financial statements unreliable.  Because Defendant Faris was the President, CEO, and a member of the Board of Directors of Ocwen at all times during the Class Period, and because Defendant Bourque was the CFO of Ocwen during the Class Period, their scienter, as to each of them, is ascribed to Ocwen.

247.    The following allegations detailed in Section IV through VIII above, viewed collectively, support a strong inference that corporate Defendants, including corporate Defendant Ocwen, acted with scienter:

> a)    Ocwen's Prior Settlements With Regulators.  As alleged above in ¶¶27-38, Ocwen had an extensive, pre-Class Period history of mortgage servicing misconduct that was substantively identical to the misconduct alleged herein arising out of the unremediated state of REALServicing and Ocwen's failure to be in compliance with the Regulator Settlements.  Indeed, the allegations arising out of and the findings of the Regulator Settlements overwhelmingly overlap with the unremediated but purported compliance efforts Defendants claimed to have made during the Class Period, including: (i) "Servicer shall maintain procedures to ensure accuracy and timely updating of borrower's account information, including posting of payments and imposition of fees. Servicer shall also maintain adequate documentation of borrower account information …" ¶30; (ii) "Servicer shall promptly accept and apply all borrower payments …" ¶30; (iii) various prohibitions concerning Ocwen's initiating inappropriate foreclosure proceedings, ¶¶8, 29-31, 59, 75-81; (iv) that Ocwen had to put into place a "system of robust internal controls and oversight" with respect to its mortgage servicing practices, ¶31; (v) that

97

Ocwen had inadequate and ineffective information technology systems and personnel, and that "Ocwen's core servicing functions rely on its inadequate systems" ¶32; (vi) that Ocwen could not accurately or timely produce correct records in connection with the CDBO's investigation of Ocwen, causing Ocwen to be barred from acquiring MSRs in California. ¶34; and (vii) ordered that Ocwen undergo a thorough review of REALServicing and other information technology systems. Defendants Faris signed the NYDFS Consent Order, dated December 19, 2014, as well as the CDBO Consent Order, dated January 23, 2015. At a minimum, since at least 2013 when Ocwen first came under investigation, Defendants Faris and Bourque were under a heightened duty to review and monitor the servicing department. As a result of these allegations and findings, Defendants knew (or were at least reckless in not knowing) that the substantively identical misconduct was occurring during the Class Period.

b)  <u>Ocwen Acknowledged Failures Related To REALServicing In Internal Emails</u>.  As alleged above in ¶¶52-55, 94, the Individual Defendants received internal emails from Ocwen executives detailing the myriad of problems concerning REALServicing's inability to accurately handle mortgage servicing. For example, in late 2014, prior to the Class Period, Ocwen's Head of Escrow wrote an email which was forwarded to defendant Faris highlighting critical "***system issue***" flaws concerning escrow accounts and REALServicing's generating inaccurate balances. ¶54. Likewise in an internal communication sent to Defendant Faris in 2014, Ocwen's Head of Servicing described REALServicing as ***"[a]n absolute train wreck***. I know there's no shot in hell but *if I could change systems tomorrow I would*" and that "I can't tell you the number of hours I and others spend on basic servicing technology blocking and tackling. I'm not talking about differentiators here, ***I'm talking about getting system to stay online, escrow analysis to work, letters to print, etc. It's ridiculous.***" ¶52  Similarly, in late 2014, Ocwen's Head of Servicing emailed Defendant Faris and noted that "***You are familiar with this issue*** - the BK escrow balance bucket is wrong and requires every BK loan to be manually reviewed and we can still have errors." ¶55. Ocwen employees also wrote an email stating that Ocwen lacked "***processes to review and ensure compliance with state laws*** for negative amortization" relating to adjustable rate mortgages, and whether to review impacted loans and provide borrowers with remediation. These internal emails, in direct conflict with Defendants' statements and omissions concerning Ocwen's purported compliance with the Regulator Settlements and the efficacy and remediation of REALServicing support a strong inference that Defendants knew (or were at least reckless in not knowing) that Ocwen was not in compliance with the Regulator Settlements, that Defendants continued to engage in mortgage servicing practices that ran afoul of federal and state laws, and that REALServicing continued to suffer from critical deficiencies that rendered it incapable of effectively serving as the Company's core mortgage servicing technology.

c)  <u>Ocwen's Own Investigation Of REALServicing Found It To Contain Critical Deficiencies</u>.  As alleged above in ¶¶57-58, since 2014, Ocwen had created a

system to track its regulatory violations, risk areas, and other failures in spreadsheets called "Risk Convergence Reports." As of August 2015, Ocwen had 2,803 issues on its Risk Convergence Report, more than 550 of which had been assigned the highest risk rating, R1, which meant that these risks involved potential adverse impact of over $5 million, ***actual or high possibility of fraud***, waste or abuse breach of company policy or procedures (frequent, repeat, or disregarding policy); ***noncompliance with the law or regulation***; or material errors or irregularities are a reasonable possibility. Indeed, and as the the CFPB Complaint alleges, following the August 2015 Risk Convergence Report, in 2016, Ocwen's Chief Information Officer, who reported to Defendant Faris, and other personnel conducted an analysis of REALServicing, and this analyis found that REALServicing had "***significant deficiencies represent[ing] significant risk and expense to Ocwen***" and that "'the most important dimensions of Core Technology' to REALServicing, such as performance and scalability, loan type support, risk exposure, and organizational capability, compare[d] 'unfavorably' to other mortgage platforms." ¶57. Ocwen'sadmissions in connection with its own investigations are in direct conflict with Defendants' statements and omissions concerning Ocwen's purported compliance with the Regulator Settlements and the efficacy and remediation of REALServicing support a strong inference that Defendants knew (or were at least reckless in not knowing) that Ocwen was not in compliance with the Regulator Settlements, that Defendants continued to engage in mortgage servicing practices that ran afoul of federal and state laws, and that REALServicing continued to suffer from critical deficiencies that rendered it incapable of effectively serving as the Company's core mortgage servicing technology.

d) <u>Ocwen Executives Knew That Critical Deficiencies Related To REALServicing Would Lead To Or Had Already Caused Noncompliance With State And Federal Laws</u>. The CFPB alleges that, in 2015, Ocwen's outside consultant conducted interviews with Ocwen business leaders who identified 67 failures representing "functional and/or technical deficiencies" that "stemm[ed] from systematic and manual processes," including: (i) with respect to escrow; a technical gap causing escrow analysis to be conducted incorrectly and a manual bankruptcy workaround for loans acquired already in bankruptcy, caused information to be deleted from history as new information was updated; (ii) with respect to insurance disbursements, no systematic controls existed to prevent duplicate disbursements in REALServicing resulting in 6,000-12,000 incidents per year; (iii) with respect to loan modification processes, upon review of a loan modification package, terms were found to be incorrect approximately 80% of the time;  (iv) with respect to foreclosure data, data between REALResolution (the REALServicing application for foreclosures) and REALServicing was not always in sync due to lack of adequate system mapping; and (v) with respect to the payment of borrower taxes, although tax assessment information is supposed to be used to project more accurate payments, REALServicing automatically used a prior

year's billing amount even if installments for the current year were different. ¶59. Moreover, by the spring of 2016, Ocwen had concluded that REALServicing was broken in a number of ways that adversely affected borrowers. ¶60. These facts demonstrate Defendants' scienter.

e) <u>Ocwen's 2016 Internal Audit Found Deficiences In The Company's Compliance With Foreclosure Practices</u>. As alleged above in ¶77, in March 2016, Ocwen conducted an internal audit of its foreclosure operations, and, as a result of this audit found noncompliance with Ocwen's foreclosure practices and determined, amongst other things, that for foreclosures initiated between July and December 2015, there was a failure to upload relevant documents thirteen percent of the time, delays in uploading documents thirty percent of the time, and a failure to update accurate event completion dates in Ocwen's system sixty percent of the time. ¶77. The extent of these failures and the fact that these failures were found by Ocwen's own audit demonstrates that Defendants knew (or were at least reckless in not knowing) that Defendants continued to engage in mortgage servicing practices that ran afoul of federal and state foreclosure laws.

f) <u>The Outside Consultant Hired By Ocwen Concluded That REALServicing lacked the basic system architecture and design necessary to properly service loans</u>. As the CFPB Complaint alleged, Ocwen hired this consultant in 2015. ¶56. As alleged above in ¶56, and as a result of this consultant's investigation into the efficacy of REALServicing and Ocwen's ability to service mortgages in compliance with federal and state laws, the consultant determined that REALServicing contained numerous critical deficiencies, which included: (i) a high volume of loan errors requiring manual revision; (ii) limited available data fields causing various groups to use and reuse the same fields for different information; and (iii) limited system functionality to accommodate the Service Members Civil Relief Act requirements (in other words, not providing the required accommodations to members of the United States Armed Services who were in active duty) such as the inability to stop fees if a fee was in place prior to a borrower becoming eligible under the Service Members Civil Relief Act. These facts demonstrate Defendants' scienter.

g) <u>Ocwen's Former CEO Was Forced To Resign Because Of Related, Prior Misconduct At Ocwen</u>. As alleged above in ¶33, under the terms of the Consent Order and the NYDFS, Ocwen's former CEO and Chairman, Erbey, was forced to resign and was banned him from engaging in any role whatsoever in Ocwen. Specifically, pursuant to the Company's settlement with the NYDFS, Ocwen admitted it did not properly deal with distressed homeowners and failed to maintain adequate systems for servicing hundreds of billions of dollars in mortgages, and, in connection with this misconduct and the Company's related-party transactions with Altisource, the NYDFS forced Erbey to resign from Ocwen. ¶33. This supports a strong inference that Ocwen and the Individual Defendants, including Defendant Faris, Erbey's

100

replacement, was charged with identifying and remediating the conduct which led to Erbey's forced resignation, and knew (or were at least reckless in not knowing) that during the Class Period Ocwen was engaged in substantively identical mortgaging servicing misconduct.

h) <u>The Mortgage Industry Is Highly Regulated</u>.  As Ocwen has admitted in the past, it operates in a "highly regulated environment." As alleged above in ¶23, Ocwen, as a mortgage servicer, Ocwen is the subject of numerous federal regulators scrutinizing its lending practices, as well as regulators from every state in the country.  This fact alone supports a strong inference that Ocwen and the Individual Defendants knew (or were at least reckless in not knowing) that its practices as a mortgage servicer, during the Class Period, continued to run afoul of the Regulators Settlements and that its REALServicing technology suffered from a myriad of critical deficiencies such that the Company's technological inadequacies continued during the Class Period and were left unabated.

i) <u>Ocwen Received Thousands Of Complaints Concerning Its Mortgage Servicing</u>. As alleged above in ¶72, during the Class Period, Ocwen received **hundreds of thousands** of customer complaints detailing the extreme frustration and financial hardship experienced by borrowers as a result of Defendants' Class Period lending practices, arising out of Ocwen's noncompliance with the Regulator Settlements and the Company's reliance on REALServicing. For example, between April 2015 and April 2016 alone, Ocwen received more than 68,000 complaints from borrowers related Ocwen's improper processing of borrower payements.  During that same period, Ocwen received more than 19,000 complaints from borrowers related to Ocwen's mishandling of the borrowers' insurance policies. Moreover, during the Class Period, Ocwen received more than 53,000 complaints relating to its improper handling of escrow accounts.  Indeed, since April 2015, Ocwen has received more than **half a million complaints** and written notices of error from more than **300,000 different borrowers**.  Indeed, a former Ocwen employee, FE2, a loan servicing supervisor for OLS during the Class Period, explained that, "**All day every day customers were calling in to complain -- every other call was a complaint.** They said the information in their account was wrong; that there was improper lien holder info; improper escrow info – everything." ¶90.  Moreover, as explained by FE2, Defendant Faris instructed employees via email to forward borrower complaints to the Ocwen office in India, despite the legitimacy of these complaints and despite the clear problems REALServicing was creating for Ocwen's customers. ¶95. Specifically, FE2 recounted that "Faris sent emails telling us to just disregard the complaints [from customers]; disregard and just keep business moving. The only thing that mattered was that we keep business moving."  ¶95.  The severity and magnitude of these complaints support a strong inference that Defendants knew (or were at least reckless in not knowing) that Ocwen was not in compliance with the Regulator Settlements, that Defendants continued

to engage in mortgage servicing practices that ran afoul of federal and state laws, and that REALServicing continued to suffer from critical deficiencies that rendered it incapable of effectively serving as the Company's core mortgage servicing technology.

j) <u>Mortgage Servicing Was Ocwen's Core Operation</u>.  As alleged in ¶¶21-22, mortgage servicing was Ocwen's core operation and, of the Company's various business segments, was its greatest generator of revenue.  As Ocwen had admitted in the Company's 2014, 2015, and 2016 10-Ks, all filed with the SEC during the Class Period and signed by Defendants Faris and Bourque, Defendants noted that: "***Servicing and Lending are our primary lines of business.***"  Moreover, the bulk of Ocwen's annual revenue derived from servicing. Indeed, during the Class Period, Ocwen derived 85% of its 2016 revenue from Servicing and 89% of its 2015 revenue from Servicing.  These facts support a strong inference of scienter.

k) <u>Defendants Were Motivated To Artificially Maintain Ocwen's Mortgage Servicing Rating Requirements</u>.  As alleged above in ¶¶37-38, Ocwen's ability to continue servicing mortgages depended on the Company's maintaining a contractually specified mortgage servicer rating.  For example, a ratings downgrade to SQ3- was considered a "termination event" under the purchase agreement between HLSS and Ocwen, pursuant to which Ocwen had purchased MSRs representing $67.5 billion in UPB in 2012 and $120 billion in UPB in 2013.  A "termination event" would allow HLSS to transfer its loans to another servicer.  Indeed, Compass Point observed that this downgrade also  "increase[d] the risk of further 'events of default' within the private label M[ortgage] B[acked] S[ecurities] pooling and servicing agreements and likely would lead to further servicer termination votes being conducted by trustees."  These facts support a strong inference of scienter that Defendants were motivated to preserve the substantial profits associated with servicing MSRs, and in doing do so Defendants knew (or were at least reckless in not knowing) that their material statements and omissions concerning Ocwen's compliance with the Regulator's Settlement and the remediation and efficacy of REALServicing were false when made.

l) <u>Former Ocwen Employees Confirmed Unremediated Class Period Deficiencies With REALServicing</u>.  As alleged above in ¶¶83-94, former Ocwen employees confirmed the critical deficiencies plaguing REALServicing, deficiencies which the Individual Defendants knew or should have known about.  For example, FE1, a senior manager of examination at Ocwen between June 2015 and June 2016, who during his tenure reported directly to Ocwen's Vice President of Compliance and Ocwen's Chief Compliance Officer, issued weekly reports that were distributed to Defendant Faris detailing the status of all ongoing regulatory examinations as well as any remediation efforts by the Company.  Indeed, FE1 explained that these reports were distributed to Defendant Faris because Faris was very hands-on and

wanted to know what was going on concerning Ocwen's federal and state regulators and the Company's remediation efforts as to these examinations. FE1 also explained that REALServicing could not be counted on to generate the necessary information for the regulators because there were always "*system glitches or system problems made some information permanently unavailable*," and accordingly REALServicing was an inadequate servicing platform for a company like Ocwen to remain in compliance with its regulatory duties. ¶86. Moreover, FE1 explained that Ocwen senior management, including Ocwen's Chief Compliance Officer and Chief Technology officer were aware of these deficiencies. ¶87. Another Ocwen former employee, FE2, a loan servicing supervisor for OLS during the Class Period, corroborated the extent of REALServicing deficiencies, explaining that "*There [were] always problems with REALServicing*," and was all but impossible to identify errors in borrowers' accounts when they existed. ¶88. These former employees' accounts supports a strong inference that Defendants knew (or were at least reckless in not knowing) that Ocwen was not in compliance with the Regulator Settlements, that Defendants continued to engage in mortgage servicing practices that ran afoul of federal and state laws, and that REALServicing continued to suffer from critical deficiencies that rendered it incapable of effectively serving as the Company's core mortgage servicing technology.

248.    Moreover, the following additional allegations support a strong inference that during the Class Period, Individual Defendants Faris and Bourque each knew or recklessly disregarded at the time of their own statements listed above that, contrary to their repeated public statements that: (i) Ocwen was not in compliance with the Regulator Settlements as a result of, among other things, the Company's reliance on REALServicing; (ii) REALServicing was fraught with deficiencies and Defendants were not remediating those deficiencies; (iii) Defendants were not committed to borrowers; and (iv) the Company's internal controls over financial reporting were ineffective.

249.    *First*, the Individual Defendants' scienter is demonstrated by the fact they represented that, during the Class Period, Ocwen's internal controls over financial reporting were effective when in fact they were not.  Indeed, in every Class Period Form 10-K and 10-Q, the Indivdual Defendants made such representations, with Defendant Faris and Bourque signing Ocwen's Class Period Forms 10-K and Defendant Bourque signing Ocwen's Class Period Form 10-Qs.  However, as

103

disclosed after the close of the Class Period, Ocwen suffered from a material weakness in its internal controls, rendering its internal controls ineffective, related specifically to Ocwen's ability to timely and accurately generate information pursuant to a regulator's examination. ¶¶121-24. Given that this critical issue affected Ocwen's core business, and, as a result of REALServicing's various failures, Defendants could not produce accurate mortgage servicing data throughout the Class Period, the Individual Defendants' repeated personal certifications were either knowingly or recklessly false when made. Indeed, after the close of the Class Period, in the Company's subsequent Forms 10-Q and 2016 10-K/A, Ocwen, Faris and Bourque each admitted that the Company's internal controls were inadequate, contrary to their own prior certifications.

250. ***Second***, the Individual Defendants' scienter is demonstrated by the fact that they received internal Company reports and emails detailing the ongoing, systemic and unremediated deficiencies with REALServicing. For example, in late 2014, prior to the Class Period, Ocwen's Head of Escrow wrote an email which was forwarded to defendant Faris highlighting critical "***system issue***" flaws concerning escrow accounts and REALServicing's generating inaccurate balances, an issue which the Head of Escrow explained that he had previously "***stressed***" to Defendant Faris. ¶55. Likewise, as alleged above in ¶52, in an internal communication sent to Defendant Faris in 2014, Ocwen's Head of Servicing described REALServicing as "***[a]n absolute train wreck***. I know there's no shot in hell but ***if I could change systems tomorrow I would***" and that "I can't tell you the number of hours I and others spend on basic servicing technology blocking and tackling. I'm not talking about differentiators here, ***I'm talking about getting system to stay online, escrow analysis to work, letters to print, etc. It's ridiculous.***" Similarly, in late 2014, Ocwen's Head of Servicing emailed Defendant Faris and noted that "***You are familiar with this issue*** - the BK escrow balance bucket is wrong and requires every BK loan

to be manually reviewed and we can still have errors." ¶55.   Moreover, as explained by FE1, reports were given to Defendant Faris on a weekly basis detailing the state of Ocwen's compliance with the Regulator Settlements, which included information concerning remediation efforts, if any, because Defendant Faris wanted to know these things. ¶¶83-85

251.   **Third**, the Individual Defendants' scienter is further demonstrated by the fact that the Individual Defendants routinely spoke about Ocwen's purported compliance with the Regulator Settlements. Indeed, repeatedly throughout the Class Period, as alleged above in ¶¶147-243, Defendants Faris made representations about Ocwen's compliance with or progress related to the Regulator Settlements.  Indeed, Faris routinely told investors that he was working closely with regulators and monitors to ensure Ocwen's compliance with federal and state laws.

252.   **Fourth,** the Individual Defendants' scienter is further demonstrated by the fact that their responsibilities involved overseeing those executives who were responsible for executing risk assessment and investigations concerning Ocwen's compliance with the Regulator Settlements.  For example, Defendant Faris, as CEO of Ocwen, was responsible for overseeing Ocwen's top executives, including Ocwen's Chief Compliance Officer, Michael Hollerich – who joined Ocwen in April 2015.  In an interview with the MReport, dated March 7, 2016, Hollerich explained that his mandate, "which comes directly from our Chief Executive Officer Ron Faris" was to provide a "new level of leadership" concerning Ocwen's purported new culture of compliance. Indeed, Hollerich explained that Faris was involved in Hollerich's supposed compliance efforts when he stated that, "With the support of the CEO [Faris] and Board Compliance Committee, we continue to 'look under the hood' at our control infrastructure using a risk-based approach." Faris' "support" in this context supports a strong inference of scienter. Moreover, as FE1 explained, weekly examination reports were generated which concerned the

Company's compliance with regulatory examinations conducted by federal and state regulators. These weekly examination reports were distributed to Hollerich and Defendants Faris.

253.   **Fifth,** Defendant Faris' scienter is further demonstrated that he told Ocwen employees to disregard borrower complaints. Despite the legitimacy of a borrower's complaint, Ocwen's untrained personnel in its India office, and Defendants' Class Period representations concerning the Company's' purported commitment to serving borrowers, FE2 explained that "Faris sent emails telling us to just disregard the complaints [from customers]; disregard and just keep business moving. The only thing that mattered was that we keep business moving." ¶94. These emails were sent from Faris's office to the entire customer service team and bore his name in the email signature.

## X.   LOSS CAUSATION

254.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused Lead Plaintiff and the Class to suffer substantial losses. During the Class Period, Lead Plaintiff and the Class purchased Ocwen common stock at artificially inflated prices and were damaged thereby when the price of Ocwen common stock declined when the truth was revealed. The price of Ocwen common stock significantly declined (causing investors to suffer losses) when Defendants' misrepresentations, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, and/or the risks that had been fraudulently concealed by the Defendants materialized.

255.   Specifically, Defendants' materially false and misleading statements misrepresented, *inter alia*, the efficacy of Ocwen's REALServicing technology, the purported progress of its remediation efforts in connection with the Regulator Settlements, and the efficacy of the Company's internal controls.   When those statements were corrected and the risks concealed by them materialized, investors suffered losses as the price of Ocwen common stock

106

declined. As a result of the disclosure of the truth of Defendants' fraud, Ocwen common stock price declined over 79%, from a Class Period high of $11.61 per share on July 29, 2015 to a closing price of $2.39 per share on April 20, 2017, the final day of the Class Period.

256.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiff and the Class.

257.    During the Class Period, Lead Plaintiff and the Class purchased Ocwen common stock at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

258.    The disclosures that corrected the market prices of Ocwen common stock to reduce the artificial inflation caused by Defendants' materially false and misleading statements and omissions are detailed below.

259.    On February 29, 2016, Ocwen and reported higher than expected costs in connection with monitoring of and compliance with the NYDFS Consent Order, other regulatory and litigation matters concerning lending misconduct arising out of the woeful state of REALServicing. Following this news, the price of Ocwen common stock plunged approximately 58%, falling from an opening price per share on February 29, 2016 of $5.02, to close at $2.11 per share on March 1, 2016 on extremely heavy trading.

260.    On February 16, 2017, Altisource revealed in its Form 10-K that the CFPB was investigating the relationship between Altisource and Ocwen. Specifically, Altisource had received a Notice and Opportunity to Respond and Advise letter from the CFPB. On this news the price of Ocwen's common stock fell $0.67 per share or approximately 13% to close at $5.15

per share.

261.    On February 23, 2017, following an Ocwen earnings call that referenced possible CFPB action and expected 2017 earnings losses, shares of Ocwen common stock fell $0.91 per share or approximately 18.1% to close at $4.42 per share.

262.    On April 20, 2017, state and federal regulators filed a slew of cease and desist orders, and civil complaints against Ocwen. The cease and desist orders were spearheaded by the North Carolina Commissioner of Banks, and quickly followed by complaints from the Attorney General for the State of Florida and the CFPB. Ultimately multiple states would file cease and desist orders preventing Ocwen from acquiring new MSRs. When the truth regarding Ocwen's failure to comply with the Regulator Settlements, and continued illegal conduct was fully revealed to the market, the price of Ocwen common stock fell $2.91 per share, or approximately 53.89% to close at $2.49 per share on April 20, 2017.

263.    Accordingly as a result of their purchases of Ocwen's publicly traded common stock during the Class Period, Lead Plaintiff and other members of the Class suffered economic losses and damages.

## XI.    PRESUMPTION OF RELIANCE

264.    Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against the Defendants are predicated upon omissions of material fact that there was a duty to disclose.

265.    Plaintiffs are also entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, during the Class Period:

        i.    Ocwen common stock was actively traded in an efficient market on the NYSE;

ii.  Ocwen common stock traded at high weekly volumes, with an average of over 17 million shares traded each week during the Class Period. The average weekly turnover as a percentage of shares outstanding was approximately 14.1% (median of 10.8%), well surpassing the higher 2% threshold level of average weekly trading volume indicative of an efficient market;

iii.  As a regulated issuer, Ocwen filed periodic public reports with the SEC;

iv.  Ocwen was eligible to file registration statements with the SEC on Form S-3;

v.  Ocwen and the Individual Defendants regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

vi.  The market reacted promptly to public information disseminated by Ocwen;

vii.  Ocwen securities were covered by numerous securities analysts employed by major brokerage firms, including Oppenheimer & Co. Inc., Piper Jaffray, and Compass Point Research & Trading, LLC. Each of these reports was publicly available and entered the public marketplace;

viii.  The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Ocwen common stock; and

ix.  Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased or acquired Ocwen common stock between the time the Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

266.  Accordingly, the market for Ocwen common stock promptly digested current information with respect to Ocwen from all publicly-available sources and reflected such information in the prices of those securities. Under these circumstances, all purchasers of the Company's publicly traded common stock suffered similar injury through their purchases at artificially inflated prices, and a presumption of reliance applies.

## XII.   INAPPLICABILITY OF STATUTORY SAFE HARBOR

267.   The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint. The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made. Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

268.   Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, the Individual Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of Ocwen who knew that the statement was materially false or misleading when made. Accordingly, any arguably forward-looking statements cannot be protected under the PSLRA safe harbor.

## XIII.   PLAINTIFF'S CLASS ACTION ALLEGATIONS

269.   Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Ocwen common stock during the Class Period, January 13, 2015 to April 20, 2017, inclusive, and were damaged thereby (the "Class"). Excluded from the Class are (i) Ocwen; (ii) the Individual Defendants; (iii) members of the immediate family of each Individual Defendant; (iv) any person who was an officer or director of Ocwen during the Class Period; (v) any firm, trust, corporation, officer, or other entity in which any Defendant has or had a controlling interest; (vi) any person who participated in the wrongdoing alleged herein; and (vii) the legal representatives,

agents, affiliates, heirs, beneficiaries, successors-in-interest, or assigns of any such excluded party.

270.   The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Throughout the Class Period, Ocwen's common stock was actively traded on the NYSE, an efficient market. As of February 17, 2017, Ocwen had more than 123 million shares of common stock outstanding. While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds of thousands of members in the Class.

271.   There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class predominate over questions that may affect individual Class members, including:

    a)   Whether Defendants violated the federal securities laws;

    b)   Whether Defendants misrepresented material facts concerning Ocwen;

    c)   Whether Defendants' statements omitted material facts necessary to make the statements not misleading in light of the circumstances under which they were made;

    d)   Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

    e)   Whether Defendants engaged in perpetrating a manipulative and deceptive device and/or scheme and/or otherwise engaged in a fraudulent course of conduct;

f)  Whether the Ocwen SEC filings issued during the Class Period which contained financial information (*i.e.*, its Forms 10-K, 10-Q, 8-K, etc.) contained untrue or materially misleading statements;

g)  Whether the prices of Ocwen common stock were artificially inflated; and

h)  The extent of damage sustained by Class members and the appropriate measure of damages.

272.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

273.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

274.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIV.   CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT

### FIRST CLAIM FOR RELIEF

**(Violations of Section 10(b) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

275.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

112

276.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.  During the Class Period, Defendants disseminated or approved the false statements specified herein, which they knew or recklessly disregarded were misleading in that they failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and they contained material misrepresentations.

277.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Ocwen common stock the Class Period.

278.     Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Plaintiff and the Class; made various false and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements with a knowing or reckless disregard for the truth; and employed devices, and artifices to defraud in connection with the purchase and sale of securities, which were intended to, and did: (i) deceive the investing public, including Plaintiffs and the Class concerning Ocwen true financial condition, the efficacy of its internal controls over financial reporting, the efficacy of its REALServicing

platform, and its regulatory remediation progress; (ii) artificially inflate and maintain the market price of Ocwen common stock; and (iii) cause members of the Class to purchase Ocwen common stock at artificially inflated prices.

279.   Defendants, including Faris and Bourque, as top executive officers of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as officers of the Company, each of these Individual Defendants was able to and did control the content of the public statements disseminated by Ocwen. These Individual Defendants had direct involvement in the daily business of Ocwen and participated in the preparation and dissemination of the false and misleading statements.

280.   As described above, Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.

281.   Plaintiff and the Class have suffered damages in that they paid artificially inflated prices for Ocwen common stock. Plaintiffs and the Class would not have purchased Ocwen common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements.

282.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their purchases of Ocwen common stock during the Class Period.

### SECOND CLAIM FOR RELIEF

**For Violations Of Section 20(a) Of The Exchange Act**
**(Against Defendants Faris and Bourque)**

283.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

284.     This Count is asserted against Defendants Faris and Bourque for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of all members of the Class.

285.     As alleged herein, the Individual Defendants caused Ocwen to violate Section 10(b) and Rule 10b-5 promulgated thereunder by making material misstatements and omissions in connection with the purchase and sale of securities throughout the Class Period. This conduct was undertaken with the scienter of the Individual Defendants who knew of or recklessly disregarded the falsity of the Company's and their statements and the nature of its scheme during the Class Period.

286.     During their tenures as officers and/or directors of Ocwen, the Individual Defendants were controlling persons of Ocwen within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as officers and/or directors of Ocwen, these Individual Defendants had the power and authority to cause Ocwen to engage in the wrongful conduct complained of herein. As set forth in detail above, the Individual Defendants named in this Count were able to and did control, directly and indirectly, and exert control over Ocwen, including the content of the public statements made by Ocwen during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

287.     In their capacities as senior corporate officers of the Company, and as more fully described above, Defendants Faris and Bourque had direct involvement in the day-to-day operations of the Company and in Ocwen's financial reporting and accounting functions. Each of these Individual Defendants was also directly involved in providing false information and

certifying and/or approving the false financial statements disseminated by Ocwen during the Class Period. Further, as detailed above, Defendants Faris and Ocwen had direct involvement in the presentation and/or manipulation of false financial reports included within the Company's press releases and filings with the SEC.

288.    Defendant Faris served as Ocwen's President, CEO, and Director during the Class Period. In this capacity as the senior manager of the Company and member of Ocwen's Board of Directors, Defendant Faris had ultimate control over the actions of Ocwen.

289.    Defendant Bourque served as Ocwen's CFO and Executive Vice President during the Class Period.  In this capacity as a senior manager of the Company, Defendant Bourque had control over the actions of Ocwen.

290.    Defendants Faris and Bourque each personally participated in regular Company calls concerning Ocwen's financial condition, purported remedial progress related to the regulatory investigations and settlements of which the Company was the subject, and the Company's supposed commitment to servicing borrowers.

291.    By reason of their positions as officers of Ocwen, and more specifically as controlling officers – as can be seen by their corresponding ability to influence and control Ocwen – each of these Individual Defendants is a "controlling person" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to direct the management and activities of the Company and its employees, and to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions, these Individual Defendants had access to adverse nonpublic financial information about the Company and acted to conceal the same, or knowingly or recklessly authorized and approved the concealment of the same. Moreover, each of the Individual Defendants was also involved in providing false information

116

and certifying and/or approving the false statements disseminated by the Company during the Class Period. Each of these Individual Defendants was provided with or had access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

292.    As set forth above, the Indivdual Defendants caused Ocwen to violate Section 10(b) of the Exchange Act by making material misstatements and omissions in connection with the purchase and sale of securities and by participating in a scheme and course of business or conduct throughout the Class Period. This conduct was undertaken with the scienter of the Individual Defendants who knew of or recklessly disregarded the falsity of the Company's statements and the nature of its scheme during the Class Period.

293.    As a direct and proximate result of these Individual Defendants' conduct, Plaintiff and the Class suffered damages in connection with their purchase or acquisition of Ocwen common stock.

## XV.    **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment individually and on behalf of the Class as follows:

a)    Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b)    Finding Defendants violated the law as alleged above;

c)    Awarding Lead Plaintiff and the Class damages, including interest;

d)    Awarding Lead Plaintiff reasonable costs, including attorneys' and experts' fees; and

e)    Awarding such equitable/injunctive or other relief for the benefit of the Class as the Court may deem just and proper.

## XVI.    **DEMAND FOR TRIAL BY JURY**

Lead Plaintiff hereby demands a trial by jury for all issues so triable.

Dated: August 28, 2017

*s/ Julie Prag Vianale*
Julie Prag Vianale
**VIANALE & VIANALE LLP**
5550 Glades Road, Suite 500
Boca Raton, Florida 33431
Tel. (561) 392-4750
Fax. (561) 961-5191
JVianale@vianalelaw.com

**ABRAHAM, FRUCHTER AND TWERSKY, LLP**
Mitchell M.Z. Twersky
Atara Hirsch
Lawrence D. Levit
Matthew E. Guarnero
One Penn Plaza, Suite 2805
New York, New York 10119
(212) 279-5050
(212) 279-3655 (fax)
MTwersky@aftlaw.com
AHirsch@aftlaw.com
LLevit@aftlaw.com
MGuarnero@aftlaw.com

*Counsel for Lead Plaintiff, the University of Puerto Rico Retirement System, and Lead Counsel for the Class*

## <u>CERTIFICATE OF SERVICE</u>

 I hereby certify that on this 28th day of August, 2017 I filed the foregoing using the court's ECF system which will cause a true and correct copy to be sent to counsel for all parties of record.

<u>By: s/Julie Prag Vianale</u>
Julie Prag Vianale
**VIANALE & VIANALE LLP**
5550 Glades Road, Suite 500
Boca Raton, Florida 33431
Tel. (561) 392-4750
Fax. (561) 961-5191
jvianale@vianalelaw.com