## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| KAREN A. CARVELLI, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>OCWEN FINANCIAL CORPORATION, RONALD M. FARIS, and MICHAEL R. BOURQUE JR.,<br><br>Defendants. | Civil No.   9:17-cv-80500-RLR |

## DEFENDANTS' MOTION TO DISMISS
## THE CONSOLIDATED SECURITIES CLASS ACTION COMPLAINT
## AND INCORPORATED SUPPORTING MEMORANDUM OF LAW

**GREENBERG TRAURIG, P.A.**

Jeffrey Hirsch, Esq.
401 East Las Olas Boulevard, Suite 2000
Fort Lauderdale, Florida  33301
Telephone: (954) 765-0500
Facsimile:  (954) 765-1477
Florida Bar No. 199850
Email: hirschj@GTLAW.com

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**

John P. Coffey, Esq.
Jonathan M. Wagner, Esq.
Jason M. Moff, Esq.
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
Email: scoffey@kramerlevin.com

*Counsel for All Defendants*

**Table of Contents**

**Page**

I. PRELIMINARY STATEMENT ............................................................................................1

II. FACTS ...........................................................................................................................2

A.      Ocwen and Messrs. Faris and Bourque ...............................................................2

B.      Ocwen's Regulatory Matters and REALServicing Technology Platform .........................3

C.      UPR's Allegations ........................................................................................4

III. ARGUMENT ..................................................................................................................6

      A.      The Complaint Does Not Plead Any Actionable Misstatement of Material Fact. ...............................................................................................................6

            1.      Puffery .............................................................................................7

            2.      Forward-Looking Statements ...........................................................10

            3.      Statements of Opinion ....................................................................12

            4.      Statements That On Their Face Are Not False ...............................13

      B.      The Alleged Misrepresentations in the Complaint Concern Management and Regulatory Compliance and Therefore are Not Actionable Under *Santa Fe* .......................................................................................................15

      C.      The Complaint Does Not Sufficiently Plead Loss Causation ..............................18

IV. CONCLUSION .............................................................................................................20

Pursuant to Fed. R. Civ. P. 12(b)(6) and the heightened pleading standards of the Private Securities Litigation Reform Act ("PSLRA") and Fed. R. Civ. P. 9(b), Defendants Ocwen Financial Corporation, Ronald M. Faris and Michael R. Bourque, Jr. respectfully submit this memorandum in support of their motion to dismiss the amended class action complaint ("Complaint") of Lead Plaintiff University of Puerto Rico Retirement System ("UPR"). For the reasons set forth below, the Court should dismiss (i) Count I against Defendants for alleged violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, as well as (ii) Count II against Messrs. Faris and Bourque as purported Ocwen control persons, for alleged violations of Section 20(a) of the Exchange Act.

**MEMORANDUM OF LAW**

## I.  PRELIMINARY STATEMENT

UPR's 118-page, 293-paragraph Complaint seeks redress for statements that constitute non-actionable "puffery," statements of opinion or forward-looking statements. The Complaint also seeks to dress up allegations of corporate mismanagement in the garb of securities fraud, in violation of the Supreme Court's directive in *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 478-79 (1977). And finally, the Complaint fails to plead properly that any of the alleged misrepresentations caused UPR's losses. On all or any one of these separate grounds, UPR's prolix pleading is legally defective and should be dismissed.

*No actionable false statement of material fact*. UPR has not pleaded a single actionable false statement of material fact. Rather, UPR alleges as false Ocwen's vague statements of puffery, forward-looking statements and statements of opinion. Notably, in another securities class action filed against Ocwen in this District, Judge William Dimitrouleas held as non-actionable statements that were strikingly similar to those challenged here. UPR also pleads that Ocwen's public statements were false because the company supposedly concealed information concerning regulatory developments, but the Complaint conspicuously omits the detailed statements in Ocwen's filings expressly disclosing the status of various regulatory matters and the risks associated with regulatory scrutiny. Indeed, for many of the alleged misstatements cited in the Complaint, UPR has surgically excised words and sentences in which Ocwen disclosed the very information that UPR claims was concealed. UPR's cherry-picked quotations do not transform truthful statements into actionable falsehoods.

1

*No 10b-5 action for allegations concerning regulatory compliance and mismanagement*.  UPR also improperly predicates its 10b-5 claim on supposed false statements and omissions concerning the many regulatory and management issues that Ocwen has faced over the years.  But the Supreme Court held in *Santa Fe* that corporate mismanagement is not a 10b-5 violation, and over the four decades since that decision courts (including Judge Dimitrouleas in the prior Ocwen class action) have consistently rejected attempts like UPR's to dress up corporate mismanagement and regulatory sanction as securities fraud.

*No loss causation*.  Finally, UPR has not properly pleaded the 10b-5 element of loss causation.  To satisfy this element, UPR must allege corrective disclosures that reveal for the first time a previously concealed truth.  But the previously-concealed truths cited by UPR – that Ocwen faced stringent regulatory scrutiny and used flawed servicing technology – had already been disclosed by Ocwen.  In other words, UPR has not identified any new information previously unknown to the market that caused Ocwen's stock price to drop.  On this separate and independent basis, UPR's 10b-5 claim fails as a matter of law.

## II. FACTS[1]

### A.   Ocwen and Messrs. Faris and Bourque

Ocwen is a diversified financial services company founded in 1988.  (¶3).  During the Class Period, Ocwen's core business involved servicing mortgages.  (¶¶21-22).  Mr. Faris has been Ocwen's Chief Executive Officer since October 2010, its President since March 2001, and a director since May 2003.  (¶18).  Mr. Bourque has been Ocwen's Chief Financial Officer and Executive Vice President since June 2014.  (¶19).

To provide perspective on UPR's allegations, it is important to situate Ocwen in the market before and during the alleged Class Period.  Prior to and throughout that period, Ocwen operated – and continues to operate – in a fraught regulatory environment. The Complaint acknowledges that the mortgage industry is a "highly regulated environment" and that

---

[1] The facts set out here are based on the allegations of the Complaint, accepted as true solely for the purposes of this motion, as well as securities filings and other documents referenced in the Complaint and attached as exhibits to the accompanying Declaration of John P. Coffey.  *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1276-81 (11th Cir. 1999) (permitting court review on motion to dismiss of documents cited in the pleading and publicly available documents like SEC filings).  Exhibits to Mr. Coffey's Declaration are referenced herein as "Exhibit __" or "Ex.__".  References to "¶" are to paragraphs in the Complaint.  Unless otherwise noted, all emphasis has been added.

"Ocwen is the subject of numerous federal regulators scrutinizing its lending practices, as well as regulators from every state in the country." (¶247(h); *see also* ¶23). The Complaint likewise acknowledges that Ocwen had been subject to regulatory scrutiny prior to and during the Class Period. (¶¶27-38, 112-19). Indeed, as the Complaint notes, during the Class Period Ocwen repeatedly stated that the Company "faced and expect[ed] to continue to face increased regulatory and public scrutiny as an organization as well as stricter and more comprehensive regulation of the entire mortgage sector." (¶¶192, 234). Missing from UPR's Complaint, however, are the pages-long sections in every one of Ocwen's quarterly and annual public filings during the Class Period detailing the status of Ocwen's regulatory matters and stating among many other caveats that:

> ***Our business is subject to extensive regulation by federal, state and local governmental authorities***, including the Consumer Financial Protection Bureau, HUD, the SEC and various state agencies that license, audit and conduct examinations of our mortgage servicing origination and collection activities. In addition, ***we operate under a number of regulatory settlements that subject us to ongoing monitoring or reporting***. . . . As a result of the current regulatory environment, ***we have faced and expect to continue to face increased regulatory and public scrutiny as well as stricter and more comprehensive regulation of our business***. We continue to work diligently to assess and understand the implications of the regulatory environment in which we operate and to meet the requirements of the changing environment in which we operate . . . . These requirements can and do change as statutes and regulations are enacted, promulgated, amended, interpreted and enforced. The recent trend among federal, state and local lawmakers and regulators has been toward increasing laws, regulations and investigative proceedings with regard to residential real estate lenders and servicers.

(Ex. 9 at 8-13, 15-16; Ex. 10 at 41-42 & 44-46; Ex. 11 at 43-44 & 47-49; Ex. 12 at 43-44 & 47-49; Ex. 13 at 7-11; Ex. 15 at 42-44 & 47-49; Ex. 20 at 40-41 & 44-47; Ex. 21 at 43-45 & 47-50; and *see*, *e.g.*, Ex. 19 at 6-10). In light of Ocwen's disclosures, any investor purchasing Ocwen stock would have been well aware of the regulatory risks facing the company.

## B.    Ocwen's Regulatory Matters and REALServicing Technology Platform

Prior to the Class Period, various regulatory investigations culminated in consent orders between Ocwen and certain of its regulators. (¶247(a)). Ocwen signed (i) a consent judgment with the Consumer Financial Protection Bureau ("CFPB") and forty-nine attorneys general in December 2013 (¶¶28, 30); (ii) a consent order with the New York Department of Financial Services in December 2014 (¶¶31-33); and (iii) a consent order with the California

3

Department of Business Oversight in January 2015. (¶34). These regulatory settlements "mandated severe penalties" (¶33); subjected Ocwen to monitorships "imposing onerous monitoring costs" (¶35); and afforded numerous forms of relief to borrowers whose loans Ocwen serviced. (¶¶30-34). All of these regulatory settlements were disclosed to the market prior to the Class Period. (¶¶27-38, 247(a)).

According to UPR, Ocwen used a mortgage servicing software platform furnished by Altisource Portfolio Solutions, S.A. ("Altisource") – called REALServicing – that was flawed and caused Ocwen to breach the terms of the regulatory settlements, harm borrowers, and violate state and federal laws. (¶¶8, 23, 44-94). UPR alleges that Ocwen's reliance on REALServicing led Ocwen to (i) mishandle borrower payments, escrow accounts, hazard insurance, and private and mortgage insurance (¶¶63-71); (ii) fail to respond to borrower complaints and notices of errors (¶¶72-74); and (iii) foreclose illegally on borrowers' homes (¶¶75-81). According to UPR, given REALServicing's supposed flaws Ocwen must have known that regulators would take action against the company. In support of these allegations, UPR liberally parrots the allegations contained in a complaint filed by the CFPB against Ocwen on April 20, 2017. *See CFPB v. Ocwen*, No. 9:17-cv-80495 (S.D Fla.). [*See* D.E. 67 at n.2, n.3, n.8-n.61].

## C.     UPR's Allegations

UPR has brought a 10b-5 claim against Defendants predicated principally on Defendants' purported false representations during the Class Period that Ocwen was (i) focusing on addressing compliance, risk management and technology issues (*e.g.*, ¶¶100, 103, 151, 177, 222, 242); (ii) devoting resources to compliance and risk management efforts (*e.g.*, ¶¶179, 184, 186, 192, 218, 224, 234, 242); and (iii) enhancing, strengthening, improving and building out aspects of the company, including risk and compliance infrastructure (*e.g.*, ¶¶147, 151, 168, 174, 175, 177, 183, 184, 204, 212, 226). UPR also cites Ocwen's statements concerning the company's (i) competitive strengths (*e.g.,* ¶¶153, 242); (ii) leadership in the servicing industry (*e.g.*, ¶¶149, 153, 168, 181, 202, 210, 218, 220, 232, 244); (iii) cooperation with regulators (*e.g.*, ¶¶147, 161, 167); (iv) progress in integrating servicing operations (¶161); and (v) adoption of a new risk management model (¶¶195-96, 236). UPR pleads that certain of Ocwen's statements fraudulently misrepresented and concealed information concerning Ocwen's REALServicing platform and regulatory compliance. UPR goes on to allege that Defendants could not have maintained effective disclosure controls and procedures and that therefore Defendants'

4

assurances to investors concerning Ocwen's disclosure controls and procedures were false.  (*See*, *e.g.*, ¶¶158-60).

UPR claims that the "truth" concerning Defendants' misstatements was revealed during a sequence of corrective disclosures.  *First*, UPR pleads that the "true facts" were partially revealed for the first time on February 29, 2016 when Ocwen made statements that the "decline [in expenses] from 2014 . . . was offset in part by higher regulatory monitoring and compliance costs, litigation expenses and fees paid to advisers assisting us with strategic initiatives" (¶¶95-97), an allegation in conflict with the Complaint's explicit acknowledgement the market knew that the Regulatory Settlements imposed "onerous monitoring costs" on Ocwen (*see*, *e.g.*, ¶35).  *Second*, UPR alleges that additional "true facts" were revealed on February 16, 2017, when Altisource disclosed that it had received a Notice and Opportunity to Respond and Advise letter ("NORA letter") from the CFPB concerning mortgage-servicing related services that Altisource provided to Ocwen.   (¶106).   Notably, and in keeping with its selective description of the record, UPR omits to mention that Ocwen had disclosed to investors eight months earlier that Ocwen had received from the CFPB its own NORA letter concerning its mortgage servicing practices.  (Ex. 16 at 43).  *Third*, Ocwen supposedly continued to reveal the "truth" on February 22, 2017 when the company filed its 2016 Form 10-K disclosing costs from ongoing CFPB investigations and when Mr. Faris made a statement that day concerning a possible CFPB enforcement action.  (¶109).  Here too, UPR omits reference to Ocwen's previous disclosures addressing CFPB matters.   (Ex. 15 (disclosing NORA letter and several Civil Investigative Demands Ocwen received from CFPB)).   *Fourth,* notwithstanding Defendants' prior cautions about potential regulatory action, UPR asserts that the "truth" concerning Ocwen's compliance was not "fully revealed" until April 20, 2017, when (i) the CFPB filed its complaint against Ocwen, (ii) the North Carolina Office of the Commissioner of Banks and other state regulators issued cease-and-desist orders to Ocwen's subsidiaries concerning Ocwen's management of escrow accounts, and (iii) the Florida Office of the Attorney General and Office of Financial Regulation filed a complaint captioned *Office of the Attorney General, the State of Florida, et al. v. Ocwen Financial Corporation, et al.*, 9:17-cv-80496 (S.D. Fla.).  (¶¶2, 9, 112-19).

*****

As a final background note, it is worth pointing out that UPR has been stalking Ocwen for securities fraud for years.  In 2014 UPR had filed a motion for appointment as lead plaintiff in *In re Ocwen Financial Corporation Securities Litigation*, a 10b-5 securities class action against Ocwen filed in this District before Judge Dimitrouleas, alleging that Ocwen had failed to disclose information concerning the company's regulatory compliance and other corporate practices.  *See* 2014 WL 7236985, at *1 (S.D. Fla. Nov. 7, 2014).  The Court denied UPR's lead plaintiff motion.   In late 2016 UPR filed a motion to intervene in that lawsuit – also denied.  *See In re Ocwen*, No. 9:14-cv-81057, D.E. 141.  It is thus quite striking for UPR to feign ignorance of the many regulatory issues facing Ocwen stretching back to 2014 and earlier.

## III. <u>ARGUMENT</u>

To state a claim under Rule 10b-5, a plaintiff must properly allege: (1) a material misrepresentation or omission by the defendant; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misrepresentation or omission; (5) economic loss; and (6) a causal connection between the material misrepresentation or omission and the loss, an element commonly called "loss causation."   *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236-37 (11th Cir 2008).

Under the PSLRA, falsity allegations must satisfy an exacting pleading standard. The PSLRA mandates that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).  In addition, Fed. R. Civ. P. 9(b) requires that "[i]n alleging a fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."

As set forth below, UPR has not properly pleaded at least two elements:  falsity and loss causation.  Accordingly, UPR's 10b-5 claim and its derivative Section 20 claim should be dismissed on the pleadings.

### A.    **Alleged Misrepresentations Based on Puffery, Forward-Looking Statements, and Opinion Are Not Actionable.**

Many of the supposedly false statements cited in the Complaint generally fall into three categories: (i) corporate puffery, which for the Court's convenience are listed at Exhibit 1; (ii) forward-looking statements, listed in Exhibit 2; and (iii) statements of opinion, listed in Exhibit 3.  Statements cited by UPR are also listed in Exhibit 4, a table that compares alleged

misstatements pleaded by UPR to similar statements held non-actionable in other cases, most notably in *In re Ocwen*, the prior 10b-5 securities class action against Ocwen described above. *See In re Ocwen*, 2015 WL 12780960 (S.D. Fla. Sept. 4, 2015).  As set forth in Exhibit 4 and in more detail below, under settled 10b-5 precedent none of the statements alleged in the Complaint is actionable.[2]

### 1.    Puffery

UPR predicates much of its 10b-5 claim on statements that constitute corporate "puffery" (*see* Ex. 1) – statements that as a matter of law and under settled precedent are not actionable.

Puffery consists of "generalized, non-verifiable, vaguely optimistic statements." *Mogensen v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1211 (M.D. Fla. 2014).  Because "reasonable investors do not base their investing decisions on corporate 'puffery' . . . courts both within and outside of this circuit have agreed that such statements are immaterial as a matter of law and therefore inactionable."  *Id.*  Courts in this Circuit have held that non-actionable puffery includes statements touting "operating efficiencies, financial flexibility, and growth potential," *In re Airgate PCS, Inc. Sec. Litig.*, 389 F. Supp. 2d 1360, 1378-79 (N.D. Ga. 2005), and optimistic discussions of "healthy demands" and an "intention to compete successfully," *In re Royal Caribbean Cruises Ltd. Sec. Litig.*, 2013 WL 3295951, at *12 (S.D. Fla. April 19, 2013).

The statements in Exhibit 1 are nothing more than puffery.  For example:

•    UPR maintains that Ocwen falsely represented its expectations concerning its compliance management systems and deficiencies.  These include Ocwen's statements that the company (i) was "committed to correcting any deficiencies, remediating any borrower harm, and improving its compliance management systems and customer service" (¶151); (ii) "take[ ] its

---

[2] In *In re Ocwen*, the 10b-5 securities class action against Ocwen described above (at 6), the lead plaintiff filed a consolidated amended securities fraud complaint alleging that Ocwen had failed to disclose information concerning the company's regulatory compliance and other corporate practices.  *See In re Ocwen*, 2015 WL 12780960 (S.D. Fla. Sept. 4, 2015).  The Court dismissed that pleading in its entirety on many of the same grounds asserted by Defendants in this motion, including that Ocwen's alleged misstatements constituted non-actionable puffery, statements of opinion and statements concerning corporate mismanagement and regulatory compliance.  *See id.*, at *4.  The lead plaintiff subsequently amended its complaint and the Court ultimately permitted Plaintiff to proceed with respect to certain discrete statements far more concrete than the statements that UPR challenges here.  *See In re Ocwen*, 2015 WL 12780961 (S.D. Fla. Dec. 22, 2015).

commitments . . . very seriously" (¶226); (iii) "remain[s] focused" on regulatory concerns (¶¶100, 103, 222); and (iv) is "striving to regain approvals" (¶222).  Statements of this type are classic puffery.  In *In re Ocwen*, the Court held as non-actionable puffery statements by Ocwen that "we devote substantial resource to regulatory compliance" and that "we are making the investments required to continuously improve our service and quality and exceed compliant standards."  *In re Ocwen*, 2015 WL 12780960, at *15; No. 9:14-cv-81057-WPD (S.D. Fla.), D.E. 64-2 (enumerating statements dismissed as puffery in *In re Ocwen* decision).  *See also In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, 2017 WL 4049253 T *6 n.4 (S.D.N.Y. Jun. 28, 2017) (statement that "Deutsche Bank is committed to ensuring the robust risk management of financial crime" was non-actionable puffery); *Mogensen*, 15 F. Supp. 3d at 1213 (statement describing company's "focus on quickly adapting to the latest trends to provide the right merchandise" held to be puffery); *In re Australia & New Zealand Banking Grp. Ltd. Sec. Litig.*, 2009 WL 4823923, at *11 (S.D.N.Y. Dec. 14, 2009) (statements that "[m]anagement is committed to achieving a strong risk control" and that company was "committed to best practice in preparing its financial statements" were non-actionable puffery).

- UPR recites Ocwen's statements that the company (i) was "invested" in achieving compliance; (ii) "invested heavily in compliance" (¶242); (iii) "continue[s] to invest in risk management compliance, service excellence and technology" (¶218); and (iv) has "significant investments in servicing operations, risk and compliance infrastructure [which] will position us favorably relative to our peers" (¶212).  Statements that a company is invested in improving its services and/or compliance are non-actionable puffery.  *See In re Ocwen*, 2015 WL 12780960, at *15 (holding as puffery statements that Ocwen "made significant investments in" compliance and that "investments in risk and compliance will support sustainable growth"), *and* No. 9:14-cv-81057-WPD (S.D. Fla.), D.E. 64-2.  *See also Perez v. Higher One Holdings, Inc.*, 2016 WL 6997160, at *13 (D. Conn. Sep. 13, 2016) (statements concerning "improvements and investments in compliance" not actionable).

- UPR cites multiple occasions in which Ocwen compared itself favorably to its peers.  Ocwen's filings noted the company's (i) "leadership in the industry" (¶202); (ii) "best-in-class" loss mitigation results  (¶177); (iii) position as a "leader in the servicing industry . . . that helps families stay in their homes" (¶168); and (iv) "compliance infrastructure [that]. . . will position us favorably relative to our peers" (¶212).  Statements that companies are "industry

leaders" likewise constitute puffery. *See Martin v. GNC Holdings, Inc.*, 2017 WL 3974002, at *8 (W.D. Pa. Sept. 8, 2017) (statements that company was an "industry leader" and "sets the [industry] standard" were puffery); *In re Cornerstone Propane Partners, L.P.*, 355 F. Supp. 2d 1069, 1087 (N.D. Cal. 2005) (statements concerning "industry leading growth" non-actionable).

- Other vague, non-verifiable words pervade the Ocwen statements challenged in UPR's Complaint, including (i) "stronger," (¶212 ("stronger financial performance"); (ii) "sound" and "well controlled" (¶195 (company was providing a "sound well controlled operational environment"); (iii) "progress" (¶183 ("we feel good about the progress we have made with our national mortgage settlement compliance, and expect to continue to demonstrate progress"); and (iv) "enhancing" (¶167 ("[we] continue to work with our regulators, including the CFPB and state regulators and attorneys general, on enhancing our risk and compliance management systems"). Courts uniformly hold that phrases of this type fall squarely within the ambit of non-actionable puffing. *See, e.g.*, *In re Hertz Glob. Holdings, Inc. Sec. Litig.*, 2017 WL 1536223, at *10 (D.N.J. Apr. 27, 2017) ("strong" financial results); *Perez*, 2016 WL 6997160, at *13 (company was "showing good progress" in "compliance and internal audit"); *Se. Pennsylvania Transp. Auth. v. Orrstown Fin. Servs., Inc.*, 2015 WL 3833849, at *19 (M.D. Pa. June 22, 2015) ("sound credit practices and stringent underwriting standards"); *C.D.T.S. v. UBS AG*, 2013 WL 6576031, at *2 (S.D.N.Y. Dec. 13, 2013), ("controlled and disciplined risk culture") *aff'd sub nom. Westchester Teamsters Pension Fund v. UBS AG*, 604 F. App'x 5 (2d Cir. 2015); *In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 891 (W.D.N.C. 2001) ("progress in integrating recent acquisitions").[3]

---

[3] *See also Philadelphia Fin. Mgmt.*, 2011 WL 4591541 (S.D. Fla. Sep, 30, 2011). There, plaintiff shareholders alleged that the defendant mortgage servicer fraudulently omitted information concerning its foreclosure-related and other business operations to inflate the price of company shares. The defendant had allegedly misstated that the servicer (i) "relies heavily on a proprietary case management software system . . . to achieve a high level of efficiency, accuracy, and customer service;" (ii) makes "extensive investment in its leading-edge IT;" (iii) "delivers effective staff training to ensure the efficient and effective processing of all referrals;" and (iv) "delivers unparalleled customer service [that ] . . . has historically enabled us to significantly grow." *Id*. at *14. The shareholders had pleaded that these statements failed to disclose the mortgage servicer's mismanagement and other misdeeds, including "churning out a large volume of foreclosure documents with no regard for their accuracy," losing mortgage documents, "refusing to speak to homeowners who called with complaints," and "imposing excessive and unjustified fees on homeowners." *Id.* at *2. The court dismissed the complaint, holding that "these terms do not assert specific, verifiable facts that reasonable investors would

In short, these and other statements set forth in Exhibit 1 do not satisfy the 10b-5 element of falsity because they are "generalized, non-verifiable, vaguely optimistic statements" on which reasonable market participants would not base their investment decisions. *Mogensen*, 15 F. Supp. 3d at 1211.

### 2.    Forward-Looking Statements

UPR also pleads as false several of Ocwen's forward-looking statements – even though the PSLRA's safe harbor precludes 10b-5 liability predicated on such statements.

Under the PSLRA, a 10b-5 plaintiff may not bring claims challenging optimistic "forward-looking statements that prove false if the statement[s are] 'accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.'" *Harris v. Ivax Corp.*, 182 F.3d 799, 803 (11th Cir. 1999). "Forward-looking" statements include representations concerning management's future plans and objectives and statements concerning future economic performance. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1276 n.7 (11th Cir. 1999) (citing 15 U.S.C. § 78u-5(i)(1)(B) & (C)). They also include statements that have a "forward-looking basis . . . combined with historical or present facts." *In re KLX, Inc. Sec. Litig.*, 232 F. Supp. 3d 1269, 1280 (S.D. Fla. 2017) (Rosenberg, D.J.) (safe harbor shielded statement that "despite these headwinds, we did make important progress in adding resources and assets, gain market share and maximize future revenue growth opportunities").

UPR's Complaint is replete with allegations of falsity bottomed on Ocwen's non-actionable forward-looking statements, including:

- Ocwen "expected to '***continue*** to be profitable and generate strong operating cash flow; continue to demonstrate strong corporate governance, risk management and compliance management; continue to refocus on improving operating margins in the servicing business.'" (¶151).

- "Ocwen [is] '***committed*** to correcting any deficiencies, remediating any borrower harm, and improving our compliance management systems and customer service.'" (*Id.*).

---

rely on in deciding whether to buy DJSP securities." *Id.* at *14. After plaintiffs amended their complaint, the court again dismissed the action and the Court of Appeals affirmed, holding that statements concerning the "efficiency" and "accuracy" of the servicer's operations and the "rigor" of its processes are not actionable because they "do[] not rest upon specific facts, but only upon generalized opinions . . . ." *Philadelphia Fin. Mgmt. of S.F. v. DJSP Enters., Inc.*, 572 Fed. App. 713, at *717 (11th Cir. 2014).

- **"*We are striving* to regain approvals to be able to acquire MSRs again.  *We want* to resolve our remaining legacy, regulatory, and legal concerns."** (¶222).

These and other statements listed in Exhibit 2 are non-actionable because they either reflect management's future plans and objectives or offer predictions concerning Ocwen's future economic performance.  *Cf. In re Australia & New Zealand Banking Grp. Ltd. Sec. Litig.*, 2009 WL 4823923, at *11-12 (S.D.N.Y. Dec. 14, 2009) (statement that "We will continue to work in cooperation with our regulators on this issue" was non-actionable, forward-looking statement); *Schultz v. Applica Inc.*, 488 F. Supp. 2d 1219, 1230 (S.D. Fla. 2007) (statement that company "expects sales . . . to continue to increase for the remainder of 2004 as the result of sales of several new products" was non-actionable, forward-looking statement).

In an effort to avoid this dispositive authority, UPR pleads in conclusory fashion that Ocwen's forward-looking statements fall outside the PSLRA's safe harbor because Ocwen supposedly did not make the forward-looking statements in conjunction with cautionary language.  (¶¶267-68).  Not so.  Ocwen's securities filings repeatedly alerted potential investors to the regulatory and operational risks facing the company.  Every public filing by Ocwen during the Class Period declared that its "forward-looking statements"

> [I]nclude declarations regarding our management's beliefs and current expectations . . . [with] terminology such as "may," "will," "should," "could," "intend," "consider," expect," "plan," "anticipate," "believe," "estimate," "predict," or "continue" . . . . Forward-looking statements by their nature address matters that are, to different degrees, uncertain [and] involve a number of assumptions, risks and uncertainties that could cause actual results to differ materially from expected results.

(*See*, *e.g.*, Ex. 13 at 2 & Ex. 19 at 2).  Ocwen's warnings likewise particularized the many factors that could affect whether Ocwen's actual results would diverge from Ocwen's expectations, including:

- "adverse effects on our business as a result of recent regulatory settlements;"
- "uncertainty related to claims, litigation and investigations brought by government agencies and private parties;"
- "adverse developments in existing legal proceedings or the initiation of new legal proceedings;"
- "ability to effectively manage [ ] regulatory and contractual compliance obligations;"
- "uncertainty related to the ability of [ ] technology vendors to adequately maintain and support our systems;" and

- "ability to protect and maintain [ ] technology systems and [ ] ability to adapt such systems for future operating environments."

(*See*, *e.g.*, *id.*)   Ocwen also provided detailed cautions concerning the risks that technology failures may occur and furnished specific examples of past and potential technological pitfalls. (Ex. 13 at 30; Ex. 19 at 27).

Courts consistently hold that forward-looking statements are not actionable when, as here, they are accompanied by similar cautionary statements.  For example, in *Philadelphia Fin. Mgmt.*, 572 Fed. Appx. 713, at *717, the court concluded that purported false statements concerning a mortgage servicer's financial outlook were not actionable in light of "risk factors" contained in the servicer's securities filings, including "legislation or other changes in the regulatory environment, particularly those impacting the mortgage default industry."  *See also Ehlert v. Singer*, 245 F.3d 1313, 1320 (11th Cir. 2001) (no 10b-5 violation in light of cautionary language accompanying forward-looking statements; "the warnings actually given were not only of a similar significance to the risks actually realized, but were also closely related to the specific warning which Plaintiffs assert should have been given").

Against this backdrop, and as a matter of law, Ocwen's specific and repeated cautions to investors concerning its forward-looking statements, regulatory matters and servicing technology bar UPR's claims predicated on the statements listed in Exhibit 2.

### 3.  Statements of Opinion

UPR also bases its 10b-5 claim on statements listed in Exhibit 3 concerning Ocwen's opinions or beliefs.  A statement of opinion is actionable under 10b-5 only if: "(1) the opinion expressed was not sincerely held or (2) the statement included an embedded statement or statements of untrue facts."  *In re Ocwen*, 2015 WL 12780960, at *4.  In other words, "a statement may be misleading if it 'omits material facts about the [maker's] inquiry into, or knowledge concerning, a statement of opinion, and if those facts conflict with what a reasonable investor reading the statement fairly and in context, would take from the statement itself.'"  *Id.*, quoting *Omnicare Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1321 (2015).

UPR pleads several statements that do nothing more than convey corporate opinions concerning Ocwen's operations.  For example, UPR cites Ocwen's opinions concerning its regulatory compliance progress and servicing technology:

- "***We believe*** that our competitive strengths flow from our ability to control and

drive down delinquencies through the use of proprietary technology and process and our lower cost to service." (¶153).

- "**We expect** our ongoing cooperation will result in a satisfactory outcome for all parties" in the California regulatory investigation.  (¶147).

Judge Dimitrouleas in *In re Ocwen*, held that similar statements of opinion were not actionable.  *In re Ocwen*, 2015 WL 12780960, at *7-8 (rejecting statements by Ocwen that "we believe that we are positioned to effectively compete for such opportunities in light of our low cost, high-quality servicing platform" and "we believe the rates charged under these agreements are market rates"); No. 9:14-cv-81057-WPD (S.D. Fla.), D.E. 64-3 (enumerating statements of opinion deemed nonactionable by *In re Ocwen* court).  *See also Jui-Yang Hong v. Extreme Networks, Inc.*, 2017 WL 1508991, at *11-12 (N.D. Cal. Apr. 27, 2017) (statement that acquisition was "expected to be immediately accretive . . . and produce 'significant value'" not actionable).

Because the Complaint does not allege that Ocwen did not actually believe the statements in question or lacked a basis for forming the stated opinions, these statements run afoul of Rule 10b-5.  *Cf. In re CIT Grp. Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 690 (S.D.N.Y. 2004) ("[S]tatements about defendants' belief in the adequacy of loan loss reserves could be actionable" but only "if it is alleged that defendants did not actually believe the loan loss reserves were adequate, or if defendants had no reasonable factual basis for their belief.").  With respect to the first statement listed above, UPR does not allege that Ocwen did not believe that the company was driving down delinquencies or that the company was not actually driving down delinquencies.  With respect to the second statement cited above, UPR does not allege that Ocwen:  (i) did not believe that a satisfactory outcome would be reached, or (ii) lacked a basis at that time for a belief that a satisfactory outcome would be achieved.  Even if not considered to be puffery, these and the other statements listed in Exhibit 3 are as a matter of law non-actionable statements of opinion.

### 4.    Statements That On Their Face Are Not False

UPR also bases its 10b-5 claim on statements that are not false under any reasonable interpretation of the Complaint.  In these instances, UPR either has failed to specify how the statements in question were false or has surgically removed critical language from Ocwen's full representation.

*First*, in certain instances UPR does not plead that the underlying factual

predicates for alleged misstatements are untrue.  For example, UPR alleges that Ocwen lied when the company stated that "a borrower who has their loan serviced by Ocwen has a much better chance of avoiding foreclosure than if their loan was serviced by any other company." (¶¶220, 232).  Putting aside that these words are puffery, the Complaint is devoid of allegations that borrowers did not have a better chance of avoiding foreclosure if their mortgages were serviced by Ocwen.  As another example, UPR alleges that Defendants misstated that Ocwen employed "three lines of defense" to manage its compliance risks and controls.  Yet nowhere does UPR allege that Ocwen in fact did not employ those three lines of defense.  *Cf. Phila. Fin. Mgmt.*, 2011 WL 4591541, at *14 (statement by mortgage servicer concerning its "efficient" and "accurate" foreclosure process not actionable, in part because "[n]owhere do Plaintiffs allege that [defendant servicer's systems] did not improve the firm's efficiency and accuracy in processing foreclosures").  Merely because, in UPR's view, those lines might have been ineffective does not establish falsity.

*Second*, UPR has excised words and sentences from Ocwen's representations to try to conjure a claim that those representations misstate or omit material information.  For instance, UPR pleads that Defendants falsely stated that Ocwen is a "leader in the servicing industry in foreclosure prevention and loss mitigation that helps families stay in their homes and improves financial outcomes for investors."  (¶153).  Critically, UPR has omitted the two paragraphs in the relevant filings immediately following that sentence, which explain that Ocwen's industry leadership is evidenced by  having "completed 559,000 loan modifications since January 2008" and  "20% of all HAMP-sponsored modifications, 45% more than the next highest servicer," according to data made public by United States Treasury's Making Homes Affordable program.  (Ex. 9 at 4).  The Complaint nowhere challenges the accuracy of these figures.  As another example, UPR pleads that Defendants falsely stated that Ocwen was "intensely focused on improving [its] operations to enhance borrower experiences and improve efficiencies, both of which we believe will drive stronger financial performance through lower overall costs."  (¶212).  Here too UPR has extracted words from their context, set out below:

> Given the intense regulatory scrutiny and the subsequent investments Ocwen has made in its risk and compliance infrastructure, we believe the underlying economics of our Servicing business have likely been changed for the foreseeable future.  ***We believe it is unlikely Ocwen will achieve meaningful profitability in its Servicing business in the near term unless there is a significant, structural change in the business model***.  While ***we***

> ***believe such structural change is probably unlikely in the current regulatory environment***, we are nonetheless intensely focused on improving our operations to enhance borrower experiences and improve efficiencies, both of which we believe will drive stronger financial performance through lower overall costs.

(Ex. 15 at 9).   When accurately stated, rather than cherry-picked as UPR has done, this representation explicitly details Ocwen's concerns that the regulatory scrutiny may hinder profitability.

Exhibit 5 lists in their entirety these and other statements that UPR has improperly taken out of their original context in an effort to manufacture a bogus claim of falsity.  *See In re KLX*, 232 F. Supp. 3d at 1276-77 (rejecting on falsity grounds plaintiffs' 10b-5 claim that defendants failed to expressly specify effects of "economic downturn" since other statements made by defendants "***did*** consistently disclose that it was being negatively impacted by the market downturn") (emphasis in original).[4]

**B.**  **The Alleged Misrepresentations Concerning Management and Regulatory Compliance are Not Actionable Under *Santa Fe***

The balance of alleged misstatements in UPR's Complaint – and many statements that are already nonactionable as puffery, forward-looking, or opinions – tries to re-cast Ocwen's supposed  mismanagement and regulatory failures as false statements under 10b-5.  *See* statements at Exhibit 6.  Yet it has been settled law for decades that a shareholder cannot transform corporate mismanagement into a federal securities fraud claim by cloaking those allegations in 10b-5 garb.  As the Supreme Court noted forty years ago:

---

[4] To the extent UPR is claiming on account of Defendants' supposedly false statements that Ocwen falsely stated in its Forms 10-Q of 2014 that the company's "disclosure controls and procedures . . . were operating effectively" (*see*, *e.g.*, ¶172), this bootstrapped claim should be dismissed because, as demonstrated above, the underlying representations are not actionable.  *Cf. In re Key Energy Servs., Inc. Sec. Litig.*, 166 F. Supp. 3d 822, 871 (S.D. Tex. 2016) (rejecting fraud claims predicated on statements concerning internal controls, since plaintiff failed "to identify anything in the certifications that is false" and did "not claim that Key misstated any financial information"); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 370-71 (E.D.N.Y. 2013) (statements concerning disclosure controls were not false, since plaintiffs did "not even challenge the Defendants' accounting in any of the SEC filings").  In any event, Ocwen cautioned in its filings the "limitations on the effectiveness of controls," stating that "[b]ecause of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements."  (*See* Ex. 9 at 80).

In addition to posing a "danger of vexatious litigation which could result from a widely expanded class of plaintiffs under Rule 10b-5," *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. [723,] 740 [(1975)], this extension of the federal securities laws would overlap and quite possibly interfere with state corporate law . . . . Absent a clear indication of congressional intent, we are reluctant to federalize the substantial portion of the law of corporations that deals with transactions in securities, particularly where established state policies of corporate regulation would be overridden . . . . We thus adhere to the position that ***Congress by [Section] 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement***.

*Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 478-79 (1977) (emphasis added).  Courts have rigorously followed the Supreme Court's directive.  *See, e.g.*, *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 640 (3d Cir. 1989) ("Where the incremental value of disclosure is solely to place potential investors on notice that management is culpable of a breach of faith or incompetence, the failure to disclose does not violate the securities acts.").

Given UPR's unhappiness with the REALServicing software (¶¶44-81), *Cutsforth v. Renschler*, 235 F. Supp. 2d 1216 (M.D. Fla. 2002), is instructive.   Purchasers of the common stock of a pharmacy services company brought a securities fraud class action against the company and its officers.   The shareholders contended that "virtually from its inception, [the company's] growth strategy was a failure and defendants knew it."   *Id.* at 1225.   The shareholders claimed that defendants failed to disclose "severe problems integrating the computer systems of [companies it acquired]," "inadequate billing of customers or pursuing accounts receivables," and problems "integrating the Company's computer system with the systems of acquirees and managing regional pharmacy networks efficiently."   *Id.* at 1243.   The court dismissed plaintiffs' 10b-5 claim because plaintiffs alleged nothing more than undisclosed corporate mismanagement and misconduct.   Under *Santa Fe*, "these assertions are not actionable because they allege only corporate mismanagement, not fraud."   *Id.* at 1242.

Other courts have likewise dismissed 10b-5 claims that at their core allege mismanagement.   For example, in *In re Donna Karan Int'l Sec. Litig.*, 1998 WL 637547 (E.D.N.Y. 1998), the court rejected allegations that attacked management's conduct, judgment and abilities.   The court held that "allegations constituting nothing more than assertions of general mismanagement, or nondisclosures of mismanagement, cannot support [10b-5] claims."   *Id.* at *9.   And in *In re United Telecommunications, Inc. Sec. Litig.*, 781 F. Supp. 696 (D. Kan. 1991), the plaintiff brought a 10b-5 claim based on the defendants' failure to disclose billing

problems, problems controlling expenses, deficient internal controls and management information systems, a failure to make write-downs for outdated and obsolete software, and problems with realignment of the work force.  In dismissing the claim, the court held that *Santa Fe* "preclude[s] federal claims based upon nondisclosure of mismanagement."  *Id.* at 699.  The court noted that when "'the central thrust of a claim or series of claims arises from acts of corporate mismanagement, the claims are not cognizable under federal law.'"  *Id.*

UPR's pleading to a significant extent tracks those at issue in these cases.  The Complaint alleges that Ocwen's servicing technology platform REALServicing was "so fraught with deficiencies that it could not properly function as a system of record" and that "Ocwen's reliance on REALServicing causes disastrous results for borrowers." (¶¶44-61).  The Complaint goes on to describe Ocwen's purported "mishandling of borrower payments, escrow accounts, hazard insurance, private mortgage insurance, borrower complaints, notices of error, and foreclosures." (¶¶62-81).   Under *Santa Fe* and the cases following that bedrock ruling, allegations of this type cannot masquerade as a tenable 10b-5 claim.

UPR goes on to try to fashion a 10b-5 claim by identifying purported misstatements concerning Ocwen's expectations that the company would meet its regulatory obligations even though Ocwen supposedly could not do so.  (*See*, *e.g.*, ¶151 ("we expect the next round of results from the National Mortgage Settlement monitor to show that we have made progress in improving our internal testing and compliance monitoring"); ¶161 ("[w]e are not aware of any pending or threatened actions to suspend or revoke any state licenses")).  This approach is legally barred, for companies have no obligation under 10b-5 to predict accurately future regulatory action.  For example, in *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367 (S.D.N.Y. 2004), *aff'd sub nom Albert Faden Trust v. Citigroup, Inc.*, 165 Fed. Appx. 928 (2d Cir. 2006), the plaintiffs alleged among other things that Citigroup failed to disclose the regulatory and other risks posed by its dealing with Enron.  The court dismissed the 10b-5 claim, holding that "Defendants' failure to disclose all possible future litigation is not actionable under Section 10(b)."  *Id.* at 377-78.  Citigroup "was not required to make disclosures predicting such litigation," including regulatory developments.  *Id.* at 377.  *See also Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 170 (S.D.N.Y. 2015) ("Plaintiff's contention that Net 1 was obligated, but failed, to disclose that Net 1 faced a material risk of regulatory scrutiny and invalidation of the contract fails . . ."; defendants "cannot be held liable for failing to disclose what would have

17

been pure speculation"). Even the specter of legal action does not require disclosure. *See In re Vonage IPO Sec. Litig.*, 2009 WL 936872, at *12 (D.N.J. Apr. 6, 2009) (when company was "repeatedly advised and warned" of allegations underlying future litigation, company was under no obligation to disclose "possibility of litigation" because there is no allegation that litigation would be "initiat[ed] or even threatened"). Under this dispositive authority, Defendants were under no 10b-5 obligation to predict that the CFPB and certain state mortgage regulators would ultimately take action against Ocwen in April 2017.

   C. **The Complaint Does Not Sufficiently Plead Loss Causation**

    UPR's Complaint should be dismissed on another, independent basis: UPR has not met the standard for pleading loss causation.

    To satisfy the element of loss causation, "a corrective disclosure must reveal a previously concealed truth [and it] obviously must disclose new information, and cannot be merely confirmatory." *Sapssov v. Health Mgmt. Assocs., Inc.*, 608 F. App'x 855, 863 (11th Cir. 2015), *cert. denied sub nom. Norfolk Cty. Ret. Sys. v. Health Mgmt. Assocs., LLC*, 137 S. Ct. 1331 (2017). In other words, an alleged disclosure does not cause losses when plaintiffs "fail to identify new information revealed." *City of St. Clair Shores Police v. Nationstar Mortg. Holdings Inc.*, 2016 WL 4705718, at *12 (S.D. Fla. June 21, 2016).

    UPR alleges that the purported corrective disclosures pleaded in the Complaint revealed for the first time the truth concerning: (i) the "efficacy" of Ocwen's servicing technology, and (ii) "the purported progress of its remediation efforts in connection with the Regulator Settlements." (¶255). Yet Ocwen had repeatedly addressed both of these facts prior to the disclosures cited in the pleading. With respect to servicing technology, Ocwen had previously set forth in the Risk Factors sections of its filings that "technology or process failures could damage [its] business operations and harm [its] relationship with key stakeholders." (*See, e.g.*, Ex. 9 at 27; Ex. 13 at 30; Ex. 19 at 27). The risk factor concerning technology also provided a specific example of the kind of technology failures Ocwen had experienced:

> [G]iven the volume of transactions that we process and monitor, ***certain errors may be repeated or compounded before they are discovered and rectified***. For example, in the area of borrower correspondence we have experienced problems with our letter dating processes, such that erroneously dated letters were sent to borrowers, which has damaged our reputation and relationships with borrowers, regulators, important counterparties and other stakeholders. Because in an average month we mail in excess of four million letters, a process problem such as our letter

> dating problem has the potential to negatively affect many parts of our business.    We are responsible for developing and maintaining sophisticated operational systems and infrastructure, which is challenging.

(Ex. 9 at 27 (emphasis added); *see also* Ex. 13 at 30; Ex. 19 at 27 (adding that "[t]he CFPB and other regulators have recently emphasized their focus on the importance of servicers' and lenders' systems and infrastructure operating effectively.  If our systems and infrastructure fail to operate effectively, such failures could . . . lead to regulatory sanctions or penalties.").  These representations alerted investors to the potential problems in Ocwen's servicing technology platform before the alleged corrective disclosures were made.  *Cf. United Food & Commercial Workers Union Local 880 Pension Fund v. Chesapeake Energy Corp.*, 774 F.3d 1229, 1238 (10th Cir. 2014) (dismissing 10b-5 claim concerning alleged misstatements in Offering Memorandum because Form 8-K filed with SEC contained the allegedly withheld information and was part of "total mix of information [ ] already in public domain"; "[a] 'reasonable investor' is neither an ostrich, hiding her head in the sand from relevant information, nor a child, unable to understand the facts and risks of investing").

With respect to the alleged corrective disclosures concerning ongoing regulatory scrutiny, Defendants had previously detailed, for example, (i) the NORA letter that the company had received from the CFPB in early 2016 (Ex. 15 at 43), (ii) the "Civil Investigative Demands or investigative subpoenas from the CFPB seeking information about [Ocwen's] servicing practices" (Ex. 13 at 8), and (iii) that "from time to time, [Ocwen] receive[s] requests from federal, state and local agencies for records, documents, and information relating to . . . mortgage servicing" (Ex. 9 at 15).  Ocwen also described the "increased regulatory and public scrutiny" and explained that the "regulatory and legislative measures, or changes in enforcement practices . . . could . . . materially and adversely affect [Ocwen's] business and [Ocwen's] financial condition, liquidity and results of operations."  (Ex. 13 at 7).  In light of Ocwen's public statements, the alleged corrective disclosures cited by UPR cannot as a matter of law satisfy the loss causation requirement that the disclosures reveal negative information for the first time.  *See Sapssov*, 608 Fed. Appx. at 863 (complaint properly dismissed for failure to allege loss causation, where alleged corrective disclosure did not reveal previously concealed truth for first time; "The lack of new information . . . is 'fatal to [plaintiff's] claim of loss causation'") (citation

omitted).[5]

UPR's Complaint is so strikingly deficient in this respect that it actually pleads that the same Ocwen SEC filing contained **both** a misstatement concerning Ocwen's regulatory compliance **and** a corrective disclosure on the same subject.   UPR pleads that Ocwen's stock price declined with a purported "corrective disclosure" on February 29, 2016, when the company's 2015 Form 10-K disclosed Ocwen's "higher than expected costs" occasioned by "regulatory and litigation matters . . . arising out of the woeful state of REALServicing." (¶259) Yet UPR also says that **same** securities filing falsely represented that Ocwen "devote[s] substantial resources to regulatory compliance."  (¶192).   As pleaded by UPR, the supposed misrepresentation conveys the same information purportedly revealed in the corrective disclosure – that Ocwen was expending substantial resources and money on compliance.   UPR's characterization of the same information as both false and corrective is emblematic its effort by a 118-page, 293-paragraph Complaint to get something – anything – to stick.   That is not how 10b-5 works.

Because Ocwen's regulatory and technology concerns were far from secret – UPR itself admits that Ocwen during the Class Period repeatedly stated that it "faced and expect[ed] to continue to face increased regulatory and public scrutiny as an organization as well as stricter and more comprehensive regulation of the entire mortgage sector" (¶¶192, 234) – the corrective disclosures pleaded in the Complaint revealed no new information, thereby negating the element of loss causation.   On account of this pleading deficiency alone, UPR cannot state a 10b-5 claim.

## IV. <u>CONCLUSION</u>

For these reasons, the Court should dismiss Count I, Plaintiff's 10b-5 claim.   In addition, because Section 20(a) liability is derivative of any liability under 10b-5, Count II should be dismissed as well.  *See Mizzaro*, 544 F.3d at 1237; 15 U.S.C. § 78t(a).

---

[5] UPR also alleges that the market learned for the first time at the time of the purported corrective disclosures that Ocwen's disclosure controls were ineffective. (*See*, *e.g.*, ¶¶158-60). As noted in note 4 above, the supposed falsity of Ocwen's statements concerning its disclosure controls is predicated on the legally erroneous proposition that other Ocwen statements cited in the Complaint were false.   In addition, as explained on page 15-18 above, allegations based on statements concerning Ocwen's disclosure controls are non-actionable because *Santa Fe* precludes 10b-5 claims predicated on mismanagement.

Dated:    October 5, 2017

GREENBERG TRAURIG, P.A.
401 East Las Olas Boulevard, Suite 2000
Fort Lauderdale, Florida  33301
Telephone:    (954) 765-0500
Facsimile:    (954) 765-1477


*/s/ Jeffrey Allan Hirsch*
JEFFREY ALLAN HIRSCH
Florida Bar No. 199850
Email: hirschj@GTLAW.com

-and-

KRAMER LEVIN NAFTALIS & FRANKEL LLP |
1177 Avenue of the Americas
New York, New York 10036
Telephone: 212-715-9100
Facsimile: 212-715-8456

*/s/ John P. Coffey*
John P. Coffey
Jonathan M. Wagner
Jason M. Moff

*Attorneys for Defendants*


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 5th day of October, 2017, I served the foregoing on all counsel

of record identified on the below Service List via CM/ECF or by electronic mail.

*s/Jeffrey Allan Hirsch*
JEFFREY ALLAN HIRSCH

## SERVICE LIST

KAREN A. CARVELLI, Individually and On Behalf of All Others Similarly Situated, v.
OCWEN FINANCIAL CORPORATION, RONALD·M. FARIS, and MICHAEL R. BOURQUE
JR.

CASE NO.:  17-cv-80500-RLR

_____

**_Counsel for Karen Carvelli_**
J. Alexander Hood, II, Esquire
Jeremy A. Lieberman, Esquire
Hui M. Chang, Esquire
POMERANTZ, LLP
600 Third Avenue
Floor 20
New York, New York 10016
Telephone: 212-661-1100
Facsimile:  202-661-8665
Email: ahood@pomlaw.com
jalieberman@pomlaw.com;
hchang@pomlaw.com
and
Patrick Dahlstrom, Esquire
POMERANTZ, LLP
10 South LaSalle
Suite 3505
Chicago, Illinois 60603
Telephone: 312-377-1181
Facsimile:  312-377-1184
Email: pdahlstrom@pomlaw.com
and
Jayne Arnold Goldstein, Esquire
SHEPHERD FINKELMAN MILLER &
SHAH LLP
1625 N. Commerce Parkway
Suite 320
Fort Lauderdale, Florida 33326
Telephone: 954-903-3170
Facsimile:  866-300-7367
Email:  jgoldstein@sfmslaw.com

**_Counsel for all Defendants_**
Jeffrey Allan Hirsch, Esquire
GREENBERG TRAURIG, P.A.
401 East Las Olas Boulevard
Suite 2000
Fort Lauderdale, Florida  33301
Telephone: 954-765-0500
Facsimile: 954-765-1477
Email: hirschj@gtlaw.com
and
John P. Coffey, Esquire
Jonathan M. Wagner, Esquire
Jason M. Moff, Esquire
KRAMER LEVIN NAFTALIS & FRANKEL
LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone: 212-715-9100
Facsimile: 212-715-8456
Email: scoffey@kramerlevin.com;
jwagner@kramerlevin.com; and
jmoff@kramerlevin.com


**_Counsel for Ryan Huseman_**
Leo W. Desmond, Esq.
Florida Bar No. 0041920
**DESMOND LAW FIRM, P.C.**
5070 Highway A1A, Suite D
Vero Beach, Florida 32963
Telephone: (772) 231-9600
Facsimile: (772) 231-0300
lwd@DesmondLawFirm.com

***Counsel for University of Puerto Rico
Retirement System***
Mitchell M.Z. Twersky, Esquire
Atara Hirsch, Esquire
Lawrence D. Levit, Esquire
Matthew E. Guarnero, Esquire
Jake Nachmani, Esquire
**ABRAHAM, FRUCHTER AND
TWERSKY, LLP**
One Penn Plaza, Suite 2805
New York, New York 10119
Telephone: 212-279-5050
Facsimile: 212-279-3655
Email:  MTwersky@aftlaw.com
AHirsch@aftlaw.com
LLevit@aftlaw.com
MGuarnero@aftlaw.com
jnachmani@aftlaw.com
and
Julie Prag Vianale, Esquire
**VIANALE & VIANALE LLP**
5550 Glades Road, Suite 500
Boca Raton, Florida 33431
Telephone: 561-392-4750
Facsimile: 561-961-5191
Email: JVianale@vianalelaw.com