## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

KAREN A. CARVELLI, Individually and On
Behalf of All Others Similarly Situated,

                  Plaintiffs,

      v.

OCWEN FINANCIAL CORPORATION,
RONALD M. FARIS, and MICHAEL R.
BOURQUE JR.,

               Defendants.

Civil No.   9:17-cv-80500-RLR

## DEFENDANTS' REPLY IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS THE CONSOLIDATED SECURITIES CLASS ACTION COMPLAINT AND INCORPORATED SUPPORTING MEMORANDUM OF LAW AND REQUEST FOR HEARING

**GREENBERG TRAURIG, P.A.**

Jeffrey Hirsch, Esq.
401 East Las Olas Boulevard, Suite 2000
Fort Lauderdale, Florida  33301
Telephone: (954) 765-0500
Facsimile:  (954) 765-1477
Florida Bar No. 199850
Email: hirschj@GTLAW.com

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**

John P. Coffey, Esq.
Jonathan M. Wagner, Esq.
Jason M. Moff, Esq.
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
Email: scoffey@kramerlevin.com

*Counsel for All Defendants*

# Table of Contents

<u>Page</u>

PRELIMINARY STATEMENT ..................................................................................1

ARGUMENT..........................................................................................................2

    I.    UPR's Falsity Arguments Misconstrue Applicable Law and Distort the Actual Language of Ocwen's Statements................................................2

        A.    Puffery. ..................................................................................2

        B.    Forward-Looking Statements. ....................................................7

        C.    Statements of Opinion. ..............................................................9

        D.    Statements That On Their Face Are Not False.............................10

        E.    Corporate Mismanagement Allegations. .....................................11

        F.    UPR's Remaining Arguments Are Meritless. ...............................13

    II.    UPR Has Not Sufficiently Pleaded Loss Causation ..............................14

CONCLUSION......................................................................................................17

REQUEST FOR HEARING......................................................................................18

Defendants Ocwen Financial Corporation, Ronald M. Faris and Michael R. Bourque, Jr. file this Reply in further support of their Motion To Dismiss the Consolidated Securities Class Action Complaint (D.E. 72), and in response to Lead Plaintiff's Corrected Memorandum In Opposition To Defendants' Motion To Dismiss. (D.E. 81).

## PRELIMINARY STATEMENT[1]

The principal focus of Plaintiff UPR's rambling and diffuse pleading appears to be Defendants' supposedly "material misrepresentations and omissions with regards to the deplorable, unremediated and undisclosed state of Ocwen's core mortgaging servicing platform, REALServicing," a servicing platform whose purported "critical deficiencies led to Ocwen's non-compliance with various regulatory mandates." (UPR Br. 1; *see also* ¶ 1). Notwithstanding UPR's hyperbole and "kitchen sink" pleading approach, UPR's 119-page Complaint cites not a single false representation of material fact concerning either REALServicing or Ocwen's compliance – or any other subject. Rather, and as demonstrated in Defendants' moving papers, the Ocwen statements challenged by UPR are either non-actionable (i) puffery, (ii) forward-looking statements, or (iii) statements of opinion.

Since the UPR pleading does not cite any actual false statement of material fact, UPR's allegations concerning REALServicing, compliance and the like are nothing more than complaints concerning Ocwen's supposed corporate mismanagement – claims definitively barred by the Supreme Court's decision in *Santa Fe Indus. Inc. v. Green*, 430 U.S. 462 (1977).

Defendants' moving papers also demonstrated that UPR has not properly pleaded loss causation. UPR's Complaint itself pleads that immediately prior to the commencement of the class period, REALServicing had been the subject of a significant and highly publicized compliance consent order entered against Ocwen. The Complaint also recites that the state agency issuing the consent order had "determined" in that public order that "REALServicing was at the heart of the company's mortgage servicing misconduct" (¶¶ 31 & 32) – the very information that UPR claims was concealed. Moreover, Ocwen's SEC filings repeatedly disclosed to shareholders its past, documented regulatory history and the risks facing the company with respect to the prospect of technology failures and future compliance proceedings.

---

[1] "¶" references UPR's Complaint. "Ex. __" references exhibits to the moving declaration of John P. Coffey, dated October 5, 2017. Defined terms have the meaning as ascribed in Defendants' Moving Brief ("Moving Br.").

Thus, the disclosures pleaded by UPR as corrective revealed nothing new, and as a matter of law do not qualify as corrective disclosures. *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1311 n.28 (11th Cir. 2011).

As demonstrated below, UPR's opposition papers do not cure a single one of these dispositive legal defects.

## ARGUMENT

### I.     UPR's Falsity Arguments Misconstrue Applicable Law and Distort the Actual Language of Ocwen's Statements

#### A.     Puffery.

A substantial number of the statements cited in UPR's complaint as "false" are, under settled authority, non-actionable puffing – vague and objectively unverifiable statements upon which no reasonable investor would base an investment decision. (Moving Br. 7-10). Significantly, in the prior Ocwen class action Judge Dimitrouleas ruled that on this very basis virtually identical statements made by Ocwen were not actionable. *See In re Ocwen Fin. Corp. Sec. Litig.*, 2015 WL 12780960, at *7 (S.D. Fla. Sept. 4, 2015). Nothing raised by UPR in its opposition overcomes these points.

*First*, UPR asserts that Ocwen "repeatedly and falsely claimed that Ocwen was complying with federal and state sanctions and mandates which regulators had placed on the Company," and "promis[ed] that such flagrant violations of federal and state lending laws would not happen again." (UPR Br. 1, 10)   Ocwen did no such thing; there is not a single Ocwen statement cited in the Complaint declaring, "Ocwen is in compliance with regulations X, Y or Z" or "Ocwen will not again be guilty of any regulatory violations."

Far from representing that the company was compliant or would never again run afoul of a regulator, Ocwen made only generalized and soft statements concerning its future compliance efforts. (Ex. 1). At the same time, Ocwen repeatedly cautioned investors concerning its heavily regulated business environment, and identified potential negative consequences should Ocwen be found not to have effectively managed its compliance obligations – all statements that UPR has left out of its Complaint and ignored in its opposition papers. Among the Ocwen statements that UPR overlooks are: (i) "we expect that one or more [compliance] metrics will require remediation," (ii) "We currently have 25 open state examinations," (iii) "If we fail to comply with regulations relating to servicing transfers in connection with our dispositions of [mortgage servicing rights], we could be subject to adverse regulatory actions,

2

which could materially and adversely affect our business," and (iv) "We are subject to a number of ongoing federal and state regulatory examinations, consent orders, inquiries, requests for information and other actions, which could result in further adverse regulatory action against us." (Ex. 5 at 1, 2, 9).  At most, UPR's Opposition Brief quotes only half-sentences – for example, "[a]s a [c]ompany we continue to make progress in resolving our legacy issues" (UPR Br. 10) – leaving out the remainder of the sentence, "there is more work to be done."  (Ex. 17 at 4).[2]

UPR's own citations highlight why this case should be dismissed on puffery grounds.  Unlike here, the 10b-5 defendants in those cases explicitly stated that they were compliant with relevant laws and regulations.  *See, e.g., Pirnik v. Fiat Chrysler Autos., N.V.*, 2016 U.S. Dist. LEXIS 138439, at *6, *21 (S.D.N.Y. Oct. 5, 2016) (defendant stated that it was "substantially in compliance" and "remain[ed] in compliance."); *Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 983 n.8 (8th Cir. 2012) (defendant "affirmatively represented it was compliant with FDA regulations"); *In re Cryolife Inc. Sec. Litig.*, 2003 U.S. Dist. LEXIS 26170, at *28 (N.D. Ga. May 27, 2003) (defendant stated that it "was in compliance with all FDA regulations").  That is a far cry from the vague, soft and qualified statements, coupled with caveats, that permeated Ocwen's SEC filings at issue here, and upon which no reasonable investor would base a decision to buy or sell stock.

*Second*, UPR asserts that Defendants "repeatedly claimed that REALServicing was an effective system of record." (UPR Br. 1).  As the plain language of Ocwen's SEC filings makes clear, Ocwen stated only that the company would "remain focused" and "committed" to "making ongoing enhancements" to its technology, and that the company "believed" that would "position us favorably relative to our peers." (*Id.* at 12, citing ¶¶ 177, 212; *see also* ¶ 41).  Judge Dimitrouleas held in the prior Ocwen class action that similar statements were non-actionable as puffery.  *In re Ocwen*, 2015 WL 12780960, at *7 (statements touting the "'unique scalability' of Ocwen's technology" held to be puffery).  And in a critical sentence omitted from UPR's complaint, Ocwen specifically warned investors that "we believe the underlying economics of our Servicing business have likely been changed for the foreseeable future. We believe it is

---

[2] The failure of UPR to demonstrate the alleged falsity of Ocwen's disclosures in their context is fatal to UPR's case.  *In Re KLX, Inc. Sec. Litig.*, 232 F. Supp. 3d 1269, 1276 (S.D. Fla. 2017) (Rosenberg, D.J.) ("allegedly fraudulent statements are to be considered in context," citing *Harris v. IVAX Corp.*, 182 F.3d 799, 802 n.2 (11th Cir. 1999)).

unlikely Ocwen will achieve meaningful profitability in its Servicing business in the near term unless there is a significant, structural change in the business model," which Ocwen believed was "unlikely." (Ex. 15 at 9). *See In re KLX*, 232 F. Supp. at 1276 (no actionable misrepresentation under 10b-5 when defendant "did consistently disclose that it was being negatively impacted by the market downturn").

*Third*, UPR cites Ocwen's statements that the company was a "leader" in the mortgage servicing industry and that the company was "commit[ted]" to servicing borrowers. (UPR Br. 13-15, citing ¶168; *see also* ¶¶ 100, 149, 153, 175, 177, 181, 202, 204, 210, 212, 232, 244). That is classic puffery, as highlighted by UPR's own authorities. For example, in *Freedman v. Saint Jude Med., Inc.*, 4 F. Supp. 3d 1101, 1112–13 (D. Minn. 2014) (cited at UPR Br. 12), the court dismissed a 10b-5 claim predicated on statements that the defendant was "the industry leader for quality and reliability," because that was a "'vague, soft, puffing statement[] or obvious hyperbole' on which no reasonable investor would rely in making a decision about buying or selling [] stock." Equally critical, in the same filings cited by UPR, Ocwen disclosed that "We have recently entered into a number of regulatory settlements which have significantly impacted our ability to grow our servicing portfolio and which subject us to ongoing monitoring or reporting," and "in light of the growth restrictions placed on us under our recent regulatory settlements, we expect that the UPB of our residential servicing portfolio and, consequently, our revenues will continue to decline in the near term." (Ex. 11 at 11, 51). As a matter of law no reasonable investor would have relied on vaguely optimistic statements in Ocwen's SEC filings while ignoring the explicit disclosure that Ocwen's revenues were expected to decline. *In re KLX*, 232 F. Supp. 3d at 1277.

*Fourth*, UPR asks this Court not to follow Judge Dimitrouleas' decision in the prior Ocwen class action on the grounds that "plaintiffs there failed to allege a single affirmative representation, unlike here," and "failed to properly allege scienter," again "unlike here." (UPR Br. 17). UPR is fundamentally wrong because scienter and falsity are two separate elements of a 10b-5 claim, and Judge Dimitrouleas properly analyzed each element separately and concluded that the complaint should be dismissed on each of those independent grounds. *In re Ocwen*, 2015 WL 12780960 at *3-10. UPR also ignores that Ocwen's statements at issue here are virtually identical to the Ocwen statements that the Court previously ruled were not actionable. For example, UPR cites Ocwen's statements that (i) "we continue to make progress in resolving

4

our legacy issues," (ii) "[w]e remain focused on compliance," (iii) Ocwen "continues to invest significantly in its risk and compliance infrastructure," and (iv) "these operations are now mature and delivering *improved* controls and results." (UPR Br. 10-11, citing ¶¶ 222, 224, 242). In *In re Ocwen*, 2015 WL 12780960, the Court held that the following Ocwen statements among others were not actionable:  (i) "[w]e also believe that our platform enables us to operate in a compliant manner in an increasingly complex and highly regulated environment," (ii) "[w]e've also invested in and will continue to invest in more robust auditing and . . . compliance," and (iii) "we are making the investments required to continuously improve our service and quality and exceed compliant standards." *Id.* at *6-7 (statements touting Ocwen's "robust" compliance controls not actionable because "[r]easonable investors do not base their investing decisions on corporate 'puffery'"); *see also* Ex. 4.

   *Fifth*, UPR alternatively contends that Judge Dimitrouleas' decision was "superceded." (UPR Br. 17). That too is incorrect.  Rather, after the Court dismissed their pleading without prejudice, plaintiffs in the prior class action filed an amended complaint citing for the first time an arguably categorical statement by Ocwen concerning compliance – that Ocwen "services in compliance with [National Mortgage Settlement] standards as applicable." The Court held only that this lone statement was actionable if false. *In re Ocwen Fin. Corp. Sec. Litig.*, 2015 WL 12780961, at *1, *3 (S.D. Fla. Dec. 22, 2015).  UPR's complaint cites no such categorical statement, for Ocwen made none during the purported class period.  And Judge Dimitrouleas' subsequent decision specifically incorporated his prior decision, and repeated that Ocwen's other compliance statements were, like those put at issue by UPR, "aspirational" and thus not the proper basis for a 10b-5 claim. *Id.*

   Even putting aside Judge Dimitrouleas' decision, Ocwen's statements concerning its expectations and beliefs with respect to the company's efforts and intent to improve compliance simply are not actionable under 10b-5. *See, e.g.,* ¶ 147 ("We expect our ongoing cooperation will result in a satisfactory outcome for all parties"); *see also* ¶¶ 39, 103, 151, 161, 167, 168, 174, 175, 179, 181, 183, 186, 192, 195, 196, 218, 222, 224, 226, 234 for similarly vague statements. UPR's own cases recognize that statements concerning "expectations" are not actionable. *See Carlton v. Cannon*, 184 F. Supp. 3d 428, 475 (S.D. Tex.) (UPR Br. 13; statements concerning company's "expectations" not actionable; plaintiffs could not allege "what the expectations were in the first place"), *amended on denial of reconsideration*, 2016 WL

3959164 (S.D. Tex. July 22, 2016). Ocwen's representations concerning its "progress" or commitment to "continue" to "invest" in or "focus" on compliance and controls are likewise non-actionable puffery. *See* Ex. 4 (collecting cases). Nor is UPR correct that it may predicate a 10b-5 claim on Ocwen's statement that the company had a "commit[ment] to a culture of compliance." (UPR Br. 11). Such statements are "too vague to support a viable claim." *See Richard Thorpe & Darrel Weisheit v. Walter Inv. Mgmt., Corp.*, 111 F. Supp. 3d 1336, 1357 (S.D. Fla. 2015) (statement concerning company's "culture of compliance – strong independent controls and processes for monitoring and managing compliance" held to be puffery).[3]

---

[3] None of UPR's citations on the puffery point addresses statements that remotely resemble Ocwen's disclosures here. *See, e.g., Bellocco v. Curd*, 2005 U.S. Dist. LEXIS 24251, at *9-10 (M.D. Fla. Oct. 20, 2005) (statements that company was positioned to be industry "leader" or predicting "progress" were "general predictions" and were actionable only because they were made "in conjunction with Plaintiffs' other allegations"); *In re Ins. Mgmt. Sols. Grp. Sec. Litig.*, 2001 U.S. Dist. LEXIS 9962, at *33 (M.D. Fla. July 11, 2001) (representations of historical or hard facts held actionable because defendants knew acquisition was proving more costly and failed to conduct required due diligence); *In re Sci.-Atlanta, Inc. Sec. Litig.,* 239 F. Supp. 2d 1351, 1360 (N.D. Ga. 2002) (specific statements concerning defendant company's success, customers' confidence and growing needs for S–A products, and economic success of the company's customers held actionable); *In re Massey Energy Co. Securities Litigation*, 883 F. Supp. 2d 597, 616-18 (S.D. W. Va. 2012) (statements that safety was defendant company's "first priority" were actionable because company had explicitly linked this commitment to profitability); *Gross v. Medaphis Corp.*, 977 F. Supp. 1463, 1467-68 (N.D. Ga. 1997) ("positive historic statements" were actionable when defendants falsely "represented that [their product] was a major contributor to [the company's] current revenues and profits"); *Bach v. Amedisys, Inc.*, 2016 U.S. Dist. LEXIS 111077, at *35-39 (M.D. La. Aug. 19, 2016) (defendants made false representations concerning specific compliance actions); *Sohol v. Yan*, 2016 U.S. Dist. LEXIS 56049, at *27-28 (N.D. Ohio Apr. 27, 2016) (Exchange Act claims were based on statements such as "we have established the largest number of Energy Star compliant light products for LEDs and CFLs combined"); *In re Ulta Salon, Cosmetics & Fragrance Inc. Securities Litigation*, 604 F. Supp. 2d 1188, 1196 (N.D. Ill. 2009) (statements that SG&A expenses and merchandise inventory levels tracked levels for prior six month period were misleading because defendants had access to subsequent data indicating dramatic increase); *Freedman*, 4 F. Supp. 3d at 1113 (statement that company was committed to "improving" so that it "will be" FDA-compliant not actionable standing alone, but only actionable "in conjunction with other statements disclosing FDA actions arising from the inspections of the [company] facilities" which misled investors to believe that there were "no adverse interactions with the FDA"); *In re Lucent Techs., Inc. Sec. Litig.*, 217 F. Supp. 2d 529, 546 (D.N.J. 2002) (defendant stated "Optical is growing 40 to 50% and we're exactly the same range even though we are the leader").

B.     **Forward-Looking Statements.**

Defendants demonstrated that the PSLRA safe harbor precludes liability predicated on Ocwen's forward-looking statements, which were accompanied by meaningful cautionary language. (Moving Br. 10-12). UPR's arguments in response are meritless.

As a preliminary matter, UPR errs in asserting that a January 20, 2016 SEC Consent Order concerning Ocwen bars application of the PSLRA safe harbor. (UPR Br. 18-19). As UPR notes, the PSLRA safe harbor provision "shall not apply" when the defendant is the subject of a "judicial or administrative decree" addressing "the antifraud provisions of the securities laws." (UPR Br. 18). However, the Order did not reference any such antifraud provisions, nor did the SEC identify any fraud committed by Ocwen. Instead, the Order cited only Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder. (UPR Br. 19 n.9; Twersky Decl. Ex. C). These sections and rules are not antifraud provisions. *See SEC v. Monterosso*, 756 F.3d 1326, 1332 & n.15 (11th Cir. 2014) (classifying Section 17(a)(1), Section 10(b), and Rule 10b-5(a) as "the antifraud provisions of the Securities Act and the Exchange Act" and distinguishing them from alleged violations of 13(a) and 13(b)(2)(A) and Rules 12b-20, 13a-1 and 13a-13); *SEC v. Wills*, 472 F. Supp. 1250, 1268 (D.D.C. 1978) ("Section 13(a), like Section 13(d)(1), is a 'reporting, and not an antifraud, provision.'"). Beyond that, and likewise ignored by UPR, the 2016 Order addressed Ocwen's statements predating the purported class period, alleged to begin in January 2015 (¶ 1); the order concerned filings that Ocwen made no later than 2014. Ocwen's statements addressed in the SEC Consent Order were the subject of the prior and now-settled class action before Judge Dimitrouleas. *See In re Ocwen*, Case No. 14-81057 CIV-WPD (S.D. Fla), D.E. 330.

Next, UPR maintains that "many of the statements highlighted by Defendants are not forward looking." (UPR Br. 19). On this score, UPR addresses only a handful of the statements identified in Ocwen's moving papers as non-actionable forward-looking statements. (Ex. 2). And UPR's selective challenge ignores the law in the Eleventh Circuit. According to UPR, statements concerning what Ocwen "believe[d]," was "committed" to, or would "continue" to do are not forward-looking because they purportedly implicate Ocwen's past or present intent, in addition to the company's future commitment. (UPR Br. 19-20). In our Circuit, however, forward-looking statements that also contain historical facts do not lose safe harbor protection.

7

"Forward-looking conclusions often rest both on historical observations and assumptions about future events. Thus, were we to banish from the safe harbor lists that contain both factual and forward-looking factors, we would inhibit corporate officers from fully explaining their outlooks. . . . That would hamper the communication that Congress sought to foster." *Harris v. Ivax Corp.*, 182 F.3d 799, 806–07 (11th Cir. 1999). *See also In re KLX*, 232 F. Supp. 3d at 1280 (statements concerning corporate "progress" were forward-looking even though they included both assumptions and statements of known fact). UPR attempts to distinguish this authority, arguing that unlike here the defendants in those cases also moved to dismiss on scienter grounds. (UPR Br. 19 n.11, 20 n.13 & 22 n.15). Scienter is irrelevant to the applicable PSLRA safe harbor prong invoked by Defendants. *In re KLX*, 232 F. Supp. 3d at 1280.

UPR also asserts that Ocwen's forward-looking statements were not "accompanied by meaningful cautionary language." (UPR Br. 21). This conclusory assertion is just rhetoric, for UPR closes its eyes to the plain language of Ocwen's filings. There, Ocwen affirmatively cautioned investors, warning that (i) Ocwen was subject to subpoenas issued by the CFPB and that any CFPB enforcement action could have a material adverse impact on Ocwen's "business, reputation, financial condition and results of operations" (Ex. 13 at 8), (ii) Ocwen was "subject to a number of ongoing federal and state regulatory examinations, consent orders, inquiries, requests for information and other actions, which could result in further adverse regulatory action against us" (*id.* at 9), (iii) CFPB and state regulators "increasingly focused on the use and adequacy of technology in the mortgage servicing industry" (Ex. 19 at 7), and (iv) "changes in enforcement practices, including those related to the technology we use" could "require significant changes to our business practices, impose additional costs on us, limit our product offerings, limit our ability to efficiently pursue business opportunities, negatively impact asset values or reduce our revenues." (*Id.* at 15).

Notwithstanding these warnings, UPR contends that Ocwen's statements were not sufficiently cautionary because Ocwen did not disclose the "grave" and "deplorable" state of REALServicing. (UPR Br. 21-22). The Court of Appeals does not require that "the cautionary language explicitly mention *the* factor that ultimately belies a forward-looking statement." *Harris,* 182 F.3d at 807. Rather, "when an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward." *Id.*

8

And in any event, Ocwen disclosed to shareholders the pitfalls and risks posed by its servicing technology, warning in bold and italics that *"[t]echnology or process failures could damage our business operations or reputation and harm our relationships with key stakeholders."* (Ex. 13 at 30). Ocwen also warned that "[b]ecause in an average month we mail nearly three million letters, a process problem such as erroneous letter dating has the potential to negatively affect many parts of our business and have widespread negative implications…." (Ex. 19 at 27).

As Judge Dimitrouleas held in the prior class action, Ocwen's forward-looking statements – strikingly similar to those at issue here – were "accompanied by meaningful cautionary statements and specific warnings of the risks involved" and thus "render[ed] any alleged misrepresentations or omissions immaterial as a matter of law." *In re Ocwen*, 2015 WL 12780960, at *7 (citation omitted). The Court should hold likewise here.

## C.   Statements of Opinion.

Defendants' Moving Brief showed that under *Omnicare Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318 (2015), UPR cannot state a 10b-5 claim bottomed on Ocwen's statements of opinion cited in the Complaint. (Moving Br. 12-13; Ex. 3). The Supreme Court has emphasized that meeting the standard under *Omnicare* "is no small task for an investor." 135 S. Ct. at 1332. UPR's prolix pleading does not come close.

UPR contends that Ocwen's statements of opinion are actionable because Defendants supposedly conceded that they knew about the "deficiencies" with REALServicing, and "knew Ocwen was not in compliance" with applicable laws. (UPR Br. 22-23). This charge is predicated on a mischaracterization of Ocwen's actual disclosures. Defendants never said that they believed REALServicing was fool-proof or that Ocwen was compliant. Ocwen merely stated that the company (i) "believe[d] its significant investments in [its] servicing operations, risks and compliance infrastructure over recent years will position us favorably relative to our peers," (ii) "expect[s] the next round of results" to show that "we have made progress" in improving its compliance monitoring, and that "we feel good about the progress we have made with our national mortgage settlement compliance," and (iii) "invested heavily in compliance and risk management. We believe these operations are now mature and delivering improved controls and results." *See* Ex. 3. And beyond conclusory boiler-plate, the Complaint nowhere alleges any facts establishing that Ocwen did not believe its statements. *Cf. In re CIT Grp. Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 690 (S.D.N.Y. 2004) ("[S]tatements about defendants' belief in

9

the adequacy of loan loss reserves could be actionable" but only "if it is alleged that defendants did not actually believe the loan loss reserves were adequate, or if defendants had no reasonable factual basis for their belief.").

UPR also maintains in a footnote that Defendants' statements are actionable since the facts supporting Ocwen's opinions were untrue. (UPR Br. 22 n.16). The Supreme Court held in *Omnicare*, however, that "[a] sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless whether an investor can ultimately prove the belief wrong." 135 S. Ct. at 1327. UPR goes on to string-cite scienter cases and paragraphs from its Complaint that bear on scienter (UPR Br. 22-23 & n.17), but none demonstrates that Defendants were aware of facts belying their public statements.

D.    **Statements That On Their Face Are Not False.**

Defendants' Moving Brief also demonstrated that as to other Ocwen statements cited in the Complaint, UPR either does not properly allege that the statements are false or by sleight of hand has excised words and sentences providing critical context to the statements in question. (Moving Br. 13-15)  UPR's opposition does not meaningfully address these points.

UPR claims that Ocwen's representations concerning the company's "Three Lines of Defense" are actionable because Ocwen stated that the model "includes mechanisms to assess the effectiveness of executing these responsibilities" (¶¶ 236, 196), yet the model was supposedly ineffective and "fail[ed] to manage the [c]ompany's risk and controls." (UPR Br. 26). Ocwen never stated that the controls and mechanisms were fool-proof or even effective. *Cf. In re BP p.l.c. Sec. Litig.*, 852 F. Supp. 2d 767, 804–05 (S.D. Tex. 2012) (dismissing 10b-5 claim; "the facts Plaintiffs cite as evidence of the falsity of [defendant's] representation do not undercut the truth of the statement").

UPR also asserts that Ocwen falsely claimed to be a "leader in the servicing industry," misdirecting the Court to an unrelated statement concerning technology and costs. (UPR Br. 26). Even if Ocwen's statements concerning its leadership were not puffery (Moving Br. 8-9), UPR simply closes its eyes to the context of these statements set out in Ocwen's SEC filings – that Ocwen's leadership is evidenced by "complet[ing] 559,000 loan modifications since January 2008," and "20% of all HAMP-sponsored modifications, 45% more than the next highest services." (Ex. 9 at 4). UPR does not contest these figures.

10

UPR likewise does not allege any facts undermining Ocwen's statement that "a borrower who has their loan serviced by Ocwen has a much better chance of avoiding foreclosure than if their loan was serviced by any other company." (¶¶220, 232).   In sharp contrast, UPR offers only its repeated refrain concerning supposed problems with REALServicing. (UPR Br. 26-27).   UPR also points to Ocwen's statement that "we are getting even better" (*id.* at 13, 27 n.19), but omits the context explaining that statement: "In the second quarter, we helped almost 20,000 struggling families obtain a loan modification and avoid foreclosure, but what is really amazing is that this was a 19% increase in families helped over the first quarter. In the last 6 months alone, we have helped over 36,000 households." (Ex. 5 at 13). Again, UPR nowhere explains why that specific factual statement is false.

E.    **Corporate Mismanagement Allegations.**

As demonstrated above, none of the dozens of Ocwen statements cobbled together in UPR's verbose pleading suffices to meet the stringent pleading requirements of the PSLRA. Thus, when all the dust settles UPR's Complaint pleads nothing more than corporate mismanagement.   Under *Santa Fe*, UPR's allegations – concerning supposed deficiencies in the REALServicing platform (*e.g.,* ¶¶ 44-81), compliance practices (*e.g.,* ¶¶ 64, 66, 73, 75), and other internal controls (*e.g.,* ¶¶ 131, 147, 158-60, 166) – do not state a claim under 10b-5. (Moving Br. 15).

Hemmed in by this dispositive authority, UPR makes the hyperbolic declaration that dismissal here would create a blanket rule "that allegations of regulatory and legal compliance are *per se* inactionable." (UPR Br. 24).   Not true.   Rule 10b-5 proscribes false and misleading statements, not corporate mismanagement, and when a 10b-5 plaintiff properly pleads that a supposedly factual statement in a filing is false, the claim will be sustained.   That is not our case by a long shot, as demonstrated above and in Defendants' moving papers.   Notably, in the prior *In re Ocwen* decision the Court held that allegations like those here concerning the failings of Ocwen's technology platform, Ocwen's regulatory compliance and other internal controls were barred by *Santa Fe*.   *See In re Ocwen*, 2015 WL 12780960, at *4-7 ("Plaintiff's claims regarding Ocwen's dubious regulatory compliance fall squarely within the ambit of *Santa Fe*'s holding.").   Judge Dimitrouleas relied in part on *Cutsforth v. Renschler*, 235 F. Supp. 2d 1216, 1242-43 (M.D. Fla. 2002), which dismissed a 10b-5 claim predicated on defendants' alleged failure to disclose problems with its computer systems – the same type of claim asserted

by UPR here.   UPR tries to distinguish *Cutsforth* and the other relevant authority cited in Defendants' Moving Brief on the supposed basis that Ocwen in the prior action "did not act with scienter." (UPR Br. 24). Yet under 10b-5 the scienter element is different from and assessed separately from the issue of falsity; UPR must meet the stringent PSLRA pleading requirements for each and every element of its 10b-5 claim.   UPR's own cases highlight the point.   *See Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 97–98 (2d Cir. 2016) (UPR Br. 9; scienter allegation "does not cure [the] generality" of representations concerning company's "culture of high ethical standards, integrity, operational excellence, and customer satisfaction"); *Sohol v. Yan*, 2016 U.S. Dist. LEXIS 56049, at *27-28 (N.D. Ohio Apr. 27, 2016) (UPR Br. 14; court evaluated whether plaintiff adequately pleaded a false or misleading misrepresentation even though defendant did not move to dismiss on scienter grounds).

UPR also asserts that to "accurately represent the [c]ompany's status concerning its regulatory obligations," Ocwen should have accused itself of non-compliance.  (UPR Br. 24). That is not the law. *See In re Citigroup Inc. Sec. Litig*, 330 F. Supp. 2d 367, 377-78 (S.D.N.Y. 2004) ("the federal securities laws do not require a company to accuse itself of wrongdoing"), *aff'd sub nom. Albert Faden Trust v. Citigroup, Inc*., 165 F. App'x 928 (2d Cir. 2006). Significantly, UPR's Complaint does not allege that any regulatory actions were pending when Ocwen stated that "[w]e are not aware of any pending or threatened actions to suspend or revoke any state licenses."  (¶ 161; *see also* ¶ 151).  Nor was Ocwen legally required to predict future regulatory action. *See Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 170 (S.D.N.Y. 2015) (dismissing 10b-5 claim predicated on "failure to disclose the 'amplified risk' of regulatory scrutiny"; "where an outcome is merely speculative, a duty to disclose does not attach"). UPR invokes cases in which a defendant made affirmative representations that it was in compliance – a far cry from Ocwen's cautionary and qualified statements. *See* pages 2-5 above.[4]

---

[4] *See In re Omnicare, Inc. Sec. Litig.,* 769 F.3d 455, 478 (6th Cir. 2014) (UPR Br. 24; "[w]e believe that our billing practices materially comply with applicable state and federal requirements"). UPR's reliance on *Pennsylvania Public School Employees' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341 (S.D.N.Y. 2012) (cited at UPR Br. 25 n.18) is likewise misplaced. That court held only that defendants were required to disclose a prior judicial finding that its mortgage electronic registration system was faulty.  The court distinguished that scenario from ours here, where a previous finding that a defendant was non-compliant "did not render it a 'foregone conclusion'" that defendant would again be found non-compliant. *Bank of Am. Corp.*, 874 F. Supp. 2d. at 352-53.

Finally, UPR cannot state a claim premised on the company's statements concerning internal controls and Sarbanes-Oxley certifications. (UPR Br. 14-15). UPR again ignores the actual language of Ocwen's filings, explicitly warning of the "limitations on the effectiveness of controls," and that "[b]ecause of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements." (Ex. 9 at 80). UPR contends that had management correctly evaluated the company's financial reporting controls, Ocwen would have found them deficient. That is the exact type of claim barred by *Santa Fe*. *See also In re Citigroup*, 330 F. Supp. 2d at 378 (allegation that company misstated its controls over financial reporting not actionable; claim was "fundamentally one challenging Citigroup's management of its financial reporting function").[5]

### F.   **UPR's Remaining Arguments Are Meritless.**

UPR's remaining arguments do not plug the legal holes in the Complaint.

• UPR contends that materiality cannot be decided as a matter of law. (UPR Br. 15). Not correct. Courts routinely dismiss at the pleading stage complaints predicated as here on corporate puffery, forward-looking statements and/or statements of opinion. *See, e.g.*, *In re Ocwen*, 2015 WL 12780960; *In re KLX*, 232 F. Supp. 3d at 1275–76.

• UPR end-runs the law in asserting that Defendants' supposed silence concerning alleged violations of Item 303 of SEC Regulation S-K and GAAP FAS 5/ASC 450 automatically establishes that these purported violations are actionable under 10b-5. (UPR Br. 9 & n.3). Defendants have moved to dismiss UPR's entire complaint. And as noted in Defendants' Moving Brief (at 15 n.4), when as here the underlying statements concerning servicing, compliance and the like as a matter of law are not false, UPR's claims with respect to those statements cannot be bootstrapped into claims concerning disclosure controls and other

---

[5] UPR also ignores the authority cited in Defendants' Moving Brief at 15 n.4 holding that claims predicated on a failure of internal controls are barred when, as here, the underlying representations are not actionable. In the cases cited by UPR on this point (UPR Br. 14-15), the courts upheld allegations addressed to the underlying representation. *See, e.g.*, *In re Hamilton Bankcorp, Inc. Sec. Litig.*, 194 F. Supp. 2d 1353, 1356 (S.D. Fla. 2002) (upholding claim for failure to follow internal controls when court upheld underlying claim); *In re Ebix Inc. Sec. Litig.*, 898 F. Supp. 2d 1325, 1342 (N.D. Ga. 2012) (same); *Local 703, I B of T. Grocery & Food Emples. Welfare Fund v. Regions Fin. Corp.*, 2011 U.S. Dist. LEXIS 60761, at *30 (N.D. Ala. June 7, 2011) (court did not find that Sarbanes-Oxley certification was false, but instead found that certification was probative only on issue of scienter).

regulations.  Contrary to the theory apparently underlying UPR's allegations on this point, "Item 303 is not a magic black box in which inadequate allegations under Rule 10b-5 are transformed, by means of broader and different SEC regulations, into adequate allegations under Rule 10b-5." *Ash v. PowerSecure International, Inc.*, 2015 WL 5444741, at *11 (E.D.N.C. Sept. 15, 2015).

Beyond that, "[i]n the Eleventh Circuit [ ], 'allegations of violations of . . . GAAP, standing alone, do not satisfy the particularity requirement of Rule 9(b).'" *In Re KLX*, 232 F. Supp. 3d at 1279 (internal citation omitted); *see also Cutsforth*, 235 F. Supp. 2d at 1260 ("[T]he failure to follow GAAP is, by itself, insufficient to state a securities fraud claim.").  Equally critical, no private right of action exists under 10b-5 for Item 303 violations.  *See In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1054 (9th Cir. 2014) ("We have never directly decided whether Item 303's disclosure duty is actionable under Section 10(b) and Rule 10b-5.  We now hold that it is not."); *Oran v. Stafford*, 226 F. 3d 275, 286 n.6, 287-88 (3d Cir. 2000) (Item 303 violations do not create independent cause of action for private plaintiffs and "reject[ing] plaintiffs' claim that SEC Regulation S–K, Item 303(a) imposed an affirmative duty of disclosure on AHP that could give rise to a claim under Rule 10b-5").[6]

## II.      UPR Has Not Sufficiently Pleaded Loss Causation

As an independent basis for dismissal on the pleadings, Defendants' moving papers showed that UPR has not properly alleged the 10b-5 element of loss causation. Specifically, none of the corrective disclosures cited in the Complaint actually revealed to the market any previously unknown information, for Ocwen had already disclosed in its filings that (i) the company was facing increased and stringent regulatory scrutiny and the risk of future

---

[6] The Court of Appeals has suggested --but not decided whether-- alleged Item 303 violations are actionable under 10b-5. *See Thompson v. RelationServe Media Inc.*, 610 F.3d 628, 682 n.78 (11th Cir. 2010) (Tjoflat, C.J., concurring) ("The assumption that Item 303 of Regulation S-B" – which is "materially identical" to Item 303 of Regulation S-K – "would impose an actionable duty to speak under Rule 10b-5 is generous").  In asserting that "courts in this Circuit and across the country routinely hold that violations of [ ] Item 303 constitute actionable false statements" (UPR Br. 9 n.3), UPR cites to the Second Circuit's minority view, and omits mention of the Supreme Court's grant of certiorari on the issue earlier this year.  *See Leidos, Inc. v. Indiana Pub. Ret. Sys.*, 137 S. Ct. 1395, 1396 (2017).

UPR mistakenly claims that *SEC v. BankAtlantic Bancorp. Inc.*, 2012 WL 1936112 (S.D. Fla. May 29, 2012) "recognized a cause of action for violations of Item 303 in the Eleventh Circuit." (UPR Br. 9 n.3).  That case concerned the SEC's authority to enforce its own regulations, not the existence of a private claim for relief under 10b-5.

regulatory action, and (ii) Ocwen servicing technology faced issues and was far from perfect. Moreover, the Complaint itself references Ocwen's well-publicized regulatory issues, including a state regulatory consent order publicly announced in December 2014. (¶ 32). As the Complaint acknowledges, that consent order "determined that REALServicing was at the heart of the company's mortgage servicing misconduct" (*id.*) – the very information which UPR contends that Defendants concealed. *See Sapssov v. Health Mgmt. Assocs., Inc.*, 608 F. App'x 855, 863 (11th Cir. 2015) (to satisfy the element of loss causation, "a corrective disclosure must reveal a previously concealed truth [and] obviously must disclose new information").

UPR's Complaint pleads four separate corrective disclosure dates. As a matter of law, none of the disclosures on those dates revealed any new information or otherwise supplies the required logical link between the supposedly fraudulently enhanced share price and UPR's claimed later economic loss. UPR's opposition does not cure this flaw.

February 29, 2016 and February 23, 2017: UPR asserts that on these dates, almost a year apart, Ocwen revealed for the first time that the company was paying compliance and legal costs in connection with the NYDFS and CFPB regulatory investigations that were "higher than what Defendants had previously expected." (UPR Br. 28-29; ¶¶ 96-97, 109, 255). Ocwen's actual disclosures on those dates merely explained in each instance that the company had incurred "higher regulatory monitoring and compliance costs, litigation expenses" than the preceding fiscal year. *See* Ex. 13 at 48; Ex. 19 at 61 ("10% increase in expenses before allocations" incurred in 2016 due to regulatory monitoring costs, regulatory and litigation settlements, and a $12.5 million reserve charge based on Ocwen's negotiations with the CFPB). Nowhere did Ocwen make any statement that these expenses were significantly higher than previously expected, and UPR does not point to any earlier concrete prediction on Ocwen's part that would otherwise substantiate this claim. Thus, these disclosures are not "corrective" under the law in our Circuit. *See Meyer v. Greene*, 710 F.3d 1189, 1197 (11th Cir. 2013) ("To be corrective, [a] disclosure need not precisely mirror the earlier misrepresentation, but it must at least relate back to the misrepresentation and not to some other negative information about the company.") (internal citation and quotation marks omitted).

Moreover, when read in their proper context these disclosures merely confirm information that the Complaint itself acknowledges was known to investors. By UPR's own admission, as of early 2015 the market was well aware of the "onerous monitoring costs,"

15

"myriad compliance terms," and "significant overhang of additional litigation" imposed by Ocwen's February 2014, December 2014 and January 2015 settlements with the CFPB, NYDFS, and CADBO, respectively, as well as Owen's public statement in February 2016 that the company "expect[ed] to have elevated legal costs in 2016." *See* ¶¶ 33-37, 97. That Ocwen's regulatory and litigation-related expenses increased from 2014 to 2015 and then again from 2015 to 2016 therefore would not have been be a surprise.

February 16, 2017: UPR cites a NORA regulatory letter received by a different company, Altisource, concerning supposed deficiencies with Altisource's REALServicing platform. But in July 2016, Ocwen itself disclosed that it had received a NORA letter. Thus, the Altisource NORA letter revealed nothing new concerning Ocwen. Confronted with this record, UPR asserts that the Altisource NORA letter was "a different letter than the letter Defendants had previously disclosed [in Ocwen's July 28, 2016 10-Q] and concerned a different potential topic of CFPB inquiry." (UPR Br. 29). However, both letters concerned servicing. *Compare* ¶ 106 ("Altisource received a [NORA] letter . . . relating to an alleged violation of federal law that primarily concerns certain technology services provided to Ocwen.") *with* Ex. 15 at 43 ("Recently, we received a [NORA] letter from the CFPB . . . relating to compliance with federal laws pertaining to our servicing practices."). It is difficult to understand how a letter threatening Altisource with an enforcement action would reveal new information detrimental to Ocwen, especially since Ocwen itself had already announced receipt of its own NORA letter.

Ocwen's prior disclosure of its own NORA letter and other public statements concerning the CFPB's civil investigation demands likewise disqualify the February 22-23, 2017 10-K and earnings call as corrective disclosures. (¶ 109). When announcing the NORA letter in its July 28, 2016 Form 10-Q, Ocwen explicitly noted that the CFPB was considering legal action against the company, a step which Ocwen warned "could have a material adverse impact on [Ocwen's] business, reputation, financial condition and results of operations." (Moving Br. Ex. 15 at 43). Ocwen's subsequent reference on February 22-23, 2017 to a possible CFPB enforcement action and a related $12.5 million reserve charge therefore constituted confirmatory rather than new information concerning Ocwen's regulatory status vis-à-vis the CFPB. *See City of St. Clair Shores Police v. Nationstar Mortg. Holdings Inc.*, 2016 WL 4705718, at *12 (S.D. Fla. June 21, 2016) (dismissing complaint on loss causation grounds when plaintiffs failed to

identify new information revealed by company CEO's comments during earnings call; such comments "merely confirmed Nationstar's prior disclosures to the market").

April 20, 2017: In light of the company's numerous, concrete, and detailed disclosures concerning the potential for regulatory action against Ocwen and the issues affecting REALServicing (Moving Br. 18-20), the April 20, 2017 CPFB complaint against Ocwen and state proceedings commenced on that date do not qualify as corrective. *See Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72, 75 (2d Cir. 2013) (affirming dismissal on loss causation grounds; company "made extensive disclosures about its investments and internal controls throughout the class period" and thus alleged corrective disclosures concerning company's solvency were "based on information that was already publicly available"). Underscoring the point, as a matter of law Ocwen was under no legal obligation to predict accurately the outcome of the CFPB investigation or any other regulatory investigation. (Moving Br. 17.)[7]

In short, absent a legally viable corrective disclosure, as a matter of law UPR cannot plead loss causation. *See In re KBC Asset Mgmt. N.V.*, 572 F. App'x 356, 360-62 (6th Cir. 2014) ("Because the complaint does not identify sufficiently new evidence that was revealed to the market, KBC has not plausibly pled loss causation.").

## CONCLUSION

The Court should reject UPR's kitchen-sink pleading and dismiss this action with prejudice and without leave to replead. *In re KLX*, 232 F. Supp. 3d at 1283 (dismissing 10b-5 claim with prejudice and without leave to replead; an amendment "would not cure the infirmities inherent in the Amended Complaint and Plaintiffs have had adequate opportunity to amend their pleading").

---

[7] UPR's reliance on the "materialization-of-concealed-risk" theory of loss causation (UPR Br. 29) poses no obstacle to Defendants' motion. To begin with, the Court of Appeals has not recognized this theory. *Sapssov*, 608 F. App'x at 861 n.7. Even were materialization-of-risk a viable theory in our Circuit, UPR must show that the risks that materialized – that Ocwen was out of compliance and REALServicing was ineffective – had been previously concealed. As demonstrated above, throughout the class period Ocwen's disclosures repeatedly noted the relevant risks. (Moving Br. 2-3 & 19-20). *See Lentell v. Merrill Lynch & Co. Inc.*, 396 F.3d 161, 176–77 (2d Cir. 2005) (plaintiff failed to plead loss causation when "the risk of price volatility – and hence, the risk of implosion – is apparent on the face of every report challenged in the underlying complaints").

## REQUEST FOR HEARING

Because Defendants believe that the outcome of their motion could (and should) dispose of UPR's lawsuit, Defendants respectfully request pursuant to Local Rule 7.1(b) a hearing to last no longer than one hour to address the important issues raised here.

Dated:    November 30, 2017

GREENBERG TRAURIG, P.A.
401 East Las Olas Boulevard, Suite 2000
Fort Lauderdale, Florida  33301
Telephone:     (954) 765-0500
Facsimile:      (954) 765-1477


*/s/ Jeffrey Allan Hirsch*
JEFFREY ALLAN HIRSCH
Florida Bar No. 199850
Email: hirschj@GTLAW.com

-and-

KRAMER LEVIN NAFTALIS & FRANKEL LLP |
1177 Avenue of the Americas
New York, New York 10036
Telephone: 212-715-9100
Facsimile: 212-715-8456

*/s/ John P. Coffey*
John P. Coffey
Jonathan M. Wagner
Jason M. Moff

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 30th day of November, 2017, I served the foregoing on all

counsel of record identified on the below Service List via CM/ECF or by electronic mail.

*s/Jeffrey Allan Hirsch*
JEFFREY ALLAN HIRSCH

## SERVICE LIST

KAREN A. CARVELLI, Individually and On Behalf of All Others Similarly Situated, v.
OCWEN FINANCIAL CORPORATION, RONALD M. FARIS, and MICHAEL R. BOURQUE JR.
CASE NO.:  17-cv-80500-RLR

**_Counsel for Karen Carvelli_**
J. Alexander Hood, II, Esquire
Jeremy A. Lieberman, Esquire
Hui M. Chang, Esquire
POMERANTZ, LLP
600 Third Avenue
Floor 20
New York, New York 10016
Telephone: 212-661-1100
Facsimile: 202-661-8665
Email: ahood@pomlaw.com
jalieberman@pomlaw.com;
hchang@pomlaw.com
and
Patrick Dahlstrom, Esquire
POMERANTZ, LLP
10 South LaSalle
Suite 3505
Chicago, Illinois 60603
Telephone: 312-377-1181
Facsimile: 312-377-1184
Email: pdahlstrom@pomlaw.com
and
Jayne Arnold Goldstein, Esquire
SHEPHERD FINKELMAN MILLER &
SHAH LLP
1625 N. Commerce Parkway
Suite 320
Fort Lauderdale, Florida 33326
Telephone: 954-903-3170
Facsimile: 866-300-7367
Email: jgoldstein@sfmslaw.com

**_Counsel for all Defendants_**
Jeffrey Allan Hirsch, Esquire
GREENBERG TRAURIG, P.A.
401 East Las Olas Boulevard
Suite 2000
Fort Lauderdale, Florida 33301
Telephone: 954-765-0500
Facsimile: 954-765-1477
Email: hirschj@gtlaw.com
and
John P. Coffey, Esquire
Jonathan M. Wagner, Esquire
Jason M. Moff, Esquire
KRAMER LEVIN NAFTALIS & FRANKEL
LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone: 212-715-9100
Facsimile: 212-715-8456
Email: scoffey@kramerlevin.com;
jwagner@kramerlevin.com; and
jmoff@kramerlevin.com

**_Counsel for Ryan Huseman Leo W.
Desmond,_** Esq. Florida Bar No. 0041920
DESMOND LAW FIRM, P.C.
5070 Highway A1A, Suite D
Vero Beach, Florida 32963
Telephone: (772) 231-9600
Facsimile: (772) 231-0300
lwd@DesmondLawFirm.com

***Counsel for University of Puerto Rico***
***Retirement System***
Mitchell M.Z. Twersky, Esquire
Atara Hirsch, Esquire
Lawrence D. Levit, Esquire
Matthew E. Guarnero, Esquire
Jake Nachmani, Esquire
ABRAHAM, FRUCHTER AND
TWERSKY, LLP
One Penn Plaza, Suite 2805
New York, New York 10119
Telephone: 212-279-5050
Facsimile: 212-279-3655
Email:  MTwersky@aftlaw.com AHirsch@aftlaw.com
LLevit@aftlaw.com
MGuarnero@aftlaw.com
jnachmani@aftlaw.com
and
Julie Prag Vianale, Esquire
VIANALE & VIANALE LLP
5550 Glades Road, Suite 500
Boca Raton, Florida 33431
Telephone: 561-392-4750
Facsimile: 561-961-5191
Email:  JVianale@vianalelaw.com