UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 9:17-cv-80500-RLR

KAREN A. CARVELLI, Individually and On
Behalf of All Others Similarly Situated,

Plaintiffs,

v.

OCWEN FINANCIAL CORPORATION,
RONALD M. FARIS, and MICHAEL R.
BOURQUE, JR.,

Defendants.

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS
THE CONSOLIDATED SECURITIES CLASS ACTION COMPLAINT

**THIS MATTER** is before the Court on Defendants' Motion to Dismiss, DE 72, Lead

Plaintiff's Corrected Response in Opposition to Defendants' Motion to Dismiss, DE 81, and

Defendants' Reply in Support of their Motion to Dismiss, DE 83. The Court heard argument on

April 16, 2018. For the reasons set forth below, Defendants' Motion to Dismiss is **GRANTED**.

The case is **DISMISSED WITH PREJUDICE**.

I.      **BACKGROUND**

On August 28, 2017, Lead Plaintiff University of Puerto Rico Retirement System

("UPR") filed its Amended Consolidated Securities Class Action Complaint (the "Complaint")

against Defendants Ocwen Financial Corporation ("Ocwen"), Ronald M. Faris and Michael R.

Bourque, Jr. (Faris and Bourque, collectively, the "Individual Defendants," and together with

Ocwen, the "Defendants"). DE 67. UPR brought this action on behalf of itself and a putative class of others who acquired Ocwen common stock between January 13, 2015 and April 20, 2017 (the "Class Period"). UPR's two-count complaint alleges violations of Section 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5.

Ocwen is incorporated in Florida and maintains its principal executive offices in West Palm Beach, Florida. *Id.* ¶ 17. Throughout the Class Period, Mr. Faris served as Chief Executive Officer, President of Ocwen, and as a Director on the Board of Directors of Ocwen, *id.* ¶ 18; Mr. Bourque served as the Chief Financial Officer, *id.* ¶ 19.

Ocwen is a diversified financial services company founded in 1988. *Id.* ¶ 3. During the Class Period, Ocwen's core business involved servicing mortgages. *Id.* ¶¶ 21–22. At all times relevant to the Complaint, Ocwen used a mortgage servicing software platform furnished by Altisource Portfolio Solutions, S.A. ("Altisource") called REALServicing. Prior to the Class Period, Ocwen entered into Consent Orders with certain of its regulators regarding its mortgage servicing business. *Id.* ¶ 247(a). Ocwen signed (i) a consent judgment with the Consumer Financial Protection Bureau ("CFPB") and forty-nine attorneys general in December 2013, *id.* ¶¶ 28, 30; (ii) a consent order with the New York Department of Financial Services in December 2014, *id.* ¶¶ 31–33; and (iii) a consent order with the California Department of Business Oversight in January 2015, *id.* ¶ 34. Prior to the Class Period, Ocwen disclosed these regulatory settlements to the market. *Id.* ¶¶ 27–38, 247(a).

The Complaint alleges that Defendants failed to fix operational and technological deficiencies with REALServicing, and instead made materially false and misleading statements and omissions, that its mortgage servicing misconduct was a thing of the past. Specifically, the Complaint alleges that Defendants' misrepresentations and omissions concerned: (i) Ocwen's

purported progress in and commitment to complying with the Regulator Settlements, *e.g.*, *id.* ¶¶ 100, 179, 147, 153, 161, 167, 186, 222, 224, 242; (ii) the efficacy and remediation of REALServicing, *e.g.*, *id.* ¶¶ 177, 184, 212; (iii) Ocwen's supposed commitment to borrowers, *e.g.*, *id.* ¶¶ 168, 220; (iv) the efficacy of the Company's internal controls, *e.g.*, *id.* ¶¶ 131, 158–59; and (v) the Company's failure to make the required disclosure obligations under GAAP FAS 5/ASC 40 and SEC Rule Item 303, *id.* ¶¶ 132–41. For example, Defendants stated that Ocwen was "committed to correcting any deficiencies, remediating any borrower harm, and improving our compliance management systems and customer service," *id.* ¶ 151, and that Ocwen "invested heavily in compliance and risk management" and that those "operations are now mature and delivering improved controls and results." *id.* ¶ 242.

The Complaint alleges that these statements were materially false and misleading because, throughout the Class Period, just like prior to the Class Period, REALServicing was fraught with deficiencies that Defendants did not remediate. These deficiencies made REALServicing incapable of functioning as an adequate system of record, caused Ocwen to remain out of compliance with the Regulator Settlements, and led to violations of federal and state mortgage servicing laws. *Id.* ¶¶ 44–81.

The Complaint alleges that the truth concerning the deficient and unremediated state of REALServicing and Ocwen's non-compliance with the Regulator Settlements began to be revealed in February 2016 with the issuance of Ocwen's 2015 10-K. *Id.* ¶¶ 96–97. According to the Complaint, from February 2017 until the end of the Class Period, investors suffered a string of bad news about the full scope of the facts and risks that Defendants had concealed finally emerged. *Id.* ¶¶ 106–20. Altisource revealed that it had received a Notice and Opportunity to Respond and Advise ("NORA") letter from the CFPB related to violations of federal law

concerning its relationship to Ocwen and Ocwen's use of REALServicing. *Id.* ¶¶ 106–08. Then, Ocwen revealed that its remediation costs were higher than expected and that it had taken a reserve charge in connection with the CFPB enforcement action. *Id.* ¶¶ 109–11. Finally, on the last day of the Class Period, the Office of the Attorney General for the State of Florida and the Office of Financial Regulation for the State of Florida filed a complaint against Ocwen and its related entities for their continued violation of federal and state laws in connection with Ocwen's mortgage servicing misconduct. That same day Ocwen also revealed that the Multi-State Mortgage Committee, state regulators from more than twenty states, had issued cease-and-desist orders to Ocwen's subsidiaries in connection with the Company's gross mishandling of escrow accounts, based on an investigation that was a "culmination of several years of examinations and monitoring" and that prohibited Ocwen from acquiring Mortgage Servicing Rights ("MSRs") until Ocwen could demonstrate it had remediated its escrow-related deficiencies. *Id.* ¶¶ 112-20.

The Complaint alleges that as a result of Defendants' fraud, the price of Ocwen common stock fell from a Class Period high of $11.61 per share to $2.49 per share – a decline of nearly 80%. *Id.* ¶ 120.

Lead Plaintiff filed its Complaint on August 28, 2018, DE 67, alleging one count for violations of Section 10(b) of the Exchange Act and Rule 10b-5 and one count for violations of Section 20(a) of the Exchange Act. Defendants moved to dismiss, arguing that the Complaint does not sufficiently allege that Defendants made material misrepresentations or omissions and that Plaintiff did not properly plead loss causation. DE 72.[1]

---

[1] Because the Court finds that the Complaint does not sufficiently allege that Defendants made material misrepresentations or omissions, it does not reach the issue of whether Plaintiff properly pled loss causation.

## II.    APPLICABLE LAW

A securities fraud claim under Section 10(b) must satisfy six elements: (1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the material misrepresentation or omission and the loss, an element commonly called "loss causation." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236–37 (11th Cir. 2008); *see also* 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5.

To state a "control person" claim under Section 20(a), a plaintiff must allege that: (1) Ocwen committed a primary violation of the securities laws; (2) the Individual Defendants had power to control the general business affairs of Ocwen; and (3) the Individual Defendants "had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in primary liability." *Theoharous v. Fong*, 256 F.3d 1219, 1227 (11th Cir. 2001) (citation omitted). If a plaintiff fails to plead adequately a violation of Section 10(b) and Rule 10b-5, a claim under Section 20(a) necessarily fails as well. *See Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir. 2006). *See generally In re KLX, Inc. Sec. Litig.*, 232 F. Supp. 3d 1269, 1274 (S.D. Fla. 2017).

Defendants moved to dismiss the Complaint based on Federal Rules of Civil Procedure 12(b)(6) and 9(b), and the Private Securities Litigation Reform Act ("PSLRA").

### A. General Motion to Dismiss Standard

Under Rule 12(b)(6), the Court accepts UPR's factual allegations as true and draws inferences from the Complaint in the light most favorable to UPR. *Ashcroft v. Iqbal*, 556 U.S. 662, 696 (2009). However, "conclusory allegations, unwarranted deductions of facts or legal

conclusions masquerading as facts will not prevent dismissal." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).

### B. Rule 9(b) and the Private Securities Litigation Reform Act

The Complaint is subject to the heightened pleading requirements of Rule 9(b) and the PSLRA. *Mizzaro*, 544 F.3d at 1238. Rule 9(b) requires that a complaint set out "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Id.* at 1237.

In addition, in 1995 Congress enacted the PSLRA "[a]s a check against abusive litigation in private securities fraud actions." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 308 (2007). The PSLRA made two key changes to securities fraud cases. First, the law shifted the particularity requirement, mandating that a complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Second, the PSLRA raised the pleading requirement for scienter such that a "complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). These changes were designed to stop baseless suits at the earliest stage in a litigation. *Waterford Twp. Gen. Emps. Ret. Sys. v. BankUnited Fin. Corp.*, No. 08-CIV-22572, 2010 WL 1332574, at *13 (S.D. Fla. Mar. 30, 2010). *See generally In re KLX*, 232 F. Supp. 3d at 1274–75.

### C. Judicial Notice

In analyzing a motion to dismiss in a securities fraud case, the Court may consider the full text of documents incorporated by reference in the complaint and other documents as to which the Court may take judicial notice. *Tellabs*, 551 U.S. at 322. In particular, the Court may consider the full text of securities filings alleged to contain misstatements. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1276–81 (11th Cir. 1999) (noticing SEC filings). Documents incorporated by reference may be considered if they are central to a plaintiff's claim and undisputed. *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005); *see also Harris v. Ivax Corp.*, 182 F.3d 799, 802 n.2 (11th Cir. 1999). Here the Court considers the full contents of Ocwen's securities filings, press releases, and other items referenced in the Complaint.

### III. UPR FAILS TO PLEAD ACTIONABLE MISSTATEMENTS OR OMISSIONS

A particular statement is a "misrepresentation" under Section 10(b) and Rule 10b-5 if "in the light of the facts existing at the time of the [statement] . . . [a] reasonable investor, in the exercise of due care, would have been misled by it." *IBEW Local 595 Pension and Money Purchase Pension Plans v. ADT Corp.*, 660 F. App'x 850, 857 (11th Cir. 2016) (quoting *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1305 (11th Cir. 2011)). To be actionable under the securities laws, misrepresentations and omissions must also be "material." 17 C.F.R. § 240.10(b). A statement is "material" if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *SEC v. Morgan Keegan & Co., Inc.*, 678 F.3d 1233, 1245 (11th Cir. 2012) (quoting *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 455 (1976)). A duty of disclosure only arises when an "omitted fact was necessary to render a preexisting statement not misleading, or because securities law otherwise required its

disclosure." *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 681 (11th Cir. 2010). Here, the Complaint fails to satisfy this standard.[2]

### A. Non-Actionable Puffery

Puffery consists of "generalized, non-verifiable, vaguely optimistic statements." *Mogensen v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1211 (M.D. Fla. 2014). Because "reasonable investors do not base their investing decisions on corporate 'puffery' . . . courts both within and outside of this circuit have agreed that such statements are immaterial as a matter of law and therefore inactionable." *Id.* UPR pleads that Defendants "made materially false and misleading statements and omissions, meant to convince the market that Ocwen was turning over a new leaf and that its history of mortgage servicing misconduct was a thing of the past." DE 79 at 4. According to Defendants, these statements, which are in Exhibit 1 attached to their Motion to Dismiss, are merely puffery. *See* DE 72-2. Generally, the statements consist of Ocwen representing its expectations concerning its compliance management systems and deficiencies, and statements where Ocwen describes itself as a leader compared to its peers. Examples include "[w]e take all compliance examinations and findings seriously, and we are committed to correcting any deficiencies remediating any borrower harm and improving our compliance management systems and customer service," DE 67 ¶ 39, and "we have taken a leading role in helping to stabilize communities most affected by the financial crisis. We intend to continue to play a leading role in helping homeowners," *id.* ¶ 149. As the Defendants noted at the hearing on the Motion to Dismiss, the Defendants never "represented that Ocwen was in compliance [with regulations]. . . . It was subject to, among other things, two ongoing monitorships that were put

---

[2] Although the Court's Order does not proceed statement by statement, the Court has considered each statement that Plaintiff alleges was a material misrepresentation or omission. In this Order, the Court uses examples from the Complaint and relies on Defendants' exhibits which categorize the statements in Plaintiff's Complaint.

in place in order to remediate Ocwen and bring it back ultimately into compliance." Apr. 16, 2018 Hr'g Tran. at 19. Plaintiff did not refute this. Rather, Plaintiff argued that "the essence of the false and misleading statements and admissions alleged is that the Defendants portrayed that Ocwen was making progress toward remediation while they knew remediation was impossible as they described because of technology issues." *Id.* at 29.

The Court agrees with Defendants that the statements in its Exhibit 1, DE 72-2, are "puffery." Ocwen never said it was in compliance with regulations but rather made vague statements about its efforts towards compliance. Vague, generalized or "corporate puffery" are not actionable under the securities laws because "a reasonable investor would not base a decision on such statements." *In re Royal Caribbean Cruises Ltd. Sec. Litig.*, No. 1:11-22855-CIV, 2013 WL 3295951, at *12 (S.D. Fla. Apr. 19, 2013); *see also Mogensen*, 15 F. Supp. 3d at 1211 ("[C]ourts both within and outside of this circuit have agreed that such statements are immaterial as a matter of law and therefore inactionable.").

**B. Non-Actionable Forward-Looking Statements**

Defendants also argue that many of the statements cited by UPR in its pleading, in addition to constituting puffing, are also forward-looking statements protected by the PSLRA's safe harbor. For example, the Complaint alleges that Ocwen falsely represented that it "expected 'to continue to be profitable and generate strong operating cash flow,'" *id.* ¶ 151; is "committed to correcting any deficiencies, remediating any borrower harm, and improving our compliance management systems and customer service," *id.*, and it "want[s] to resolve [its] remaining legacy, regulatory, and legal concerns," *id.* ¶ 222.

Under the PSLRA, a 10b-5 plaintiff may not bring claims challenging optimistic "forward-looking statements that prove false if the statement[s are] 'accompanied by meaningful

cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.'" *Harris v. Ivax Corp.*, 182 F.3d 799, 803 (11th Cir. 1999). "Forward-looking" statements include representations concerning management's future plans and objectives and statements concerning future economic performance. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1276 n.7 (11th Cir. 1999) (citing 15 U.S.C. § 78u-5(i)(1)(B) & (C)). They also include statements that have a "forward-looking basis . . . combined with historical or present facts." *In re KLX*, 232 F. Supp. 3d at 1280 (safe harbor shielded statement that "despite these headwinds, we did make important progress in adding resources and assets, gain market share and maximize future revenue growth opportunities").

The Court agrees with Defendants that the alleged statements set forth in Exhibit 2 of their Motion are forward-looking. *See* DE 72-3. These statements either reflect management's future plans and objectives or offer predictions concerning Ocwen's future economic performance. *Cf. In re Australia & New Zealand Banking Grp. Ltd. Sec. Litig.*, No. 08-civ-11278, 2009 WL 4823923, at *11–12 (S.D.N.Y. Dec. 14, 2009) (statement that "[w]e will continue to work in cooperation with our regulators on this issue" was non-actionable, forward-looking statement).

Sufficient cautionary language accompanied these forward-looking statements.  Ocwen repeatedly particularized in its public filings the many factors that could affect whether Ocwen's actual results would diverge from Ocwen's expectations, including (i) "adverse effects on our business as a result of regulatory settlements;" (ii) "uncertainty related to claims, litigation and investigations brought by government agencies and private parties;" (iii) "adverse developments in existing legal proceedings or the initiation of new legal proceedings;" (iv) "ability to

10

effectively manage [ ] regulatory and contractual compliance obligations;" (v) "uncertainty related to the ability of [ ] technology vendors to adequately maintain and support our systems;" and (vi) "ability to maintain [ ] technology systems and [ ] ability to adapt such systems for future operating environments." *See*, *e.g.*, DE 72-14 at 6 & DE 72-20 at 6. Ocwen provided detailed warnings concerning the risks that technology failures may occur and furnished specific examples of past and potential technological pitfalls. DE 72-14 at 34; DE 72-20 at 31.

Ocwen provided sufficient cautionary language to alert a reasonable investor, when making investment decisions, not to rely on Ocwen's forward-looking representations. In *Phila. Fin. Mgmt.*, 572 F. App'x 713 (11th Cir. 2014), the court held that purported false statements concerning a mortgage servicer's financial outlook were not actionable in light of "risk factors" contained in the servicer's securities filings, including "legislation or other changes in the regulatory environment, particularly those impacting the mortgage default industry." *Id.* at 717. And in *Ehlert v. Singer*, 245 F.3d 1313 (11th Cir. 2001), the court found no 10b-5 violation in light of cautionary language accompanying forward-looking statements, and held that "the warnings actually given were not only of a similar significance to the risks actually realized, but were also closely related to the specific warning which Plaintiffs assert should have been given." *Id.* at 1320. Here, Ocwen's cautionary language was not only "of a similar significance to that actually realized;" the cautionary language described the "precise risks that came to pass." Defendants also noted at the hearing that investors buying during the Class Period were aware of Ocwen prior regulatory problems and the settlements that Ocwen had entered into with its regulators and that "during the class period the company is constantly repeatedly reminding investors" of the restrictions placed on Ocwen due to these regulatory settlements. Apr. 16, 2018 Hr'g Tran. at 16–18.

### C. Non-Actionable Statements of Opinion

Defendants also argue that some of the representations on which UPR bases its 10b-5 claim, collected at Exhibit 3 to Defendants' motion, concern non-actionable opinions or beliefs. *See* DE 72-4. One example is "***We believe*** that our competitive strengths flow from our ability to control and drive down delinquencies through the use of proprietary technology and process and our lower cost to service." DE 67 ¶ 147.

A statement of opinion is actionable under 10b-5 only if: "(1) the opinion expressed was not sincerely held or (2) the statement included an embedded statement or statements of untrue facts." *In re Ocwen*, 2015 WL 12780960, at *4.

UPR contends that these statements are actionable opinions because Defendants did not actually believe their representations. The Complaint, however, does not sufficiently allege with the particularity required by Rule 9(b) and the PSLRA that Defendants did not believe the statements in question or lacked a basis for forming the stated opinions. *Cf. In re CIT Grp. Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 690 (S.D.N.Y. 2004) ("[S]tatements about defendants' belief in the adequacy of loan loss reserves could be actionable," but only "if it is alleged that defendants did not actually believe the loan loss reserves were adequate, or if defendants had no reasonable factual basis for their belief."). Defendants are not alleged to have said that they believed REALServicing was perfect or that Ocwen's REALServicing platform was compliant. Ocwen stated only that the company (i) "believe[d] its significant investments in [its] servicing operations, risks and compliance infrastructure over recent years will position us favorably relative to our peers;" (ii) "expect[s] the next round of results" to show that "we have made progress" in improving its compliance monitoring; and (iii) is "invested heavily in compliance and risk management. We believe these operations are now mature and delivering improved controls and results." *See* DE 72-4.

### D. Statements on their Face Not False

Other statements on which UPR tries to base its 10b-5 claim on their face simply are not false. For example, UPR alleges that Ocwen lied in stating that "a borrower who has their loan serviced by Ocwen has a much better chance of avoiding foreclosure than if their loan was serviced by any other company." DE 67 ¶¶ 220, 232. The Complaint does not allege that borrowers did not have a better chance of avoiding foreclosure if their mortgages were serviced by Ocwen. UPR also alleges that Defendants misstated that Ocwen employed "three lines of defense" to manage its compliance risks and controls. Yet UPR does not allege that Ocwen did not employ those three lines of defense. *Cf. Phila. Fin. Mgmt.*, 2011 WL 4591541, at *14 (statement by mortgage servicer concerning its "efficient" and "accurate" foreclosure process not actionable, in part because "[n]owhere do Plaintiffs allege that [defendant servicer's systems] did not improve the firm's efficiency and accuracy in processing foreclosures"). UPR likewise pleads that Defendants falsely stated that Ocwen is a "leader in the servicing industry in foreclosure prevention and loss mitigation that helps families stay in their homes and improves financial outcomes for investors." DE 67 ¶ 153. Ocwen's filings containing that statement explained that Ocwen's industry leadership is evidenced by having "completed over 559,000 loan modifications since January 2008" and "20% of all HAMP-sponsored modifications, 45% more than the next highest servicer," according to data made public by United States Treasury's Making Homes Affordable program. DE 72-10 at 4. UPR does not challenge these statistics.

### E. Non-Actionable Statements Concerning Mismanagement and Regulatory Compliance

Alternatively, the Court agrees with Defendants that the Complaint improperly tries to re-cast Ocwen's supposed mismanagement and regulatory failures as false statements under 10b-5. The Supreme Court has observed that "Congress by [Section] 10(b) did not seek to regulate

13

transactions which constitute no more than internal corporate mismanagement" and that allowing mismanagement claims to proceed under 10b-5 would pose a "danger of vexatious litigation which could result from a widely expanded class of plaintiffs under Rule 10b-5." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 478–79 (1977). "Where the incremental value of disclosure is solely to place potential investors on notice that management is culpable of a breach of faith or incompetence, the failure to disclose does not violate the securities acts." *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 640 (3d Cir. 1989).

The Complaint pleads that Ocwen's REALServicing technology platform was "so fraught with deficiencies that it could not properly function as a system of record" and that "Ocwen's reliance on REALServicing causes disastrous results for borrowers." DE 67 ¶¶ 44–62. UPR goes on to describe Ocwen's purported "mishandling of borrower payments, escrow accounts, hazard insurance, private mortgage insurance, borrower complaints, notices of error, and foreclosures." *Id.* ¶¶ 62–81. Under *Santa Fe*, a 10b-5 action cannot be predicated on these allegations of mismanagement. In *Cutsforth v. Renschler*, 235 F. Supp. 2d 1216 (M.D. Fla. 2002), purchasers of the common stock of a pharmacy services company brought a securities fraud class action against the company and its officers. The shareholders contended that "virtually from its inception, [the company's] growth strategy was a failure and that the defendants knew it." *Id.* at 1225. The shareholders further claimed that defendants failed to disclose "severe problems integrating the computer systems of [companies it acquired]," "inadequate billing of customers or pursuing accounts receivables," and problems "integrating the Company's computer system with the systems of acquirees and managing regional pharmacy networks efficiently." *Id.* at 1243. The court dismissed plaintiffs' 10b-5 claim because plaintiffs alleged nothing more than undisclosed corporate mismanagement and misconduct. *Id.* at 1242.

14

UPR also tries to fashion a 10b-5 claim by identifying purported misstatements concerning Ocwen's expectations that the company would meet its regulatory obligations even though Ocwen supposedly could not do so in light of its purported mismanagement of REALServicing. *See*, *e.g.*, DE 67 ¶ 151 ("[W]e expect the next round of results from the National Mortgage Settlement monitor to show that we have made progress in improving our internal testing and compliance monitoring"); *id.* ¶ 161 ("We are not aware of any pending or threatened actions to suspend or revoke any state licenses")). Companies have no obligation under 10b-5 to predict accurately future regulatory action. In *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377–78 (S.D.N.Y. 2004) (holding that "Defendants' failure to disclose all possible future litigation is not actionable under Section 10(b)"). *Id.* at 377–78. Accordingly, UPR's references to certain purported misstatements concerning mismanagement and regulatory management do not state a 10b-5 claim.[3]

### IV. UPR'S SECONDARY CLAIM FAILS

Because UPR failed to plead adequately a violation of Section 10(b) and Rule 10b-5, UPR's claim that the Individual Defendants are liable as "control persons" under Section 20(a) of the Securities Exchange Act necessarily fails as well.

---

[3] To the extent UPR is claiming on account of Defendants' supposedly false statements that Ocwen falsely represented in its Forms 10-Q of 2014 that the company's "disclosure controls and procedures . . . were operating effectively," *see*, *e.g.*, DE 67 ¶ 172, or that Defendants violated 10b-5 because they allegedly violated Item 303 or GAAP, these bootstrapped claims are likewise dismissed. As the Court has found above, the underlying representations upon which such claims are based are not actionable. *See In Re KLX*, 232 F. Supp. 3d at 1279 ("In the Eleventh Circuit [ ] 'allegations of violations of . . . GAAP, standing alone, do not satisfy the particularity requirement of Rule 9(b)'") (internal citation omitted); *Cutsforth*, 235 F. Supp. 2d at 1260 ("[T]he failure to follow GAAP is, by itself, insufficient to state a securities fraud claim.") (citation omitted); *Ash v. PowerSecure International, Inc.*, No. M-21-67, 2015 WL 5444741, at *11 (E.D.N.C. Sept. 15, 2015) ("Item 303 is not a magic black box in which inadequate allegations under Rule 10b-5 are transformed, by means of broader and different SEC regulations, into adequate allegations under Rule 10b-5.").

## V.      CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss is **GRANTED**. Because amendment would not cure the infirmities inherent in the Complaint and UPR has had adequate opportunity to amend its pleadings, Lead Plaintiff's Complaint is **DISMISSED WITH PREJUDICE**. The Clerk of Court shall **CLOSE** this case.

**DONE AND ORDERED** in chambers, West Palm Beach, Florida, this 27th day of April, 2018.

ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

Copies furnished to: All counsel of record via CM/ECF